# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS

| | |
|---|---|
| **ARWYN HEILRAYNE**, **CITLALLI SOTO-FERATE, ILIANA MEDRANO,** and **MIA CISCO**<br><br>Plaintiffs,<br><br>v.<br><br>**UNIVERSITY OF TEXAS AT AUSTIN** and the **UNIVERSITY OF TEXAS SYSTEM BOARD OF REGENTS**, and its members **KEVIN ELTIFE, JANIECE LONGORIA, JAMES WEAVER, CHRISTINA MELTON CRAIN, JODIE LEE JILES, KELCY WARREN, NOLAN PEREZ, STUART STEDMAN**, and **ROBERT GAUNTT**, in their individual and official capacities;<br><br>**JAY HARTZELL**, in his individual capacity and official capacity as the President of the University of Texas at Austin;<br><br>**GREG ABBOTT**, in his individual capacity;<br><br>**HECTOR LUEVANO, ADAN ZAVALA, JOHN DOE SUPERVISING UTPD OFFICERS A** and **B, ROBERTO RODRIGUEZ, REYNALDO ADAME, L. HENRY, & JOHN DOE UTPD OFFICERS A-I**, in their individual capacities; and<br><br>**CHRISTOPHER WRAY & JOHN DOE DPS OFFICERS A-E**, in their individual capacities,<br><br>Defendants. | Case No.: 1:25-cv-00640<br><br>**COMPLAINT**<br><br>JURY TRIAL DEMANDED |

## INTRODUCTION

1.      This is a civil rights action challenging the unlawful arrests and retaliatory discipline imposed on Plaintiffs, a group of students and peaceful demonstrators at the University of Texas at Austin ("UT Austin"), for their participation in a Palestine solidarity protest on April 24, 2024. Plaintiffs bring this action under 42 U.S.C. § 1983 for violations of their rights under the First and Fourth Amendments to the United States Constitution, as well as under Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d.

2.      On April 24, 2024, Plaintiffs joined a nationwide student movement advocating for Palestinian liberation and protesting U.S. support for Israel's genocidal assault on Gaza, including their universities' investments in weapons manufacturing. The protest, organized by the Palestine Solidarity Committee ("PSC"), was peaceful and intended to express political speech, a core right protected by the First Amendment.

3.      Defendants, acting under color of Texas law, unlawfully targeted and arrested Plaintiffs based on the viewpoint they expressed. Defendants also subjected Plaintiffs to retaliatory disciplinary measures, including campus bans, administrative holds, and threats of suspension, in an effort to chill their speech and deter further advocacy.

4.      Plaintiffs were subjected to unconstitutional restrictions on their right to assemble, targeted arrests without probable cause, and violent police tactics that resulted in injuries, trauma, and long-term academic and professional consequences. The University's actions, in collaboration with Texas state officials and law enforcement, were driven by viewpoint discrimination and hostility towards Plaintiffs' pro-Palestine advocacy and their association with Palestinians.

5.      Defendants' conduct was part of a broader pattern of suppression against students engaging in Palestine solidarity protests nationwide. The University's actions—disrupting the

protest, coordinating with law enforcement to preemptively shut down speech, and imposing disciplinary consequences—were designed to stifle political expression critical of U.S. and Israeli policies and the University's financial role therein.

6.      By targeting Plaintiffs for disproportionate punishment following a peaceful and nondisruptive protest, Defendants, in their official capacities, discriminated against Plaintiffs on the basis of national origin due to their associations with and advocacy for Palestine in violation of their obligations under Title VI of the Civil Rights Act.

7.      Plaintiffs seek declaratory and injunctive relief to reverse the disciplinary measures imposed against them, as well as compensatory and punitive damages for the violations of their constitutional rights. Plaintiffs also seek attorney's fees and costs pursuant to 42 U.S.C. § 1988.

## JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 because this action arises under the First and Fourth Amendments to the United States Constitution and Title VI of the Civil Rights Act of 1964. This Court also has jurisdiction under 28 U.S.C. § 1343 because the action seeks to address the deprivation of civil rights under 42 U.S.C. § 1983.

9.      Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) because the events that give rise to this action occurred in this district.

## PARTIES

**I.    Plaintiffs**

10.     **Arwyn Heilrayne** (she/they) is a second-year student at UT Austin, majoring in Theater Education. She intends to continue her activism in the future but is fearful of further retaliation.

11.     **Iliana Medrano** (she/her) is a recent graduate of UT Austin and a current Austin resident. She received her master's degree in social work from UT Austin's Steve Hicks School of Social Work in August 2024. She intends to continue her activism in the future but is fearful of further retaliation.

12.     **Citlalli Soto-Ferate** (she/they) is a recent graduate of UT Austin and a current Austin resident. She graduated in spring 2024, with degrees in Health and Society, and Race, Indigeneity, and Migration. She also earned a minor in Health Communications. She intends to continue her activism in the future but is fearful of further retaliation.

13.     **Mia Cisco** (she/her) is a Ukrainian American third-year student at UT Austin. She is majoring in Health Promotion and Behavioral Science, with a minor in Africa and African Diaspora Studies. She is Muslim and frequently wears a hijab. She intends to continue her activism in the future but is fearful of further retaliation.

## II.   Defendants

14.     The **University of Texas at Austin** is a public research university located in Austin, Texas. It is one of the largest universities in the United States, with a diverse and vibrant student body. At all times relevant, the University of Texas at Austin operated under the governance of the University of Texas System Board of Regents and under color of the laws of the State of Texas.

15.     The **University of Texas System Board of Regents** is the governing body overseeing the University of Texas at Austin and other institutions within the University of Texas System. The Board of Regents consists of nine members appointed by the Governor of Texas, with the advice and consent of the Texas Senate, for staggered six-year terms. The Board is responsible for setting policies, approving budgets, and ensuring the effective management and operation of

the institutions under its governance. At all times relevant, the Board of Regents exercised its authority under color of the laws of the State of Texas.

16.     **Jay Hartzell** is the president of UT Austin who directed the University's response to the April 24th protest at issue in this case. At all times relevant, Defendant Hartzell was acting within the scope of his employment as President of UT Austin and under color of the laws of the State of Texas. He is sued in his individual and official capacity.

17.     **Greg Abbott** is the Governor of the State of Texas. Defendant Abbott directed DPS to respond to the April 24th protest at issue in this case and ordered the mass arrest of protesters based on viewpoint animus. At all times relevant, Defendant Abbott was acting under color of the laws of the State of Texas. He is sued in his individual capacity.

18.     **Hector Luevano, Adan Zavala, and John Doe Supervising UTPD Officers A and B** are commanders, inspectors, captains, lieutenants, or sergeants within the University of Texas Police Department ("UTPD") that were present at the April 24th protest at issue in this case. At all times relevant, Supervising UTPD Defendant Officers were acting within the scope of their employment as UTPD commanders, inspectors, captains, lieutenants, or sergeants and under color of the laws of the State of Texas. They are sued in their individual capacities.

19.     **Roberto Rodriguez, Reynaldo Adame, L. Henry, and John Doe UTPD Officers A-I** are officers of UTPD, subject to the supervision of Supervising UTPD Defendant Officers. They were present at the April 24th protest at issue in this case. At all times relevant, all UTPD Defendant Officers were acting within the scope of their employment as UTPD officers and under color of the laws of the State of Texas. They are sued in their individual capacities.

20.     **Christopher Wray** is a commander, inspector, captain, lieutenant, or sergeant within the Texas Department of Public Safety ("DPS") that was present at the April 24th protest at

issue in this case. At all times relevant, Christopher Wray was acting within the scope of his employment as a DPS commander, inspector, captain, lieutenant, or sergeant and under color of the laws of the State of Texas. He is sued in his individual capacity.

21.    **John Doe DPS Officers A-E** are officers of DPS, subject to the supervision of Supervising DPS Defendant Officers. They were present at the April 24th protest at issue in this case. At all times relevant, all DPS Defendant Officers were acting within the scope of their employment as DPS officers and under color of the laws of the State of Texas. They are sued in their individual capacities.

**STATEMENT OF FACTS**

**I.    Events Leading to the April 24th Student Protest at University Texas at Austin**

**A.    Israel's Genocidal Campaign Against the People of Palestine**

22.    The West Bank and Gaza Strip ("Gaza") have been occupied by Israel since 1967.[1] While Israel evacuated settlers from Gaza in 2005, it retained control of Gaza's airspace, sea access, and borders, and imposed a total blockade on the area in 2008.[2]

23.    Following October 7, 2023, Israel waged on Gaza one of the most unrelenting military campaigns in contemporary history. Within four weeks, Israel unleashed over 25,000 tons of bombs, equivalent to about two Hiroshima bombs.[3] More than 50,000 have been killed with almost a third of victims being children.[4] A study published in the medical journal Lancet estimates

---

[1] UNITED NATIONS, *History of the Question of Palestine*, https://www.un.org/unispal/history/.
[2] *Id.*
[3] EURO-MED HUMAN RIGHTS MONITOR, *Israel hits Gaza Strip with the equivalent of two nuclear bombs* (Nov. 2, 2023), https://euromedmonitor.org/en/article/5908/Israel-hits-Gaza-Strip-with-the-equivalent-of-two-nuclear-bombs.
[4] Emma Farge & Nidal Al-Mughrabi, *Gaza death toll: how many Palestinians has Israel's offensive killed?* REUTERS (Mar. 25, 2025), https://www.reuters.com/world/middle-east/how-many-palestinians-has-israels-gaza-offensive-killed-2025-01-15/.

the death toll to be roughly 40% higher.[5] This figure is only for death from traumatic injuries and does not include deaths from a lack of healthcare or food, or the thousands believed to be buried under rubble.[6] 1.9 million people in Gaza have been internally displaced, some multiple times.[7] 68% of the agricultural land and 66% of housing units have been destroyed, along with most of the health, educational, welfare and heritage facilities and sites.[8]

24.    The U.S. government has long been the primary funder of the Israeli military, providing unparalleled financial aid, advanced weaponry, and political backing that sustain its operations. Israel has received over $250 billion in American taxpayer money.[9]

25.    On January 26, 2024, the International Court of Justice ("ICJ") issued an order responding to South Africa's application against Israel alleging violations of the Convention on the Prevention and Punishment of the Crime of Genocide in Gaza. The ICJ found that Israel's

---

[5] Zeina Janaluddine *et al., Traumatic injury mortality in the Gaza Strip from Oct 7, 2023 to June 30, 2024: a capture-recapture analysis*, THE LANCET (Jan. 9, 2025), https://www.thelancet.com/journals/lancet/article/PIIS0140-6736(24)02678-3/fulltext.

[6] A July 2024 study by the medical journal The Lancet estimates the true death toll could reach more than 186,000 people because the Gaza Ministry of Health's official toll does not take into account thousands of dead buried under rubble and indirect deaths due to the destruction of health facilities, food distribution systems and other public infrastructure. *Gaza death toll 40% higher than official number, Lancet study finds*, THE GUARDIAN (Jan. 20, 2025), https://www.theguardian.com/world/2025/jan/10/gaza-death-toll-40-higher-than-official-number-lancet-study-finds.

[7] DEPT. OF GLOBAL COMMUNICATIONS, UNITED NATIONS, *Gaza: 90 percent of all people have been displaced under dire conditions* (Aug. 28, 2024), https://webtv.un.org/en/asset/k15/k15udfv2p3.

[8] Press Release, United Nations, *67.6% of Gaza's cropland has been damaged: Geospatial data shows intensifying damage to Gaza's agricultural infrastructure – FAO & UNOSAT* (Oct. 3, 2024), https://www.un.org/unispal/document/fao-press-release-03oct24/.

[9] A NEW POLICY, NOT IN AMERICA'S INTEREST: WHY UNCONDITIONAL SUPPORT FOR ISRAEL IS BAD FOR AMERICA, AND BAD FOR AMERICANS (Jan. 2025), https://46959239.fs1.hubspotusercontent-na1.net/hubfs/46959239/ANP%20PAPER%20Not%20in%20America%E2%80%99s%20Interest%201.16.25.pdf.

actions plausibly constituted acts of genocide and ordered Israel to immediately take measures to prevent the commission of genocide in Gaza.[10]

26.     Despite international institutions like the United Nations and the International Court of Justice and international human rights organizations like Amnesty International and Human Rights Watch warning that Israel's actions in Gaza may constitute war crimes and genocide, America's financial and military support has remained unwavering.

### B. The Student Palestine Solidary Movement

26.     Israel's genocidal campaign and U.S. complicity therewith gave rise to a nationwide wave of student-led Palestine solidarity demonstrations at educational institutions. These protests, which began primary on higher education campuses, quickly proliferated across the country, reflecting widespread student outrage at both the United States' support of Israel's war crimes and their own universities' support for such actions through investments in weapons manufacturing and other related enterprises.[11]

27.     Despite frequent claims to the contrary, these protests were peaceful. According to the Armed Conflict Location & Event Data Project, 97% of student Palestine solidarity demonstrations were non-violent.[12]

---

[10] *See* Adil Ahmad Haque & Jasmin Johurun Nessa, *"In the Event of Extreme Urgency": The International Court of Justice Must Indicate New Provisional Measures to Protect Civilians in Gaza*, JUST SECURITY (Mar. 21, 2025), https://www.justsecurity.org/109393/icj-measures-protect-civilians-gaza/.

[11] Between October 7, 2023, and May 30, 2024, there were over 3,700 days of protest at 525 different colleges, universities, and schools in 317 different cities and towns. Jay Ulfelder, *Crowd Counting Consortium: An Empirical Overview of Recent Pro-Palestine Protests at U.S. Schools.*, HARVARD KENNEDY SCHOOL ASH CENTER FOR DEMOCRATIC GOVERNANCE AND INNOVATION (May 30, 2024), https://ash.harvard.edu/articles/crowd-counting-blog-an-empirical-overview-of-recent-pro-palestine-protests-at-u-s-schools/.

[12] Bianca Ho & Kieran Doyle, *US Student Pro-Palestine Demonstrations Remain Overwhelmingly Peaceful*, ACLED (May 10, 2024), https://acleddata.com/2024/05/10/us-student-pro-palestine-demonstrations-remain-overwhelmingly-peaceful-acled-brief/.

28.     Despite the overwhelmingly peaceful nature of these assemblies, student protesters have faced significant retaliation by both university administrators and government entities.[13]

29.     Between April 18, 2024, and July 22, 2024, more than 3,100 people were arrested on college campuses.[14] Police intervention in these peaceful protests has been staggering, increasing by more than *eight* times between March and April 2024.[15] Notably, when protesters have gathered without counter-protesters, police have intervened almost six times as often against pro-Palestine protesters as they have against pro-Israel protesters.[16]

30.     The scale of the student Palestine solidarity movement between October 7, 2023, and April 24, 2024—and the militarized response thereto—form a critical backdrop against which the protest at issue in this Complaint must be understood. Plaintiffs' participation in the national movement for Palestinian liberation must be viewed in the context of this large surge in student activism, which has raised significant First Amendment and civil rights concerns across the country.

31.     As outlined more fully below, this Complaint focuses on the events at UT Austin within that nationwide wave of campus-based Palestine solidarity activism. Plaintiffs' claims necessarily reflect the heightened scrutiny, militarized policing, and administrative controls that pro-Palestine demonstrators have repeatedly encountered at countless educational institutions during this period.

---

[13] *See, e.g.*, Isabelle Taft, *How Universities Cracked Down on Pro-Palestinian Activism*, N.Y. TIMES (Nov. 25, 2024), https://www.nytimes.com/2024/11/25/us/university-crackdowns-protests-israel-hamas-war.html.
[14] The New York Times, *Where Protesters on U.S. Campuses Have Been Arrested or Detained*, N.Y. TIMES (July 22, 2024), https://www.nytimes.com/interactive/2024/us/pro-palestinian-college-protests-encampments.html.
[15] Ho & Doyle, *supra* note 12.
[16] *Id.*

## II.    The April 24th Protest

### A.  Background

32.    Palestine Solidary Committee ("PSC") is part of a nationwide student movement that promotes education, discourse, activism, and awareness of the Palestinian struggle for justice and self-determination through lectures by academics and political activists, movie screenings, events, and other displays.[17]

33.    On April 23, 2024, the PSC chapter at UT Austin posted on their Instagram account a notice of a planned walk-out and protest on the University's main lawn to take place the following day, April 24, 2024.



34.    A post the next day announced a schedule of programming including such things as a teach-in, a study break, and an art workshop. The final event on the program was scheduled for 7:00PM on April 24, 2024.

---

[17] Palestine Solidarity Committee, UTexas HornsLink,
https://utexas.campuslabs.com/engage/organization/palestinesolidaritycommittee.



35.     Plaintiffs came across the announcement on social media and decided to attend as their schedules allowed. Plaintiffs intended to attend the protest between classes and work obligations and to return throughout the day during their free time. All intended to leave at the end of the scheduled programming, around 8PM.

36.     Plaintiffs joined the April 24th protest to express support and solidarity with the Palestinian people, to express political opposition to the U.S. government's support of Israel, and to associate with PSC and its members.

37.     At no point during all relevant times did any plaintiff commit any violent act, disrupt campus activities, or damage any property.

**B.  Timeline of the Protest**

*i.     The Beginning of the Protest & Initial Police Blockade*

38.     A group of approximately 50 to 75 protesters gathered in front of Gregory Gym on East 21st Street at 11:40AM, the scheduled start time of the event, including Ms. Heilrayne. The protest leaders led chants from the gym stairs but only during class passing periods to comply with

university rules. They also refrained from using amplified sound, such as loudspeakers, for the same reason.

39.     After gathering, the plan was to turn right onto East 21st Street and proceed to the lawn for the teach-in and scheduled activities. However, eight to ten police officers, positioned in a line with their bikes, blocked the protesters' path, standing in front of a group of pro-Israel counter-protesters.

40.     The police officers faced the protest group as if guarding the counter-protesters. Then-Dean of Students Brian Davis was seen speaking with the counter-protesters, some of whom shouted slurs, such as "kapo," at anti-Zionist Jewish protesters and urged the police to arrest them.[18]

41.     PSC steering members spoke with police and university officials about an alternate route for the protesters and were instructed to turn south on Speedway. They complied, but upon reaching the edge of campus, they were blocked again by another group of police officers on bikes.

42.     This time, the group remained stationary for fifteen to twenty minutes, chanting and awaiting further instructions. Meanwhile, additional police officers on horseback positioned themselves behind the protesters, blocking their path north.

43.     Eventually, the police removed the barricade, allowing the group to move onto Brazos Street just off campus. However, as soon as they did, police vehicles pulled into the road, blocking their path once again and confining them in the street between the parking garage and Blanton Museum.

---

[18] "Kapo" is the term used to refer to Jewish individuals who were forced to supervise forced labor, among other things, in the Nazi concentration camps.  Some Zionist Jews use the term as a slur against anti-Zionist Jews because they perceive them as "traitors" to the Jewish people.

44.     While blocked by police, the group witnessed what appeared to be hundreds of state troopers in riot gear marching onto campus from the direction of the Capitol.

45.     At approximately 12:30PM, a UTPD officer announced via loudspeaker that the group was violating Penal Code Section 42.03 for obstructing a highway and had two minutes to disperse or face arrest. The officers did not provide any instructions regarding where the students were to go.

46.     The students immediately began complying, walking back onto campus in small groups of three to four along Speedway. Some departed for class or other activities, while others planned to reconvene with the protest group for the scheduled teach-in on the lawn.

47.     After the group dispersed from the Brazos Garage area, two or three police officers were stationed in front of the steps leading to the UT Tower entrance. As students approached the steps to enter the tower, the officers stepped aside to let them through. The officers denied entrance to only two students who approached.  One was a male student wearing a keffiyeh. Another was a a Muslim student wearing a hijab. Moments later, the officers again admitted a different group of students who were not wearing any clothing identifying them as part of the protest or visibly Muslim.

48.     A large contingent of DPS troopers in riot gear, mounted DPS officers, UTPD officers, and APD officers had assembled on Speedway. Meanwhile, most of the protesters who had just dispersed from the Brazos area were still moving away. At the same time, the passing period began, bringing hundreds of unaffiliated students out of class and into the area.

   *ii.*     *The First Arrests & Initial Police Aggression*

49.     At approximately 12:50PM, a student was suddenly arrested while speaking with police and/or university officials. Witnesses reported that multiple UTPD officers approached from

behind, forcibly grabbed his arms, and placed him in zip ties before leading him away. As he was escorted to a UTPD vehicle, the crowd chanted, "Let him go!" Some students attempted to leave the area after the student's arrest but were blocked by police.

50.     After the first arrest, police formed a phalanx in the middle of Speedway and forcefully advanced to clear the area. DPS troopers with batons lined the perimeter, while additional officers on foot, horseback, and in vehicles occupied the center. Police instructed students to move out of the middle of Speedway but did not order them to leave the area entirely.

51.     Most students quickly retreated to the edges of Speedway, gathering on the grassy inclines and stairways on either side. The closest protesters stood just a few feet from the police line, while those higher up on the incline were several yards away. Officers wielding batons struck and pushed students who didn't move quickly enough, knocking down several who were attempting to comply and retreat.

52.     From that point on, police carried out seemingly random arrests of protesters. Without warning, an officer would point at a protester, prompting four to five DPS troopers and other officers to rush forward and forcibly grab them. Some individuals attempted to retreat from the edge of Speedway but were chased up the stairs or incline and arrested.

53.     Several plaintiffs were arrested while attempting to comply with police orders to clear the middle of Speedway.

54.     Notably, moments before Ms. Heilrayne's arrest, a DPS trooper, gathered with other troopers close to where Ms. Heilrayne would be arrested, asked his colleagues, "What are [the students] doing that's illegal? We've been asking this question, but what are they doing that's illegal?" He went on to ask, "What if this was after a game or something? That many people is out . . . after a basketball game. We do this after the Aggie games?" His colleague replied, "No." After

14

this exchange, another trooper finally said, "Alright, let's shit or get off the pot" and asked, "Which one are we going after?" Students were indicated and the arrests began.

### iii.    *Earlier-Arrested Plaintiffs' Experiences*

#### a)   Arwyn Heilrayne

55.    After dispersing from the Brazos Garage area, Ms. Heilrayne was heading to her next class via Speedway when the police phalanx formed and chaos erupted. She stepped back onto the grass beside Speedway to observe. Around 1:15PM, four to five officers rushed at her, grabbed her shoulders, and pushed down on her arms, knocking her to the ground before pulling her up and behind the police line. They twisted her arms behind her back, causing significant pain, and held her in that position for about a minute before securing her in zip ties. Ms. Heilrayne was wearing a Palestinian keffiyeh at the time of her arrest.

56.    After her arrest, Ms. Heilrayne was held behind the police line for about ten minutes. Her zip ties were excessively tight, and despite repeatedly asking officers to loosen them, she was ignored—even after she reported losing feeling in her hands. She began hyperventilating and experiencing a panic attack. During this time a journalist captured a photo of her, which quickly went viral, bringing her massive amounts of unwanted attention.



57.    After being arrested and detained, Ms. Heilrayne was placed in a police sedan, where she overheard officers mention a quota of 50 student arrests. She was then transported to Sutton Hall, where a processing center had been set up in the basement. While searching her backpack, officers discarded some of her belongings. Still panicking and hyperventilating, she had to beg for water.

b)  Citlalli Soto-Ferate

58.    Ms. Soto-Ferate arrived at Speedway around 1:00PM after her class was dismissed and stood at its edge. She assisted other protesters in complying with police orders by warning them to clear the middle of Speedway. Around 1:30PM, she saw a group of protesters across the street between Gregory Gym and the McCombs building as police continued pushing people backward toward McCombs. She spotted someone she knew by McCombs, standing with her back to a group of officers.

59.     As Ms. Soto-Ferate walked over to warn her friend to move, both were arrested by separate groups of three to four officers. Due to the officer's rough handling, Ms. Soto-Ferate experienced arm and shoulder pain for a week following her arrest.

60.     After their arrest, Ms. Soto-Ferate was detained by police for about ten minutes. During this time, she was held on Speedway just feet away from several police horses, which appeared increasingly agitated as the crowd grew and tensions rose. Fearing she might be trampled, she repeatedly asked to be moved farther away.

61.     Ms. Soto-Ferate was placed in the back of a large police transport van. While inside, she overheard an officer in the front say they needed to arrest eight more people to meet their quota of ten.

*iv.     Continued Police Escalation*

62.     As violence and chaos escalated on Speedway between 1:00 and 2:00PM, large numbers of police and protesters gathered on the South Mall. Police formed a line on the north side of the lawn, with DPS Bike Unit officers in front using their bikes as a barrier. Behind them stood additional DPS troopers, UTPD officers, and APD officers. In response, protesters linked arms to form a protective line.

63.     Over the next few hours, DPS officers used their bikes to physically push students south and west across the lawn while continuing to make arbitrary arrests. As more protesters joined throughout the afternoon and journalists and bystanders gathered, the crowd became increasingly compressed on the west side of the lawn. Police issued no verbal instructions on restricted areas, leaving protesters uncertain about where they were being pushed.

*v.     Later-Arrested Plaintiffs' Experiences*

   a)  Iliana Medrano

64.     Ms. Medrano joined the protest around 12:45 pm and made her way to the South Mall, standing in front of the student crowd with arms linked with those beside her. The line of DPS officers repeatedly pushed their bikes into her, attempting to force the crowd back. However, with the dense crowd behind them, there was nowhere to move. Several people were knocked to the ground.

65.     Around 3:00PM, a group of police officers rushed at Ms. Medrano, forcefully pulling her right arm and bringing her to the ground facedown. As she fell, her dress rode up, exposing her behind and undergarments. She pleaded with the officers restraining her to pull her dress down to preserve her modesty, but they ignored her. For about a minute, multiple officers held her down, and one pressed down on her neck, as shown in the image below.



66.     While restraining Ms. Medrano on the ground, police pulled her arms behind her and secured her wrists with zip ties, tightening them as much as possible. Despite repeatedly requesting they be loosened and warning that she was losing feeling in her hands, officers did not

adjust them for at least two hours. She also requested medical attention in jail after being arrested and was denied. Her left hand remained numb for several days. A doctor examined her the following day and diagnosed her with a nerve compression injury in her left wrist and thumb caused by the zip ties, along with bruising on both arms, as shown in the images below.







b) Mia Cisco

67.     Ms. Cisco joined the protest later in the afternoon on the South Mall, arriving to a massive police presence using bikes as a barrier to push protesters back—though it was unclear where they were being directed. She did not hear any dispersal orders or instructions from police while she was there.

68.     Every few minutes, an officer would point at a protester, prompting a group of 4 or 5 officers to rush out from behind the bike line and make an arrest. Ms. Cisco observed that many of the arrests were unnecessarily brutal, with multiple officers tackling protesters who were not resisting.

69.     While at the protest, Ms. Cisco spoke with Defendant Wray, attempting to ask why police were present and why protesters were being arrested. In response, Wray expressed disdain for the protesters' cause and made unsolicited remarks about Palestine, Islam, and the Middle East. He referenced "Hamas tunnels," voiced his hatred for Hezbollah, and claimed that "no Muslim country supports Palestine."

70.     Ms. Cisco was arrested sometime after 4:00PM after being pushed behind a barricade by a line of police officers on bicycles. Four or five officers grabbed her, placed zip ties

on her, and restrained her. As she stood unable to move, a pro-Israel counter-protester approached within inches of her face and shouted, "Am Yisrael Chai." The arresting officer did not react.

71.     Like the others, Ms. Cisco's zip ties were extremely tight, and she repeatedly requested they be loosened. Hours later, while at the jail, officers attempted to adjust them but found them so tight that they couldn't fit a scissor blade in to cut them off. She was left with welts on her wrists and hands.

72.     While being processed for transport, an unidentified male officer removed Ms. Cisco's hijab. She immediately informed the police that it was religious garb and repeatedly pleaded for its return throughout her time in the van. She did not receive it back until later at the jail.

73.     While being transported in the police van, Ms. Cisco overheard officers discussing the need to meet a numerical quota of arrests.

   *vi.*   *The End of the Protest*

74.     At approximately 5:25PM, UT issued a dispersal order through the UT Safety Alert system via email, text, the campus emergency PA system, loudspeakers, and social media. The Safety Alert email, sent by Assistant Chief Ashley Griffin, informed occupants of the South Mall that they were ordered to disperse and that their conduct violated the following Penal Code sections: 42.01 (Disorderly Conduct), 42.02 (Riot), and 42.03 (Obstructing a Highway or Other Passageway).

75.     By shortly after 6:00PM, most protesters and police had dispersed. Once the police left, a smaller group of protesters returned to the South Mall and continued activities, including short speeches, until about 7:00PM.

**C.  Aftermath and Student Discipline**

76.     Each plaintiff was initially charged with Criminal Trespass and booked into Travis Country Jail. On April 26, 2024, the Travis County District Attorney announced that all charges against the 57 protesters arrested at the demonstration had been dropped due to a lack of probable cause.[19]

77.     On April 25, 2024, the day after the protest, UT sent an email notice and posted flyers (shown below) stating that students involved in the protest were prohibited from campus. The following morning, April 26, 2024, Brian Davis initially confirmed the flyers' accuracy, stating that arrested students were banned from campus for any reason. This announcement caused significant distress, as it was the last week of the semester and finals were set to begin the following week.

78.     A few hours later, Davis amended the policy, allowing arrested students on campus for academic purposes. By Friday evening, UT released a statement fully revising its earlier position, permitting arrested students to return for any reason. Despite this reversal, many students remained confused about their status and feared they could be arrested again for coming to campus.

---

[19] *See, e.g.*, Pooja Salhotra, *Travis County rejects all criminal trespass charges against 57 people arrested at UT-Austin protest*, TEXAS TRIBUNE (Apr. 26, 2024), https://www.texastribune.org/2024/04/25/ut-austin-palestinian-arrests-criminal-cases/.

**NOTICE**

The freedom to speak and peacefully assemble is a cornerstone of the University's identity as a world-class university. It's not just a privilege, but a responsibility we all share in fostering an environment where diverse ideas can thrive. Individuals on campus are free to:

- **Assemble peacefully to protest**
- **Hand out flyers and brochures**
- **Invite guest speakers to present in common outdoor areas**
- **Engage with staff members if they need assistance or have questions**

This freedom comes with the duty to respect our students' right to learn and move freely and the University's operational needs. All individuals on campus must follow the Institutional Rules, Operating Procedures, and laws. Individuals may not:

- **Disrupt the operations of the university, including but not limited to:**

  - Making loud sounds that interfere with learning; teaching, or other official actions; blocking entrances, exits, and walkways; calls for immediate lawless behavior, and vandalism.

- **Camp or attempt to camp on university property  (including bringing tents on campus and sleeping on university property, with or without a tent, later than 10:00 p.m.)**
- **Refuse to identify themselves to university officials or law enforcement**
- **Refuse to comply with directions given by university officials or law enforcement**
- **Use amplified sound without prior approval**
- **Wear masks or disguises**
- **Coerce attention by following students walking away from the protest**
- **Coming to campus without authorization including instances where a person is subject to a criminal trespass warning or arrested for criminal trespass. Returning to campus while under a criminal trespass warning will result in your arrest/re-arrest.**

Those who violate these or any other rule, policy, or law are subject to immediate removal from campus, conduct charges, or arrest.

**EVERYONE MUST LEAVE THE MAIN MALL OR OTHER UNIVERSITY PROPERTY NO LATER THAN 10:00 P.M.**

---

79.    On June 14, each plaintiff received a notice from UT stating they faced academic discipline for participating in the protest. The notices stated, "On Wednesday, April 24, 2024, the student participated in an event that disrupted/interfered with operations and violated university rules and policies. Multiple University officials told the group to disperse numerous times, but participants refused to follow these orders. To gain compliance and eliminate the disruption,

officials had to remove the student and others from campus involuntarily." Each plaintiff was accused of the following rule violations:

> 11-402(a)(19)(a) Failure to Comply - failure to comply with the directives of any university official(s) acting in the performance of their duties, and who has the authorization to issue such directives.

> 11-402(a)(18)(a) Disruptive Conduct - engages in conduct that interferes with or disrupts any teaching, research, administrative, disciplinary, public service, learning, or other authorized activity.

80.    UT student disciplinary proceedings do not entitle students to a hearing. Instead, students were instructed to submit a written statement addressing the allegations, due by 5:00PM on June 26, 2024—less than two weeks later. The notice directed them to respond to the following prompts in their statement:

- Describe the events that led up to your removal from campus.

- Why did you not disperse?

- In your view, is it appropriate to engage in conduct that prevents universities from performing their daily functions? Please explain your answer.

- In your view, is it appropriate to occupy a space on campus in a way that excludes other students? Please explain your answer.

- In your view, is it appropriate to create encampments in spaces on campus?

- In your view, is it appropriate to ignore university policies regarding restrictions regarding the time, place, and manner in which a person is permitted to engage in expressive conduct on campus?

- Do you agree that your conduct on the day in question was disruptive and/or interfered with teaching, research, administrative, disciplinary, public service, learning, or other authorized activity? Please explain your answer.

- Did you intend to be disruptive and/or interfere with teaching, research, administrative, disciplinary, public service, learning, or other authorized activity? Please explain your answer.

- If given the ability to relive the day in question, would you do anything differently? Please explain your answer.

- What would you tell a fellow student who had their lives or education negatively impacted by your conduct?

- How did you learn about the event on the day in question?

- Is there any other information you would like us to consider?

81.     Plaintiffs strongly objected to the prompts, believing they presupposed guilt and were based on inaccurate depictions of the protest and their actions. Several students facing disciplinary charges sought legal advice and were warned that any response could be used against them if criminal charges were refiled. As a result, some plaintiffs chose not to respond to the disciplinary charges, despite wanting to, due to fear of self-incrimination or difficulty securing legal counsel within the short response period.

82.     Each student's disciplinary packet contained identical charges and largely the same supporting evidence: UTPD's Reporting Officer Narrative, two screenshots of PSC's Instagram posts about the event, and three photos of tents on a lawn—none of which depicted Plaintiffs. However, each plaintiff had at least one Case Supplement Report in their packet, seemingly containing additional UTPD information specific to their involvement. Plaintiffs' disciplinary packets are attached as Exhibits 1-4.

83.     In July, each plaintiff received notice that they had been found responsible for the alleged conduct violations. Ms. Heilrayne, Ms. Soto-Ferate, and Ms. Medrano, were "offered" a

disciplinary sanction of deferred suspension from UT. Under this offer, the suspension would not take effect, and neither the charge nor the punishment would appear on their final transcript. Students would also have to agree in writing that any future violations of university rules would result in a suspension. Accepting the offer would formally conclude the student conduct process, during which students had been unable to register for classes or obtain transcripts due to administrative holds. Ms. Cisco was offered a sanction of academic probation for one year.

84.    If a student declined the offer and attempted to appeal but was unsuccessful, they would face a one-year suspension. Additionally, the appeals process did not entitle students to a hearing or representation.

85.    Each plaintiff reluctantly accepted the offer of deferred suspension or probation, fearing a harsher sanction or a prolonged disciplinary process, despite disagreeing with UT's allegations.

86.    Ms. Soto-Ferate wanted to appeal but refrained, fearing it would delay her graduation and access to her transcripts. Similarly, Ms. Medrano felt compelled to accept the deferred suspension to ensure the timely conferral of her degree, which she needed to in order to apply for her social work license and seek post-graduate employment. Ms. Cisco also believed she had no choice but to accept, as she is on a need-based full scholarship at UT, maintains a 4.0 GPA, and works for a professor in her department. She feared that prolonging the disciplinary process could jeopardize her financial aid and employment.

87.    Plaintiffs have already faced significant academic and career consequences due to the response to the protest. For example, Ms. Heilrayne, who works at the Texas State Capitol and aspires to a career in local politics, was doxed after the viral photo of her arrest. She now fears that the negative attention will impact her job prospects.

88.     Beyond academic and professional consequences, each plaintiff has experienced deep trauma from their arrest and UT's response. Ms. Heilrayne and Ms. Cisco, who remain UT students, feel especially anxious and distressed when on campus for class or work. Ms. Heilrayne was diagnosed with post-traumatic stress disorder and has been in intensive trauma therapy since August 2024. Ms. Soto-Ferate's trauma was also so severe that she sought psychological counseling.

**D.  Viewpoint-Based Motivations for the Response to the April 24th Protest**

89.     In the weeks, days, and hours before the April 24th protest, state actors and University officials expressed hostility towards the message of pro-Palestine student protestors around the country and took measures to ensure that no such message would be tolerated at UT Austin.

*i.     University Administration Attitude towards Pro-Palestine Student Movement*

a)  Past Protests at UT Austin

90.     Under UT's Institutional Rules in effect at the time of the protest, subchapter 13-100 lays out governing principles regarding speech, expression, and assembly on campus. It states, "The freedoms of speech, expression, and assembly are fundamental rights of all persons and are central to the mission of the University. In accordance with this Chapter, students, faculty members, staff members, and Members of the Public have the right to assemble, to speak, and to attempt to attract the attention of others. . ."[20] "Students, faculty and staff members are free to express their views, individually or in organized groups, orally or in writing or by other symbols,

---

[20] University of Texas at Austin "Institutional Rules on Student Services and Activities," Chapter 13. Speech, Expression, and Assembly, section 13-101(a),
https://web.archive.org/web/20240425232237/https://catalog.utexas.edu/general-information/appendices/appendix-c/speech-expression-and-assembly/.

on any topic, in all parts of the campus, subject only to rules necessary to preserve the equal rights of others and the other functions of the University. . . . The University will not discriminate on the basis of the political, religious, philosophical, ideological, or academic viewpoint expressed by any person, either in the enforcement or administration of these rules or otherwise."[21]

91.    According to subchapter 13-100, "This Chapter applies to speech by University persons and University organizations in the common outdoor areas and the limited public forums, and to speech by members of the public in the common outdoor areas."[22] "Common outdoor area" is defined as "outdoor space that is not regularly used for dedicated University business and does not have an educational function, or a research function. . . . Common outdoor areas are designated by state law as traditional public forums."[23]

92.    Subchapter 13-100 also clarifies, "even 'time, place and manner' rules are subject to the constitutional right of free speech. Accordingly, such rules must be viewpoint neutral and cannot regulate speech more restrictively than they regulate other activities that cause the problems to be avoided by the rule, or speech more than is reasonably necessary to serve their purpose."[24]

93.    UT has a rich history of student protests, in varied forms and across the political spectrum.

94.    In 2018, student club Young Conservatives of Texas ("YCT") hosted a demonstration in support of Supreme Court Justice Brett Kavanaugh's confirmation.

95.    At least 50 counter-protesters opposing the demonstration gathered, and tensions between the groups escalated to the point of allegedly ripping up each other's signs.

---

[21] *Id*. at section 13-101(c)-(d).
[22] *Id*. at section 13-102(a).
[23] *Id*. at section 13-104.
[24] *Id*. at section 13-304(b).

96.     Due to YCT's history of provocative demonstrations, attracting widespread media attention and controversy on campus, some criticized UT for allowing the event to go forward.[25]

97.     In response, according to news coverage, UT officials released a statement: "Free speech of UT community members is fully protected on campus. Violence and threats are not. You are able to discuss, argue and condemn those views you disagree with, but unwelcome physical contact with those who espouse them or the destruction of property is never acceptable."[26]

98.     Then-spokesperson and Director of Media Relations at UT J.B. Bird said, "As the nation watches the Supreme Court confirmation process, many of our students are sharing their strong views about the ongoing events. We encourage a robust debate on campus in which everyone feels comfortable voicing their opinions. We want to remind students to be respectful, even of those whose views they disagree with."[27]

99.     UTPD was present at the protest, working to protect the YCT demonstrators from the much larger crowd of counter-protesters surrounding them.

100.    Upon information and belief, no additional law enforcement was called, and no arrests were made.

b)  UT Austin's Different Response to Palestine Solidarity

101.    According to public records released by UT, on April 23, 2024, at 10:22AM, Defendant Hartzell received an email from Sury Sacher with the subject, "Oh no!! They are trying

---

[25] Melanie Torre, *UT student rally for Kavanaugh erupts into heated dispute*, CBS AUSTIN (Oct. 3, 2018), https://cbsaustin.com/news/local/ut-student-rally-for-kavanaugh-erupts-into-heated-dispute.

[26] Gracie Awalt, *The University and some students call Young Conservatives of Texas 'provocative.' Members disagree.*, THE DAILY TEXAN (Dec. 5, 2018), https://thedailytexan.com/2018/12/05/the-university-and-some-students-call-young-conservatives-of-texas-provocative-members/.

[27] Torre, *supra* note 25.

to make UT Columbia." The content of the email is fully redacted. Upon information and belief, the sender is Sury Feinstein Sacher, the wife of a prominent Houston real estate developer. Her social media includes countless posts about Israel, warnings about the "pro-Hamas movement" threatening Texas, and endorsements of pro-Israel politicians.

102.    On April 23, 2024, at 12:40PM, Defendant Johanson emailed officials in the Dean of Students' office, stating:

> Hello, we were just made aware of this event. It appears the group plans to walk out of class and occupy one of the lawns/malls. Given the recent events on the east coast that resulted in the arrest of protesters at NYU/Columbia/Yale we will need support from your office to enforce rule violations. Do y'all have any further information or request for a reservation from PSC?

103.    Minutes later, Aaron Voyles, Executive Director of Student involvement, replied:

> Hi Lt. Johanson. My understanding is that there is high-level meeting going on currently and so additional details may come out of that meeting. We can provide an update once that concludes. We will plan to have our entire demonstration response team activated and on-site.

104.    On April 23, 2024, at 5:26PM, UT Spokesperson Mike Rosen and his staff discussed an email sent to Dean Mersey and the leadership of the Moody College of Communication be a redacted student member of the campus pro-Israel group. The email states:

> I understand you recently had a conversation with my mother and uncle, [REDACTED] in Atlanta that focused on the ongoing challenges surrounding the Israel-Palestine conflict, particularly concerning the rise in antisemitism and antizionism on university campuses. Beyond my academic pursuits, I am deeply committed to advocacy through my involvement with Student Longhorns for Israel, where I serve as the [REDACTED].
>
> This morning, I became aware of a planned walkout organized by the Austin Palestine Solidarity Committee (PSC) scheduled for tomorrow at 11:40 am at Greg Plaza. According to their flyer, 'class is canceled' during this time. My peers and I feel concerned after watching our peers at Columbia University finish their semester

online due to ongoing threats of violence on campus. I worry that this masked group of students, who hide their identities, can engage in aggressive or illegal behavior without being held accountable because it will be difficult to identify individuals who disrupt public order and safety.

    *ii.*   *Decision to Cancel the Protest*

105. On April 24, 2024, at 6:15AM, Provost Sharon Wood emailed the Dean's Council, stating that the university had heard of a planned event titled "The Popular University for Gaza." The email went on to state:

> The stated purpose of this event was to 'occupy the South Lawn' to 'take back our university…in the footsteps of our comrades' in recent demonstrations at Columbia, Rutgers, and Yale. The event invitation encouraged participants to wear masks in violation of our Institutional Rules. This 'Popular University' event is part of a national campaign by a non-UT affiliated group explicitly seeking to disrupt university operations nationwide by creating campus encampments. As we have seen over the past few days, these illegal encampments have done just that. They have resulted in significant changes to classes, hundreds of arrests, intimidation, and calls for violence against Jewish students. The University is working to ensure this type of disruption doesn't occur on campus. As part of this effort, last evening, the Office of the Dean of Students informed the event organizer that they could not hold this event on campus. DOS also explained that any attempt to do so would subject the organization and its attending members to discipline under the Institutional Rules…

106. It remains unclear when UT officially notified PSC or the event organizers that permission for the event had been revoked. On April 24, 2024, while the protest was already underway, UT released to the press an Event Cancellation Notice addressed to Jenna Homsi and dated April 23, 2024. The notice stated:

> [UT] will not allow this campus to be 'taken' and protesters to derail our mission in ways that groups affiliated with our national organization have accomplished elsewhere . . ..

107.    Public records released by UT include four messages from the Dean of Students to redacted Authorized Representatives of PSC, notifying them of the event's cancellation. Aside from notably being dated April 24, 2024, these notices were identical to the one sent to Jenna Homsi that UT publicized.

### iii.    Justifications for Arrests

108.    At 3:51PM on April 24, 2024, Defendant Abbott retweeted a post showing video footage of DPS troopers shoving through the crowd of student protesters and referring to the students as "Pro Hamas idiots.".[28]

109.    In that retweet, Defendant Abbott endorsed the original poster's message and further wrote:

> Arrests being made right now & will continue until the crowd disperses. **These protesters belong in jail.** Antisemitism will not be tolerated in Texas. Period. Students joining hate-filled, antisemitic protests at any public college or university in Texas should be expelled.[29]

110.    Defendant Abbott smeared the students as antisemitic and called for their arrest solely because they were protesting in support of Palestinian liberation.

111.    DPS released a statement at 6:20PM on April 24, confirming that both UT and Defendant Abbott had requested their presence at the protest:

> [DPS] responded to the UT campus in Austin today at the request of the University and at the direction of Texas Governor Greg Abbott, in order to prevent any unlawful assembly and to support UT Police in maintaining the peace by arresting anyone engaging in any sort of criminal activity, including criminal trespass.

---

[28] Greg Abbott (@GregAbbott_TX), X (Apr. 24, 2024), https://x.com/GregAbbott_TX/status/1783237229252346194?
[29] *Id.* (emphasis added).

112.    In 2019, Defendant Abbott zealously endorsed a Texas law protecting speech on campuses.[30]

113.    Defendant Abbott's statements and actions as applied to pro-Palestine protests are in stark contrast to his past statements and actions regarding freedom of speech on college campuses.[31]

114.    On April 30, 2024, Defendant UT System Board of Regents Chairman Eltife released a statement, claiming:

> Massive crowds of students, along with outside groups with absolutely no connection to UT, have intentionally caused disturbances with plans to harm our campus community. In fact, the majority of arrests to date have occurred with agitators who are not UT students. These activities will not be allowed.  While free speech is fundamental to our educational institutions, it is violated when it includes threats to campus safety and security or refusal to comply with institutional policies and law. At UT Austin, I have been working closely with President Hartzell on decisions to protect its entire campus community, and we will not acquiesce on those protections under any circumstance.  I appreciate our campus police officers and we cannot thank the Texas Department of Public Safety enough for all their assistance. We will continue to call upon the DPS to secure our campus when needed.

115.    In its Incident Report, released through public records on April 30, 2024, UTPD stated that it responded to a report of "Criminal Trespass" under Penal Code 30.05 at 11:52AM. According to UTPD, arrests began after "the group had ignored and defied two orders of dispersal . . . ."

---

[30] Greg Abbott (@GregAbbott_TX), X (June 9, 2019), https://x.com/GregAbbott_TX/status/1137875109362974724.
[31] *See* John C. Moritz, *Abbott's condemnation of UT protesters contrasts with his 2019 stance on campus free speech*, Austin American-Statesman (Apr. 25, 2024), https://www.statesman.com/story/news/politics/state/2024/04/25/free-speech-ut-austin-protest-greg-abbott-tweet-response-protests-contrast-2019-stance/73447192007/.

116.    The report then details a separate round of arrests on the South Mall, stating, "Dispersal orders were given through a PA system, social media, and the siren system."

117.    This second set of dispersal orders appears to reference the order issued by UT around 5:25PM. The report's author is listed as Defendant Luevano.

118.    The students' disciplinary packets included a document titled Reporting Officer Narrative, which also lists a reporting time of 11:52AM. However, unlike the Incident Report, which cites "Criminal Trespass," this document lists the offense as "Graffiti." Similarly, the Case Supplement Reports in Plaintiffs' disciplinary packets classify the alleged offense as "Graffiti."

119.    Regarding the timeline of dispersal orders the group allegedly violated, the narrative states that the group "had already received approximately 4 warnings from [the] Dean of Students prior to UTPD arrival as well as within my presence to disperse at about 11:55." See Exhibits 1–4, at 6. This would have been just fifteen minutes after the event's planned start time of 11:40AM.

120.    The arrest affidavits provided by UTPD in response to public records requests appear to have been completed en masse for all individuals arrested on April 24, 2024. Each affidavit lists the same probable cause—"given notice of dispersal and refused to leave property" or "received notice to depart but failed to do so"—quoting the language of Penal Code 30.05.  See Exhibits 1–4, at 4.

121.    All affidavits name two of the same four officers as the affiant and witness: R. Rodriguez #1863, R. Adame #2197; A. Zavala #1652; and L. Henry #2306. See Exhibit 5, at pp. 13, 25, 46, 53. Based on the officers listed in UTPD's Incident Report, also released through public records, three of these officers are believed to be Defendants Roberto Rodriguez, Reynaldo Adame, and Adan Zavala.

122.    The arrest affidavits also contain inaccurate timestamps for students' arrests. For example, Ms. Soto-Ferate was arrested at the same time as a friend on Speedway around 1:30PM, processed, and transported together. However, Ms. Soto-Ferate's arrest warrant lists the time as 3:00PM, while her friend's states 1:00PM. See Exhibit 5, at pp. 19, 46.

123.    Ms. Heilrayne also asked what charges she was being arrested for, but did not receive an answer.

124.    Additionally, Plaintiffs and witnesses reported that some protesters were arrested while actively attempting to comply with dispersal orders or leave the area on their own.

125.    UTPD appeared to base arrest decisions on the need to meet a numerical quota, as reported by several plaintiffs who overheard officers discussing it.

## CLAIMS FOR RELIEF

126.    The following claims for relief are brought against Defendants for violating Plaintiffs' rights under federal law.

127.    All Defendants are liable for violating Plaintiffs' First Amendment rights under the Ku Klux Klan Act, 42 U.S.C. § 1983. The Officer Defendants are liable for violating Plaintiff's Fourth Amendment rights under the same. Defendants UT Austin and UT System Board of Regents are liable for violating Plaintiffs' rights under Title VI of the Civil Rights Act, 42 U.S.C. § 2000d.

**Count I: Violation of the First Amendment to the United States Constitution**
**42 U.S.C. § 1983**
*Against All Individual Capacity Defendants for Money Damages and Declaratory Relief and*
*Defendants UT Austin and UT System Board of Regents for Injunctive Relief*

128.    Plaintiffs reallege and incorporate by reference the allegations set forth in all preceding paragraphs.

129.    The First Amendment to the United States Constitution protects the rights to free speech, peaceful assembly, and association. The Government may not regulate, prohibit, or punish

protected speech on the basis of the viewpoint it expresses unless that regulation, prohibition, or punishment is the least restrictive means to attain a compelling government interest.

130.    Plaintiffs engaged in constitutionally protected acts of peaceful assembly and political speech by participating in the April 24th protest, organized to express opposition to U.S. support for Israel's actions in Gaza and the universities' investments in weapons manufacturing.

131.    Defendants, acting under color of Texas law, unlawfully targeted and prevented Plaintiffs from protesting based on the viewpoint they expressed.

132.    Defendants subjected Plaintiffs to unconstitutional restrictions on their right to assemble, including campus bans, administrative holds, and threats of suspension, in an effort to chill their speech and deter further advocacy.

133.    Defendants' actions were motivated by hostility towards Plaintiffs' pro-Palestine advocacy and their association with Palestinians. This viewpoint discrimination is evident from statements made by Defendants, including Defendant Abbot and Defendant Wray, the disparate treatment of Plaintiffs and counter-protestors, and the severity of Defendants' response to a peaceful protest.

134.    Defendants Abbott and Wray made comments that gave the appearance of having the force and color of law behind them, despite exceeding the scope of their lawful authority.  Their comments and actions also improperly imposed their individual views upon others via their public positions.

135.    Defendants subjected Plaintiffs to unconstitutional restrictions on their right to assemble, targeted arrests without probable cause, and violent police tactics that resulted in injuries, trauma, and long-term academic and professional consequences.

136.    Defendants' actions were designed to stifle political expression critical of U.S. and Israeli policies.

137.    Individual Capacity Defendants' actions were willful, deliberate, and malicious, involved reckless or callous indifference to Plaintiffs' rights, and should be punished and deterred by an award of punitive damages against Individual Capacity Defendants to the extent permitted by law.

## Count II: First Amendment Retaliation
## 42 U.S.C. § 1983
*Against All Individual Capacity Defendants for Monetary Damages and Declaratory Relief and Defendants Jay Hartzell and UT System Board of Regents Members for Injunctive Relief*

138.    Plaintiffs reallege and incorporate by reference the allegations set forth in all preceding paragraphs.

139.    To succeed on a claim for retaliation under the First Amendment, a plaintiff must show that they engaged in protected conduct, that the defendant took an adverse action against them that would deter a person of ordinary firmness from continuing to engage in that conduct, and that the adverse action was caused by the protected conduct.

140.    Plaintiffs engaged in constitutionally protected acts of peaceful assembly and political speech by participating in the April 24th protest, organized to express opposition to U.S. support for Israel's actions in Gaza and the universities' investments in weapons manufacturing.

141.    At the direction of Defendants UT Austin, UT System Board of Regents, Hartzell, and Abbott, Defendant Officers unlawfully arrested Plaintiffs without probable cause, and the university disciplined Plaintiffs, in retaliation for their protected speech and to deter future advocacy.

142.    Defendant Officers did not have probable cause to arrest Plaintiffs, and all attempted charges against them were dropped for that reason. The arrests were carried out in a manner that was intended to intimidate and punish Plaintiffs for their participation in the protest.

143.    Defendants Officers' violent actions and the university's disciplinary actions would chill a person of ordinary firmness from engaging in protected speech. All Plaintiffs have expressed that Defendants' actions have caused them to fear attending future protests.

144.    Defendant Supervising UTPD and DPS Officers were responsible for the conduct of Defendant UTPD and DPS Officers and had a duty to train, supervise, or instruct them to prevent constitutional harm.

145.    Supervising UTPD and DPS Officers failed to do so, despite having many opportunities, and in fact encouraged Defendant UTPD and DPS Officers to unlawfully arrest Plaintiffs in retaliation for their protected speech.

146.    Defendants' actions were willful, deliberate, and malicious, involved reckless or callous indifference to Plaintiffs' rights, and should be punished and deterred by an award of punitive damages against Defendants to the extent permitted by law.

### Count III: Fourth Amendment Unlawful Seizure/False Arrest
### 42 U.S.C. § 1983
*Against All Defendant Officers for Monetary Damages and Declaratory Relief*

147.    Plaintiffs reallege and incorporate by reference the allegations set forth in all preceding paragraphs.

148.    The Fourth Amendment to the United States Constitution protects individuals from unreasonable searches and seizures.

149.    To succeed on a claim for unlawful seizure or false arrest under the Fourth Amendment, a plaintiff must demonstrate that they were seized or arrested without probable cause and that the seizure or arrest was unreasonable under the circumstances.

150.    Plaintiffs were unlawfully arrested by Defendant Officers during April 24th protest.

151.    The protest was peaceful and intended to express political speech, a core right protected by the First Amendment.

152.    Defendant Officers did not have probable cause to arrest Plaintiffs, and all attempted charges against them were dropped for that reason. Defendant Officers themselves questioned what, if anything, the protesters were doing that was unlawful.

153.    Defendant Officers used more force than was reasonably necessary to effectuate the seizures/arrests.

154.    Defendant Officers subjected Plaintiffs to violent police tactics, including being forcibly grabbed, knocked to the ground, and restrained with excessively tight zip ties. These actions resulted in injuries and trauma.

155.    Defendant Supervising UTPD and DPS Officers were responsible for the conduct of Defendant UTPD and DPS Officers and had a duty to train, supervise, or instruct them to prevent constitutional harm.

156.    Supervising UTPD and DPS Officers failed to do so, despite having many opportunities, and in fact encouraged Defendant UTPD and DPS Officers to unlawfully arrest Plaintiffs without probable cause and with more force than necessary.

157.    Defendant Officers' actions were willful, deliberate, and malicious, involved reckless or callous indifference to Plaintiffs' rights, and should be punished and deterred by an

award of punitive damages against Defendant UTPD and DPS Officers to the extent permitted by law.

### Count IV: Violation of Title VI of the Civil Rights Act of 1964
### 42 U.S.C. § 2000d
*Against Defendants UT Austin and UT System Board of Regents for Compensatory Damages and Declaratory and Injunctive Relief*

158.    Plaintiffs reallege and incorporate by reference the allegations set forth in all preceding paragraphs.

159.    Title VI of the Civil Rights Act of 1964 prohibits discrimination on the basis of race, color, or national origin in programs and activities receiving federal financial assistance.

160.    To establish a claim under Title VI, a plaintiff must demonstrate that they were subjected to intentional discrimination based on race, color, or national origin, including shared ancestry, by an entity receiving federal funds.

161.    Title VI prohibits discrimination not only against individuals based on their own race, color, or national origin, including shared ancestry, but also against those who are or are perceived to be associated with a protected group.

162.    Plaintiffs, who are or are associated with Palestinians and/or Muslims, were subjected to discriminatory actions by Defendants UT Austin and UT System Board of Regents.

163.    Plaintiffs participated in a peaceful Palestine solidarity protest to express opposition to U.S. support for Israel's actions in Gaza and the universities' investments in weapons manufacturing.

164.    Defendants UT Austin and UT System Board of Regents unlawfully targeted Plaintiffs for arrest and discipline, including campus bans, administrative holds, and threats of suspension, based on their association with Palestinians and/or Muslims and their pro-Palestine advocacy.

165.    Title VI of the Civil Rights Act of 1964 permits Plaintiffs to recover compensatory damages and to obtain injunctive relief to remedy the discriminatory actions taken against them.

**REQUEST FOR RELIEF**

Plaintiffs respectfully request that this Court hold a jury trial and grant the following relief:

a.    Entry of a declaratory judgment that the conduct and actions described in this Complaint constitute violations of the First and Fourth Amendments to the United States Constitution, the Ku Klux Klan Act, 42 U.S.C. § 1983, and Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d;

b.    An order requiring UT Austin to reverse the disciplinary actions against Plaintiffs;

c.    An award of all available compensatory damages to Plaintiffs in an amount to be determined at trial;

d.    An award of all available punitive damages in an amount that would punish Defendants for the willful, wanton, and reckless conduct alleged in this Complaint, and that would effectively deter similar conduct in the future;

e.    An award of Plaintiffs' reasonable attorney's fees and costs and expenses pursuant to 42 U.S.C. § 1988 and any other applicable statutes or rules of law; and

f.    Such other and further relief, including all appropriate and equitable relief, as this Court may deem just and proper.

Respectfully submitted this 30th day of April 2025.


*/s/ Rebecca Webber*                          */s/ Christopher Godshall-Bennett*
Rebecca Webber                                Christopher Godshall-Bennett*
Texas Bar No. 24060805                        D.C. Bar No. 1780920

Webber Law
4228 Threadgill St.
Austin, TX 78723
Tel: (512) 537-8833
Fax: (202) 333-6470
rebecca@rebweblaw.com

*/s/ Christina A. Jump*
Christina A. Jump
Texas Bar No. 00795828
*/s/ Chelsea Glover*
Chelsea Glover
Texas Bar No. 24097738
Constitutional Law Center for Muslims in
America[†]
100 North Central Expy., Ste. 1010
Richardson, TX 75080
Tel: (972) 914-2507
Fax: (972) 692-7454
cjump@clcma.org
cglover@clcma.org


[†]Legal Division of Muslim Legal Fund of
America

American-Arab Anti-Discrimination
Committee (ADC)
910 17th St. NW, Ste. 1000
Washington, D.C. 20002
Tel: (202) 244-2990
Fax: (202) 333-6470
cgb@adc.org

*/s/ Maria Kari*
Maria Kari*
Texas Bar No. 24127161
Project TAHA
5300 N Braeswood Blvd., Ste. 4-191
Houston, TX 77096
Tel: (205) 862-8005
Fax: (202) 333-6470
info@mariakari.org

**pro hac vice* forthcoming


Attorneys for Plaintiffs