# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### AUSTIN DIVISION

| | |
|---|---|
| **ARWYN HEILRAYNE**, **CITLALLI SOTO-FERATE, ILIANA MEDRANO,** and **MIA CISCO**<br><br>*Plaintiffs,*<br><br>v.<br><br>**UNIVERSITY OF TEXAS AT AUSTIN** and the **UNIVERSITY OF TEXAS SYSTEM BOARD OF REGENTS**, and its members **KEVIN ELTIFE**, in his individual and official capacity, **JANIECE LONGORIA, JAMES WEAVER, CHRISTINA MELTON CRAIN, JODIE LEE JILES, KELCY WARREN, NOLAN PEREZ, STUART STEDMAN**, and **ROBERT GAUNTT**, in their official capacities;<br><br>**JAY HARTZELL**, in his individual capacity, and **JIM DAVIS**, in his official capacity as the Interim President of UT Austin;<br><br>**GREG ABBOTT**, in his individual capacity;<br><br>**HECTOR LUEVANO, ROBERTO RODRIGUEZ, REYNALDO ADAME, L. HENRY, & JOHN DOE UTPD OFFICERS A-I**, in their individual capacities; and<br><br>**CHRISTOPHER WRAY & JOHN DOE DPS OFFICERS A-E**, in their individual capacities,<br><br>*Defendants.* | Case No.: 1:25-cv-00640-DAE<br><br>**FIRST AMENDED COMPLAINT**<br><br>JURY TRIAL DEMANDED |

## INTRODUCTION

1.      This is a civil rights action challenging the unlawful arrests and retaliatory discipline imposed on Plaintiffs, a group of students and peaceful demonstrators at the University of Texas at Austin ("UT Austin"), for their participation in a Palestine solidarity protest on April 24, 2024. Plaintiffs bring this action under 42 U.S.C. § 1983 for violations of their rights under the First and Fourth Amendments to the United States Constitution, as well as under Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d.

2.      On April 24, 2024, Plaintiffs joined a nationwide student movement advocating for Palestinian liberation and protesting U.S. support for Israel's genocidal assault on Gaza, including their universities' investments in weapons manufacturing. The protest, organized by the Palestine Solidarity Committee ("PSC"), was peaceful and intended to express political speech, a core right protected by the First Amendment.

3.      Plaintiffs were subjected to unconstitutional restrictions on their right to assemble, targeted arrests without probable cause, and violent police tactics that resulted in injuries, trauma, and long-term academic and professional consequences. The University's actions, in collaboration with Texas state officials and law enforcement, were driven by viewpoint discrimination and hostility towards Plaintiffs' pro-Palestine advocacy and their association with Palestinian and Muslim students.

4.      Defendants' conduct was part of a broader pattern of suppression against students engaging in Palestine solidarity protests nationwide. The University's actions—disrupting the protest, coordinating with law enforcement to preemptively shut down speech, and imposing disciplinary consequences—were designed to stifle political expression critical of U.S. and Israeli policies and the University's financial role therein.

5.      In addition to targeting the political content of Plaintiffs' speech, the University also targeted Plaintiffs and the other protestors on the basis of their actual or perceived Palestinian national origin or their actual or perceived association with Palestinian students and organizations, both at UT Austin and across the United States.

6.      Defendants' actions against Plaintiffs and the other protestors, including the preemptive cancelation of the protest, interference with their protected speech in a traditional public forum, arrests, and student discipline, would not have occurred if Plaintiffs were expressing a different viewpoint. Understanding that such explicit viewpoint discrimination is clearly unlawful, Defendants have put forth pretextual explanations for their actions, invoking the need to prevent violence and disruption to campus operations.

7.      The reliance on such reasoning to justify the *preemptive* cancellation of core First Amendment activity and the subsequent arrest and punishment of students for asserting their First Amendment rights – despite there being no indication of violence and the existence of a widely advertised, time-bound agenda for the protest – indicates that Defendants acted on impermissible assumptions and stereotypes based on either constitutionally protected associations; stereotypes of Palestinians, Arabs, and Muslims and those associated with them; or both. To discriminate against Plaintiffs and the other protestors based on the former violates the First Amendment and to do so based on the latter violates Title VI of the Civil Rights Act of 1964.

8.      That Defendants discriminated against Plaintiffs on the basis of their viewpoint, associations, and actual or perceived identities is obvious from their actions before, on, and after April 24, 2025. But Defendants' motivations needn't be guessed at – they are quite clear from Defendants' own statements expressing animus against pro-Palestine political views and Palestinian identity itself. If the First Amendment protects anything, it is the right of the people to

express views disfavored by the powerful. But if it instead permits the government to pick and choose which expressive activities it will allow and to arrest those who find themselves in disagreement with those in power, then the First Amendment protects nothing at all.

## JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 because this action arises under the First and Fourth Amendments to the United States Constitution and Title VI of the Civil Rights Act of 1964. This Court also has jurisdiction under 28 U.S.C. § 1343 because the action seeks to address the deprivation of civil rights under 42 U.S.C. § 1983.

10.     Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) because the events that give rise to this action occurred in this district.

## PARTIES

### I.    Plaintiffs

11.     **Arwyn Heilrayne** (she/they) is a second-year student at UT Austin, majoring in Theater Education. She intends to continue her activism in the future but is fearful of further retaliation.

12.     **Citlalli Soto-Ferate** (she/they) is a recent graduate of UT Austin and a current Austin resident. She graduated in spring 2024, with degrees in Health and Society, and Race, Indigeneity, and Migration. She also earned a minor in Health Communications. She intends to continue her activism in the future but is fearful of further retaliation.

13.     **Iliana Medrano** (she/her) is a recent graduate of UT Austin and a current Austin resident. She received her master's degree in social work from UT Austin's Steve Hicks School of Social Work in August 2024. She intends to continue her activism in the future but is fearful of further retaliation.

14.     **Mia Cisco** (she/her) is a Ukrainian American third-year student at UT Austin. She is majoring in Health Promotion and Behavioral Science, with a minor in Africa and African Diaspora Studies. She is Muslim and frequently wears a hijab. She intends to continue her activism in the future but is fearful of further retaliation.

## II.    Defendants

15.     The **University of Texas at Austin** is a public research university located in Austin, Texas. It is one of the largest universities in the United States, with a diverse and vibrant student body. At all times relevant, the University of Texas at Austin operated under the governance of the University of Texas System Board of Regents and under color of the laws of the State of Texas.

16.     The **University of Texas System Board of Regents** is the governing body overseeing the University of Texas at Austin and other institutions within the University of Texas System. The Board of Regents consists of nine members appointed by the Governor of Texas, with the advice and consent of the Texas Senate, for staggered six-year terms. The Board is responsible for setting policies, approving budgets, and ensuring the effective management and operation of the institutions under its governance. At all times relevant, the Board of Regents exercised its authority under color of the laws of the State of Texas.

17.     **Kevin Eltife** is the Chairman of the University of Texas System Board of Regents who directed the University's and police's response to the April 24th protest at issue in this case. At all times relevant, Defendant Eltife was acting within the scope of his employment as Chairman of the University of Texas at Austin Board of Regents and under color of the laws of the State of Texas. He is sued in his individual and official capacities.

18.     **Jay Hartzell** was the President of UT Austin who directed the University's and police's response to the April 24th protest at issue in this case. At all times relevant, Defendant

Hartzell was acting within the scope of his employment as President of UT Austin and under color of the laws of the State of Texas. He is sued in his individual capacity.

19.     **Jim Davis** is the Interim President of UT Austin. As Interim President, he is UT Austin's chief executive officer. He is sued in his official capacity.[1]

20.     **Greg Abbott** is the Governor of the State of Texas. Defendant Abbott directed DPS to suppress the April 24th protest at issue in this case and ordered the mass arrest of protesters based on viewpoint animus. At all times relevant, Defendant Abbott was acting under color of the laws of the State of Texas. He is sued in his individual capacity.

21.     **Hector Luevano** is a lieutenant within the University of Texas Police Department ("UTPD") who was present at the April 24th protest at issue in this case. In his capacity as a supervising officer, Defendant Luevano directed his subordinates to arrest protestors on April 24, 2024, including Plaintiffs. At all times relevant, Defendant Luevano was acting within the scope of his employment as a UTPD lieutenant and under color of the laws of the State of Texas. He is sued in his individual capacity.

22.     **Roberto Rodriguez** is an officer of UTPD, subject to the supervision of Defendant Luevano, who was present at the April 24th protest as issue in this case. Defendant Rodriguez is the affiant on the arrest affidavit for Ms. Cisco. At all times relevant, he was acting within the scope of his employment as a UTPD officer and under color of the laws of the State of Texas. He is sued in his individual capacity.

23.     **Reynaldo Adame** is an officer of UTPD, subject to the supervision of Defendant Luevano, who was present at the April 24th protest at issue in this case. Defendant Adame is the

---

[1] Defendant Davis is automatically substituted in to replace Defendant Hartzell as the official capacity President of UT Austin in this action, pursuant to Fed. R. Civ. P. 25(d).

affiant on the arrest affidavits for Ms. Heilrayne and Ms. Soto-Ferate. At all times relevant, he was acting within the scope of his employment as a UTPD officer and under color of the laws of the State of Texas. He is sued in his individual capacity.

24.     **L. Henry** is an officer of UTPD, subject to the supervision of Defendant Luevano, who was present at the April 24th protest at issue in this case. Defendant Henry is the affiant on the arrest affidavit for Ms. Medrano. At all times relevant, they were acting within the scope of their employment as a UTPD officer and under color of the laws of the State of Texas. They are sued in their individual capacity.

25.     **John Doe UTPD Officers A and B** are officers of UTPD, subject to the supervision of Defendant Luevano, who were present at the April 24th protest at issue in this case. Defendants John Doe UTPD Officers A and B assisted in the arrest of Ms. Heilrayne. At all times relevant, they were acting within the scope of their employment as UTPD officers and under color of the laws of the State of Texas. They are sued in their individual capacities.

26.     **John Doe UTPD Officers C and D** are officers of UTPD, subject to the supervision of Defendant Luevano, who were present at the April 24th protest at issue in this case. Defendants John Doe UTPD Officers C and D assisted in the arrest of Ms. Soto-Ferate. At all times relevant, they were acting within the scope of their employment as UTPD officers and under color of the laws of the State of Texas. They are sued in their individual capacities.

27.     **John Doe UTPD Officers E, F, G, and H** are officers of UTPD, subject to the supervision of Defendant Luevano, who were present at the April 24th protest at issue in this case. Defendant John Doe UTPD Officers E, F, G, and H assisted in the arrest of Ms. Medrano. At all times relevant, they were acting within the scope of their employment as UTPD officers and under color of the laws of the State of Texas. They are sued in their individual capacities.

28.    **John Doe UTPD Officer I** is an officer of UTPD, subject to the supervision of Defendant Luevano, who was present at the April 24th protest at issue in this case. Defendant UTPD Officer I assisted in the arrest of Ms. Cisco. At all times relevant, they were acting within the scope of their employment as a UTPD officer and under color of the laws of the State of Texas. They are sued in their individual capacity.

29.    **Christopher Wray** is a trooper within the Texas Department of Public Safety ("DPS") who was present at the April 24th protest at issue in this case. Defendant Wray assisted in the interference with Ms. Cisco's expressive conduct on the basis of her viewpoint. At all times relevant, he was acting within the scope of his employment as a DPS trooper and under color of the laws of the State of Texas. He is sued in his individual capacity.

30.    **John Doe DPS Officers A, B, and C** are officers of DPS who were present at the April 24th protest at issue in this case. Defendants John Do DPS Officers A, B, and C assisted in the arrest of Ms. Heilrayne. At all times relevant, they were acting within the scope of their employment as DPS officers and under color of the laws of the State of Texas. They are sued in their individual capacities.

31.    **John Doe DPS Officers D and E** are officers of DPS who were present at the April 24th protest at issue in this case. Defendants John Doe DPS Officers D and E assisted in the arrest of Ms. Cisco. At all times relevant, they were acting within the scope of their employment as DPS officers and under color of the laws of the State of Texas. They are sued in their individual capacities.

## STATEMENT OF FACTS

**I.    Events Leading to the April 24th Student Protest at the University of Texas at Austin**

**A.  Israel's Genocidal Campaign Against the People of Palestine**

32.    The West Bank and Gaza Strip ("Gaza") have been occupied by Israel since 1967.[2] While Israel evacuated settlers from Gaza in 2005, it retained control of Gaza's airspace, sea access, and borders, and imposed a total blockade on the area in 2008.[3]

33.    Following October 7, 2023, Israel waged on Gaza one of the most unrelenting military campaigns in contemporary history. Within four weeks, Israel unleashed over 25,000 tons of bombs, equivalent to about two Hiroshima bombs.[4] More than 50,000 have been killed with almost a third of victims being children.[5] A study published in the medical journal Lancet estimates the death toll to be roughly 40% higher.[6] This figure is only for death from traumatic injuries and does not include deaths from a lack of healthcare or food, or the thousands believed to be buried under rubble.[7] 1.9 million people in Gaza have been internally displaced, some multiple times.[8]

---

[2] UNITED NATIONS, *History of the Question of Palestine*, https://www.un.org/unispal/history/.
[3] *Id.*
[4] EURO-MED HUMAN RIGHTS MONITOR, *Israel hits Gaza Strip with the equivalent of two nuclear bombs* (Nov. 2, 2023), https://euromedmonitor.org/en/article/5908/Israel-hits-Gaza-Strip-with-the-equivalent-of-two-nuclear-bombs.
[5] Emma Farge & Nidal Al-Mughrabi, *Gaza death toll: how many Palestinians has Israel's offensive killed?* REUTERS (Mar. 25, 2025), https://www.reuters.com/world/middle-east/how-many-palestinians-has-israels-gaza-offensive-killed-2025-01-15/.
[6] Zeina Janaluddine *et al., Traumatic injury mortality in the Gaza Strip from Oct 7, 2023 to June 30, 2024: a capture-recapture analysis*, THE LANCET (Jan. 9, 2025), https://www.thelancet.com/journals/lancet/article/PIIS0140-6736(24)02678-3/fulltext.
[7] A July 2024 study by the medical journal The Lancet estimates the true death toll could reach more than 186,000 people because the Gaza Ministry of Health's official toll does not take into account thousands of dead buried under rubble and indirect deaths due to the destruction of health facilities, food distribution systems and other public infrastructure. *Gaza death toll 40% higher than official number, Lancet study finds*, THE GUARDIAN (Jan. 20, 2025), https://www.theguardian.com/world/2025/jan/10/gaza-death-toll-40-higher-than-official-number-lancet-study-finds.
[8] DEPT. OF GLOBAL COMMUNICATIONS, UNITED NATIONS, *Gaza: 90 percent of all people have been displaced under dire conditions* (Aug. 28, 2024), https://webtv.un.org/en/asset/k15/k15udfv2p3.

68% of the agricultural land and 66% of housing units have been destroyed, along with most of the health, educational, welfare and heritage facilities and sites.[9]

34.     The U.S. government has long been the primary funder of the Israeli military, providing unparalleled financial aid, advanced weaponry, and political backing that sustain its operations. Israel has received over $250 billion in American taxpayer money.[10]

35.     On January 26, 2024, the International Court of Justice ("ICJ") issued an order responding to South Africa's application against Israel alleging violations of the Convention on the Prevention and Punishment of the Crime of Genocide in Gaza. The ICJ found that Israel's actions plausibly constituted acts of genocide and ordered Israel to immediately take measures to prevent the commission of genocide in Gaza.[11]

36.     Despite international institutions like the United Nations and the International Court of Justice and international human rights organizations like Amnesty International and Human Rights Watch warning that Israel's actions in Gaza may constitute war crimes and genocide, America's financial and military support has remained unwavering.

**B.  The Student Palestine Solidarity Movement**

---

[9] Press Release, United Nations, *67.6% of Gaza's cropland has been damaged: Geospatial data shows intensifying damage to Gaza's agricultural infrastructure – FAO & UNOSAT* (Oct. 3, 2024), https://www.un.org/unispal/document/fao-press-release-03oct24/.

[10] A NEW POLICY, NOT IN AMERICA'S INTEREST: WHY UNCONDITIONAL SUPPORT FOR ISRAEL IS BAD FOR AMERICA, AND BAD FOR AMERICANS (Jan. 2025), https://46959239.fs1.hubspotusercontent-na1.net/hubfs/46959239/ANP%20PAPER%20Not%20in%20America%E2%80%99s%20Interest%201.16.25.pdf.

[11] *See* Adil Ahmad Haque & Jasmin Johurun Nessa, *"In the Event of Extreme Urgency": The International Court of Justice Must Indicate New Provisional Measures to Protect Civilians in Gaza*, JUST SECURITY (Mar. 21, 2025), https://www.justsecurity.org/109393/icj-measures-protect-civilians-gaza/.

37.    Israel's genocidal campaign and U.S. complicity therewith gave rise to a nationwide wave of student-led Palestine solidarity demonstrations at educational institutions. These protests, which began primary on higher education campuses, quickly proliferated across the country, reflecting widespread student outrage at both the United States' support of Israel's war crimes and their own universities' support for such actions through investments in weapons manufacturing and other related enterprises.[12]

38.    Despite frequent claims to the contrary, these protests were peaceful. According to the Armed Conflict Location & Event Data Project, 97% of student Palestine solidarity demonstrations were non-violent.[13]

39.    Despite the overwhelmingly peaceful nature of these assemblies, student protesters have faced significant retaliation by both university administrators and government entities.[14]

40.    Between April 18, 2024, and July 22, 2024, more than 3,100 people were arrested on college campuses.[15] Police intervention in these peaceful protests has been staggering, increasing by more than *eight* times between March and April 2024.[16] Notably, when protesters

---

[12] Between October 7, 2023, and May 30, 2024, there were over 3,700 days of protest at 525 different colleges, universities, and schools in 317 different cities and towns. Jay Ulfelder, *Crowd Counting Consortium: An Empirical Overview of Recent Pro-Palestine Protests at U.S. Schools.*, HARVARD KENNEDY SCHOOL ASH CENTER FOR DEMOCRATIC GOVERNANCE AND INNOVATION (May 30, 2024), https://ash.harvard.edu/articles/crowd-counting-blog-an-empirical-overview-of-recent-pro-palestine-protests-at-u-s-schools/.

[13] Bianca Ho & Kieran Doyle, *US Student Pro-Palestine Demonstrations Remain Overwhelmingly Peaceful*, ACLED (May 10, 2024), https://acleddata.com/2024/05/10/us-student-pro-palestine-demonstrations-remain-overwhelmingly-peaceful-acled-brief/.

[14] *See, e.g.*, Isabelle Taft, *How Universities Cracked Down on Pro-Palestinian Activism*, N.Y. TIMES (Nov. 25, 2024), https://www.nytimes.com/2024/11/25/us/university-crackdowns-protests-israel-hamas-war.html.

[15] The New York Times, *Where Protesters on U.S. Campuses Have Been Arrested or Detained*, N.Y. TIMES (July 22, 2024), https://www.nytimes.com/interactive/2024/us/pro-palestinian-college-protests-encampments.html.

[16] Ho & Doyle, *supra* note 13.

have gathered without counter-protesters, police have intervened almost six times as often against pro-Palestine protesters as they have against pro-Israel protesters.[17]

41.     The scale of the student Palestine solidarity movement between October 7, 2023, and April 24, 2024—and the militarized response thereto—form a critical backdrop against which the protest at issue in this Complaint must be understood. Plaintiffs' participation in the decentralized, national movement for Palestinian liberation must be viewed in the context of this large surge in student activism, which has raised significant First Amendment and civil rights concerns across the country.

42.     As outlined more fully below, this Complaint focuses on the events at the University of Texas at Austin ("UT Austin" or "the University") within that nationwide wave of campus-based Palestine solidarity activism. Plaintiffs' claims necessarily reflect the heightened scrutiny, militarized policing, and administrative controls that pro-Palestine demonstrators repeatedly encountered at countless educational institutions during this period.

## II.    The April 24th Protest

### A.    Background

#### i.    UT Austin's First Amendment Policies

43.     Under UT Austin's Institutional Rules in effect at the time of the protest, § 13-101 lays out governing principles regarding speech, expression, and assembly on campus. It states, "The freedoms of speech, expression, and assembly are fundamental rights of all persons and are central to the mission of the University. In accordance with this Chapter, students, faculty members, staff members, and Members of the Public have the right to assemble, to speak, and to

---

[17] *Id.*

attempt to attract the attention of others[.]"[18] "Students, faculty and staff members are free to express their views, individually or in organized groups, orally or in writing or by other symbols, on any topic, in all parts of the campus, subject only to rules necessary to preserve the equal rights of others and the other functions of the University. . . . The University will not discriminate on the basis of the political, religious, philosophical, ideological, or academic viewpoint expressed by any person, either in the enforcement or administration of these rules or otherwise."[19]

44.    According to § 13-102(b), "This Chapter applies to speech by University persons and University organizations in the common outdoor areas and the limited public forums, and to speech by members of the public in the common outdoor areas."[20] "Common outdoor area" is defined as "outdoor space that is not regularly used for dedicated University business and does not have an educational function, or a research function. . . . Common outdoor areas are designated by state law as traditional public forums."[21]

45.    In its Frequently Asked Questions on Public Forums on its website, UT Austin explains that its common outdoor areas were transformed from limited public forums to traditional public forums pursuant to Tex. Educ. Code § 51.9315, "allow[ing] any person to engage in free speech activities in the common outdoor areas of the state's public university campuses."[22] UT Austin further explains that "[a] person or group does not need a reservation for the exercise of

---

[18] University of Texas at Austin 13 *Institutional Rules on Student Services and Activities* § 13-101(a), https://web.archive.org/web/20240425232237/https://catalog.utexas.edu/general-information/appendices/appendix-c/speech-expression-and-assembly/ [hereinafter *Institutional Rules*].
[19] *Id*. §§ 13-101(c)-(d).
[20] *Id*. § 13-102(a).
[21] *Id*. § 13-104.
[22] University of Texas at Austin, "Public Forum," https://web.archive.org/web/20250718185026/https://www.utexas.edu/public-forum.

expressive activities in the common outdoor area and spontaneous expressive activity may occur in areas that are not in use."[23]

46.    Subchapter 13-300 explains that "even 'time, place and manner' rules are subject to the constitutional right of free speech. Accordingly, such rules must be viewpoint neutral and cannot regulate speech more restrictively than they regulate other activities that cause the problems to be avoided by the rule, or speech more than is reasonably necessary to serve their purpose."[24]

ii.    *The Protest as It Would Have Been*

47.    Palestine Solidarity Committee ("PSC") is a student organization at UT Austin and part of a nationwide student movement that promotes education, discourse, activism, and awareness of the Palestinian struggle for justice and self-determination through lectures by academics and political activists, movie screenings, events, and other displays.[25]

48.    On April 23, 2024, the PSC chapter at UT Austin posted on their Instagram account a notice of a planned walk-out and protest on the University's main lawn to take place the following day, April 24, 2024.

---

[23] *Id.*
[24] *Institutional Rules* § 13-304(b).
[25] Palestine Solidarity Committee, UTexas HornsLink,
https://utexas.campuslabs.com/engage/organization/palestinesolidaritycommittee.



49.    A post the next day announced a schedule of programming including such things as a teach-in, a study break, and an art workshop. The final event on the program was scheduled for 7:00PM on April 24, 2024.



50.    Plaintiffs came across the announcement on social media and decided to attend as their schedules allowed. Plaintiffs intended to attend the protest between classes and work

obligations and to return throughout the day during their free time. All intended to leave at the end of the scheduled programming, around 8PM.

51.     Plaintiffs joined the April 24th protest to express support and solidarity with the Palestinian people, to express political opposition to the U.S. government's support of Israel, and to associate with PSC and its members.

52.     At no point during all relevant times did any plaintiff commit any violent act, disrupt campus activities, or damage any property.

**B.  UT Austin's Preemptive Cancellation**

53.     On April 24, 2024, at 6:15AM, Provost Sharon Wood emailed the Dean's Council, stating that the university had heard of a planned event titled "The Popular University for Gaza." The email went on to state:

> The stated purpose of this event was to 'occupy the South Lawn' to 'take back our university…in the footsteps of our comrades' in recent demonstrations at Columbia, Rutgers, and Yale. The event invitation encouraged participants to wear masks in violation of our Institutional Rules. This 'Popular University' event is part of a national campaign by a non-UT affiliated group explicitly seeking to disrupt university operations nationwide by creating campus encampments. As we have seen over the past few days, these illegal encampments have done just that. They have resulted in significant changes to classes, hundreds of arrests, intimidation, and calls for violence against Jewish students. The University is working to ensure this type of disruption doesn't occur on campus. As part of this effort, last evening, the Office of the Dean of Students informed the event organizer that they could not hold this event on campus. DOS also explained that any attempt to do so would subject the organization and its attending members to discipline under the Institutional Rules . . . .

54.     It remains unclear when UT Austin officially notified PSC or the event organizers that permission for the event had been revoked. On April 24, 2024, while the protest was already

underway, UT Austin released to the press an Event Cancellation Notice addressed to Jenna Homsi and dated April 23, 2024. The notice stated:

> [UT] will not allow this campus to be 'taken' and protesters to derail our mission in ways that groups affiliated with your national organization have accomplished elsewhere . . . .

55. Public records released by UT Austin include four messages from the Dean of Students to redacted Authorized Representatives of PSC, notifying them of the event's cancellation. Aside from notably being dated April 24, 2024, these notices were identical to the one sent to Jenna Homsi that UT Austin publicized.

### C. Timeline of Events

*i.   The Beginning of the Protest, Initial Police Blockade, and First Dispersal Orders*

56. A group of approximately 50 to 75 protesters started gathering in front of Gregory Gym on East 21st Street at 11:40AM, the scheduled start time of the event, including Ms. Heilrayne. The protest leaders led chants from the gym stairs but only during class passing periods to comply with university rules. They also refrained from using amplified sound, such as loudspeakers, for the same reason.

57. After gathering, the students intended to turn right onto East 21st Street and proceed to the lawn for the teach-in and scheduled activities.

58. However, eight to ten police officers positioned in a line on horseback, believed to be a DPS Mounted Unit, blocked the protesters' path, standing in front of a group of pro-Israel counter-protesters. The police officers faced the protest group as if guarding the counter-protesters.



59.    Then-Dean of Students Brian Davis was seen speaking with the counter-protesters, some of whom shouted slurs, such as "kapo," at anti-Zionist Jewish protesters and urged the police to arrest them.[26]

60.    UTPD police reports indicate they were called to respond at 11:52AM. During that time, PSC steering members were speaking with police and university officials about an alternate route for the protesters and were *instructed* to turn south on Speedway. They complied, but upon approaching the edge of campus, they were blocked again by a group of several dozen state troopers, some on horseback.

61.    As the state troopers marched forward to meet the protesters and restrict them from continuing, they marched directly next to and ignored a large group of counter-protesters. The counter-protesters were wearing Israeli flags and standing in a circle with their arms around each other. The state troopers ignored them and only restricted the movement of pro-Palestine protesters.

---

[26] "Kapo" is the term used to refer to Jewish individuals who were forced to supervise forced labor, among other things, in the Nazi concentration camps. Some Zionist Jews use the term as a slur against anti-Zionist Jews because they perceive them as "traitors" to the Jewish people.



62.     The pro-Palestine protestor group remained stationary for fifteen to twenty minutes, until approximately 12PM, chanting and awaiting further instructions. Meanwhile, a group of additional police officers positioned themselves behind the protesters, blocking their path north.

63.     Eventually, the police removed the barricade, allowing the group to move south towards Brazos Street. However, as soon as they did, police vehicles pulled into the road, blocking their path once again and confining them near the street between the parking garage and Blanton Museum.

64.     While blocked by police, the group witnessed what appeared to be hundreds of state troopers in riot gear and carrying zip ties marching onto campus from the direction of the Capitol.

65.     At approximately 12:30PM, a UTPD officer announced via a DPS loudspeaker that the group was violating Penal Code Section 42.03 for obstructing a highway and had two minutes to disperse or face arrest. The officers did not provide any instructions regarding where the students were to go.

66.     The students, including Ms. Heilrayne, were attempting to comply with this order when arrests began.

67.     The approximately 12:30PM order given by UTPD in front of Brazos, citing Penal Code section 42.03 Obstructing a Highway, is the only dispersal order that Ms. Heilrayne was aware of when arrests began.

68.     Understanding the order to be based on UTPD's belief that they were obstructing a highway and despite the fact that they were explicitly instructed by university officials to walk down Speedway and then *guided* towards Brazos Street, the students immediately attempted to comply, walking back onto campus in small groups of three to four along Speedway. Some departed for class or other activities, while others planned to reconvene with the protest group for the scheduled teach-in on the lawn.

69.     After the group dispersed from the Brazos Garage area, two or three police officers were stationed in front of the steps leading to the UT Tower entrance. As students approached the steps to enter the tower, the officers stepped aside to let them through.

70.     The officers denied entrance to only two students who approached.  One was a male student wearing a keffiyeh. Another was a Muslim student wearing a hijab.

71.     Moments later, the officers again admitted a different group of students who were not wearing any clothing identifying them as part of the protest or visibly Muslim.

72.     A large contingent of DPS troopers in riot gear, mounted DPS officers, UTPD officers, and APD officers had assembled on Speedway. Meanwhile, most of the protesters who had just dispersed from the Brazos area were still moving away. At the same time, the passing period began, bringing hundreds of unaffiliated students out of class and into the area.

73.    In an Incident Report released through public records on April 30, 2024, and authored by Lieutenant Hector Luevano, UTPD states that arrests began after "the group had ignored and defied two orders of dispersal." This Report is attached as Exhibit 6.

74.    The crime reported at 11:52AM was Criminal Trespass under Tex. Pen. Code § 30.05, and the "victim" was listed as the University of Texas at Austin.

75.    The Incident Report does not make clear how the two dispersal orders that the group allegedly "ignored and defied" were communicated to the group, if at all. *See* Exhibit 6, at 3.

76.    By contrast, UTPD's "Reporting Officer Narrative" document lists "Graffiti" as the relevant offense, and states that the group "had already received approximately 4 warnings from [the] Dean of Students prior to UTPD arrival as well as within my presence to disperse at about 11:55." *See* Exhibits 1-4, at 6.

77.    This would have occurred just about fifteen minutes after the event's planned start time of 11:40AM, during the time when the protest organizers were speaking to university officials and the police about their instructions for the protest's alternate route. Ms. Heilrayne, the only plaintiff present at this time, heard no such warnings.

78.    UTPD's Reporting Officer Narrative also describes the approximately 12:30PM dispersal order in front of Brazos order differently than what Ms. Heilrayne and other protesters experienced.

79.    It describes the order as stating that the students were in violation of Tex. Pen. Code § 42.01 Disorderly Conduct, § 42.02 Riot, § 42.03 Obstructing a Highway or Other Passageway, and § 30.05 Criminal Trespass and that they were given *ten minutes* to leave the area. *See* Exhibits 1-4, at 6.

80.    Upon information and belief, the actual 12:30PM order was based only on an alleged violation of Penal Code Section 42.03 Obstructing a Highway or Other Passageway and provided only *two* minutes to comply.

81.    The Reporting Officer Narrative also notes that the 12:30PM dispersal order was given over a "DPS loudspeaker." Notably, it does not provide any information as to how the first four "warnings" alleged to have been given in the first fifteen minutes of the protest, were communicated to the group, if at all. *See* Exhibits 1-4, at 6.

82.    Upon information and belief, these warnings were provided to PSC steering members, rather than via loudspeaker, and resulted in the instruction for the group to continue south on Speedway. As such, the students, including Ms. Heilrayne, fully complied with the alleged first four warnings by walking south on Speedway until they were penned around Brazos Street.

ii.    *The First Arrests & Initial Police Aggression on Speedway*

83.     At approximately 12:50PM, a student was suddenly arrested while speaking with police and/or university officials. Witnesses reported that multiple UTPD officers approached from behind, forcibly grabbed his arms, and placed him in zip ties before leading him away. As he was escorted to a UTPD vehicle, the crowd chanted, "Let him go!" Some students attempted to leave the area after the student's arrest but were blocked by police.

84.    After the first arrest, police formed a phalanx in the middle of Speedway and forcefully advanced to clear the area. DPS troopers, some with bikes and batons lined the perimeter, while additional officers on foot, horseback, and in vehicles occupied the center. Police instructed students to move out of the middle of Speedway but did not order them to leave the area entirely.

85.    Most students quickly retreated to the edges of Speedway, gathering on the grassy inclines and stairways on either side. The closest protesters stood just a few feet from the police line, while those higher up on the incline were several yards away. Officers wielding batons struck and pushed students who didn't move quickly enough, knocking down several who were attempting to comply and retreat.

86.    From that point on, police carried out seemingly random arrests of protesters. Without warning, an officer would point at a protester, prompting four to five DPS troopers and other officers to rush forward and forcibly grab them. Some individuals attempted to retreat from the edge of Speedway but were chased up the stairs or incline and arrested.

87.    Several plaintiffs were arrested while attempting to comply with police orders to clear the middle of Speedway.

88.    Notably, moments before Ms. Heilrayne's arrest, Defendant John Doe DPS Officer A, gathered with other troopers close to where Ms. Heilrayne would be arrested, asked his colleagues, "What are [the students] doing that's illegal? We've been asking this question, but what are they doing that's illegal?" He went on to ask, "What if this was after a game or something? That many people is out . . . after a basketball game. We do this after the Aggie games?" Defendant John Doe DPS Officer B responded, "No." After this exchange, Defendant John Doe DPS Officer C finally said, "Alright, let's shit or get off the pot" and asked, "Which one are we going after?" Students were indicated and the arrests began, beginning with Ms. Heilrayne.

    *iii.*    *Plaintiffs Arrested on Speedway*

      a)  Arwyn Heilrayne

89.     After dispersing from the Brazos Garage area, Ms. Heilrayne was heading to her next class via Speedway when the police phalanx formed and chaos erupted. She stepped back onto the grass beside Speedway to observe.

90.     At 1:11PM Defendants John Doe UTPD Officers A and B were gathered with several UTPD and DPS officers on Speedway. Defendant John Doe UTPD Officer A identified Ms. Heilrayne and another individual for arrest, indicating the reason for her arrest was that "she started [a] chant."

91.     Around 1:13PM, Defendants Adame, John Doe UTPD Officers A and B, and John Doe DPS Officers A, B, and C rushed at her, grabbed her shoulders, and pushed down on her arms, knocking her to the ground before pulling her up and behind the police line. They twisted her arms behind her back, causing significant pain, and held her in that position for about a minute before securing her in zip ties. Ms. Heilrayne was wearing a Palestinian keffiyeh at the time of her arrest.

92.     After her arrest, Ms. Heilrayne was held behind the police line for about ten minutes. Her zip ties were excessively tight and she repeatedly asking officers to loosen them, reporting that she was losing feeling in her hands. She began hyperventilating and experiencing a panic attack. During this time a journalist captured a photo of her, which quickly went viral, bringing her massive amounts of unwanted attention.



93.     After being arrested and detained, Ms. Heilrayne was placed in a police sedan, where she overheard officers mention a quota of 50 student arrests. She was then transported to Sutton Hall, where a processing center had been set up in the basement. While searching her backpack, officers discarded some of her belongings. Still panicking and hyperventilating, she had to beg for water.

b)  Citlali Soto-Ferate

94.     Ms. Soto-Ferate arrived at Speedway to join the protest around 1:00PM after her class was dismissed, unaware of the morning's events, and stood at its edge. She assisted other protesters in complying with police orders by warning them to clear the middle of Speedway. Around 1:30PM, she saw a group of protesters across the street between Gregory Gym and the McCombs building as police continued pushing people backward toward McCombs. She spotted someone she knew by McCombs, standing with her back to a group of officers.

95.     As Ms. Soto-Ferate walked over to warn her friend to move, both were arrested by separate groups of officers. Ms. Soto-Ferate was arrested by Defendants Adame and John Doe UTPD Officers C and D. Due to the officer's rough handling, Ms. Soto-Ferate experienced arm and shoulder pain for a week following her arrest.

96.     After their arrest, Ms. Soto-Ferate was detained by police for about ten minutes. During this time, she was held on Speedway just feet away from several police horses, which appeared increasingly agitated as the crowd grew and tensions rose. Fearing she might be trampled, she repeatedly asked to be moved farther away.

97.     Ms. Soto-Ferate was placed in the back of a large police transport van. While inside, she overheard an officer in the front say they needed to arrest eight more people to meet their quota of ten.

   *iv.*   *The Protest Moves to the South Mall*

98.      As violence and chaos escalated on Speedway between 1:00 and 2:00PM, large numbers of police and protesters gathered on the South Mall. Police formed a line on the north side of the lawn, with DPS Bike Unit officers in front using their bikes as a barrier in some areas. Behind them stood additional DPS troopers, officers on horseback, UTPD officers, and APD officers.

99.     In response, some protesters linked arms to form a protective line.

100.    When a target for arrest was indicated, the bike unit officers temporarily moved their bikes to allow a group of officers to rush forward from behind, grab protesters, and drag them back behind the police line.

   *v.*   *Plaintiffs Arrested on the South Mall*

    a)  Iliana Medrano

101.    Ms. Medrano, also unaware of the morning's events, intended to join the protest around 12:45 pm and made her way to the South Mall, standing in front of the student crowd with arms linked with those beside her.

102.    The line of DPS officers repeatedly pushed their bikes into her, attempting to force the crowd back. However, with the dense crowd behind them, there was nowhere to move. Several people were knocked to the ground.

103.    Around 3:00PM, Defendants Henry and John Doe UTPD Officers E, F, G, and H rushed at Ms. Medrano, forcefully pulling her right arm and bringing her to the ground facedown. As she fell, her dress rode up, exposing her behind and undergarments. She pleaded with the officers restraining her to pull her dress down to preserve her modesty, but they ignored her. For about a minute, multiple officers held her down, and one pressed down on her neck, as shown in the image below.



104.    While restraining Ms. Medrano on the ground, the officers pulled her arms behind her and secured her wrists with zip ties, tightening them as much as possible. Despite repeatedly requesting they be loosened and warning that she was losing feeling in her hands, officers did not adjust them for at least two hours.

105.    She also requested medical attention in jail after being arrested and was denied. Her left hand remained numb for several days.

106.    A doctor examined her the following day and diagnosed her with a nerve compression injury in her left wrist and thumb caused by the zip ties, along with bruising on both arms, as shown in the images below.






b) Mia Cisco

107.    Ms. Cisco joined the protest later in the afternoon on the South Mall, arriving to a massive police presence using bikes as a barrier to push protesters back—though it was unclear where they were being directed. She did not hear any dispersal orders or instructions from police while she was there.

108.    Every few minutes, an officer would point at a protester, prompting a group of 4 or 5 officers to rush out from behind the bike line and make an arrest. Ms. Cisco observed that many of the arrests were unnecessarily brutal, with multiple officers tackling protesters who were not resisting.

109.    While at the protest, Ms. Cisco spoke with Defendant Wray, who was near her in the line of bike unit officers forming the barricade and restricting the protesters' movement, close to where she would soon be arrested. She asked why police were present and why protesters were being arrested. In response, Wray expressed disdain for the protesters' cause and made unsolicited remarks about Palestine, Islam, and the Middle East. He referenced "Hamas tunnels," voiced his hatred for Hezbollah, and claimed that "no Muslim country supports Palestine."



110.    Ms. Cisco was arrested sometime after 4:00PM after being pushed behind a barricade by the line of police officers on bicycles. Defendants Rodriguez, John Doe UTPD Officer I, and John Doe DPS Officers D and E rushed out from behind the bicycle barricade, grabbed her, placed zip ties on her, and restrained her.

111.    As she stood unable to move, a pro-Israel counter-protester approached within inches of her face and shouted, "Am Yisrael Chai." None of the arresting officers reacted.

112.    Like the others, Ms. Cisco's zip ties were extremely tight, and she repeatedly requested they be loosened. Hours later, while at the jail, officers attempted to adjust them but found them so tight that they couldn't fit a scissor blade in to cut them off. She was left with welts on her wrists and hands.

113.    While being processed for transport, an unidentified male officer removed Ms. Cisco's hijab. She immediately informed the police that it was religious garb and repeatedly

pleaded for its return throughout her time in the van. She did not receive it back until later at the jail.

114.    While being transported in the police van, Ms. Cisco overheard officers discussing the need to meet a numerical quota of arrests.

    *vi.    The Protest Concludes, As Planned, at 7:00PM*

115.    At approximately 5:25PM, UT issued a dispersal order through the UT Safety Alert system via email, text, the campus emergency PA system, loudspeakers, and social media. The Safety Alert email, sent by Assistant Chief Ashley Griffin, informed occupants of the South Mall that they were ordered to disperse and that their conduct violated the following Penal Code sections: 42.01 (Disorderly Conduct), 42.02 (Riot), and 42.03 (Obstructing a Highway or Other Passageway).

116.    No Plaintiff remained at the protest when this order was given.

117.    By shortly after 6:00PM, most protesters and police had dispersed. Once the police left, a smaller group of protesters returned to the South Mall and continued activities, including short speeches, until about 7:00PM.

**D.  The April 24th Pro-Israel Counter-Protest**

118.    The protest organized by PSC was not the only protest at UT Austin on April 24, 2025. Simultaneously and in the same locations – and subject to the same alleged dispersal orders that Defendants use to justify Plaintiffs' arrest – pro-Israel counter-protestors gathered to voice their opinions.

119.    The first group of pro-Israel counter-protestors known to Plaintiffs gathered in the Brazos areas at the beginning of the day where they were discussing their views on the protest with Brian Davis, shouting slurs at the pro-Palestine protestors, and urging police to arrest them.

120.    The police formed a line in front of the pro-Israel counter-protestors, seemingly to protect their speech while interfering with the pro-Palestine protest.

121.    Another group of pro-Israel counter-protestors were gathered on the South Mall later in the day, around 4PM. This group was so enmeshed in the crowd that one was able to walk up to Ms. Cisco and shout "Am Yisrael Chai" inches from her face while Ms. Cisco was restrained on the group and police surrounded them.

122.    Upon information and belief, groups of pro-Israel counter-protestors were present throughout the day, freely exercising their right to express their views, all in the same locations as pro-Palestine protestors.

123.    Some, such as the one who shouted in Ms. Cisco's face, engaged in objectively aggressive behavior.

124.    Not a single pro-Israel counter-protestor was arrested.

**E. Aftermath and Student Discipline**

125.     Each plaintiff was initially charged with Criminal Trespass and booked into Travis Country Jail.

126.    On April 26, 2024, the Travis County District Attorney announced that all charges against the 57 protesters arrested at the demonstration had been dropped due to a lack of probable cause.[27]

---

[27] *See, e.g.*, Pooja Salhotra, *Travis County rejects all criminal trespass charges against 57 people arrested at UT-Austin protest*, TEXAS TRIBUNE (Apr. 26, 2024), https://www.texastribune.org/2024/04/25/ut-austin-palestinian-arrests-criminal-cases/.

127.    On April 25, 2024, the day after the protest, UT Austin sent an email notice and posted flyers (shown below) stating that students involved in the protest were prohibited from campus.

128.    The following morning, April 26, 2024, Brian Davis initially confirmed the flyers' accuracy, stating that arrested students were banned from campus for any reason.

129.    This announcement caused significant distress, as it was the last week of the semester and finals were set to begin the following week.

130.    A few hours later, Davis amended the policy, allowing arrested students on campus for academic purposes.

131.    By Friday evening, UT Austin released a statement fully revising its earlier position, permitting arrested students to return for any reason.

132.    Despite this reversal, many students remained confused about their status and feared they could be arrested again for coming to campus.

**NOTICE**

The freedom to speak and peacefully assemble is a cornerstone of the University's identity as a world-class university. It's not just a privilege, but a responsibility we all share in fostering an environment where diverse ideas can thrive. Individuals on campus are free to:

- **Assemble peacefully to protest**
- **Hand out flyers and brochures**
- **Invite guest speakers to present in common outdoor areas**
- **Engage with staff members if they need assistance or have questions**

This freedom comes with the duty to respect our students' right to learn and move freely and the University's operational needs. All individuals on campus must follow the Institutional Rules, Operating Procedures, and laws. Individuals may not:

- **Disrupt the operations of the university, including but not limited to:**

  - Making loud sounds that interfere with learning; teaching, or other official actions; blocking entrances, exits, and walkways; calls for immediate lawless behavior, and vandalism.

- **Camp or attempt to camp on university property  (including bringing tents on campus and sleeping on university property, with or without a tent, later than 10:00 p.m.)**
- **Refuse to identify themselves to university officials or law enforcement**
- **Refuse to comply with directions given by university officials or law enforcement**
- **Use amplified sound without prior approval**
- **Wear masks or disguises**
- **Coerce attention by following students walking away from the protest**
- **Coming to campus without authorization including instances where a person is subject to a criminal trespass warning or arrested for criminal trespass. Returning to campus while under a criminal trespass warning will result in your arrest/re-arrest.**

Those who violate these or any other rule, policy, or law are subject to immediate removal from campus, conduct charges, or arrest.

**EVERYONE MUST LEAVE THE MAIN MALL OR OTHER UNIVERSITY PROPERTY NO LATER THAN 10:00 P.M.**

133.    On June 14, each plaintiff received a notice from UT Austin stating they faced academic discipline for participating in the protest.

134.    The notices stated, "On Wednesday, April 24, 2024, the student participated in an event that disrupted/interfered with operations and violated university rules and policies. Multiple University officials told the group to disperse numerous times, but participants refused to follow

these orders. To gain compliance and eliminate the disruption, officials had to remove the student and others from campus involuntarily."

135.    Each plaintiff was accused of the following rule violations:

11-402(a)(19)(a) Failure to Comply - failure to comply with the directives of any university official(s) acting in the performance of their duties, and who has the authorization to issue such directives.

11-402(a)(18)(a) Disruptive Conduct - engages in conduct that interferes with or disrupts any teaching, research, administrative, disciplinary, public service, learning, or other authorized activity.

136.    UT Austin student disciplinary proceedings do not entitle students to a hearing. Instead, students were instructed to submit a written statement addressing the allegations, due by 5:00PM on June 26, 2024—less than two weeks later.

137.    The notice directed them to respond to the following prompts in their statement:

- Describe the events that led up to your removal from campus.

- Why did you not disperse?

- In your view, is it appropriate to engage in conduct that prevents universities from performing their daily functions? Please explain your answer.

- In your view, is it appropriate to occupy a space on campus in a way that excludes other students? Please explain your answer.

- In your view, is it appropriate to create encampments in spaces on campus?

- In your view, is it appropriate to ignore university policies regarding restrictions regarding the time, place, and manner in which a person is permitted to engage in expressive conduct on campus?

- Do you agree that your conduct on the day in question was disruptive and/or interfered with teaching, research, administrative, disciplinary, public service, learning, or other authorized activity? Please explain your answer.

- Did you intend to be disruptive and/or interfere with teaching, research, administrative, disciplinary, public service, learning, or other authorized activity? Please explain your answer.

- If given the ability to relive the day in question, would you do anything differently? Please explain your answer.

- What would you tell a fellow student who had their lives or education negatively impacted by your conduct?

- How did you learn about the event on the day in question?

- Is there any other information you would like us to consider?

138.    Plaintiffs strongly objected to the prompts, believing they presupposed guilt and were based on inaccurate depictions of the protest and their actions.

139.    Several students facing disciplinary charges sought legal advice and were warned that any response could be used against them if criminal charges were refiled. As a result, some chose not to respond to the disciplinary charges, despite wanting to, due to fear of self-incrimination or difficulty securing legal counsel within the short response period.

140.    Each student's disciplinary packet contained identical charges and largely the same supporting evidence: UTPD's Reporting Officer Narrative, two screenshots of PSC's Instagram posts about the event, and three photos of tents on a lawn—none of which depicted Plaintiffs. However, each plaintiff had at least one Case Supplement Report in their packet, seemingly

containing additional UTPD information specific to their involvement. Plaintiffs' disciplinary packets are attached as Exhibits 1-4.

141.    In July, each plaintiff received notice that they had been found responsible for the alleged conduct violations.

142.    Ms. Heilrayne, Ms. Soto-Ferate, and Ms. Medrano, were "offered" a disciplinary sanction of deferred suspension from UT.

143.    Under this offer, the suspension would not take effect, and neither the charge nor the punishment would appear on their final transcript. Students would also have to agree in writing that any future violations of university rules would result in a suspension. Accepting the offer would formally conclude the student conduct process, during which students had been unable to register for classes or obtain transcripts due to administrative holds.

144.    Ms. Cisco was offered a sanction of academic probation for one year.

145.    If a student declined the offer and attempted to appeal but was unsuccessful, they would face a one-year suspension. Additionally, the appeals process did not entitle students to a hearing or representation.

146.    Each plaintiff reluctantly accepted the offer of deferred suspension or probation, fearing a harsher sanction or a prolonged disciplinary process, despite disagreeing with UT Austin's allegations.

147.    Ms. Soto-Ferate wanted to appeal but refrained, fearing it would delay her graduation and access to her transcripts.

148.    Similarly, Ms. Medrano felt compelled to accept the deferred suspension to ensure the timely conferral of her degree, which she needed to in order to apply for her social work license and seek post-graduate employment.

149.    Ms. Cisco also believed she had no choice but to accept, as she is on a need-based full scholarship at UT Austin, maintains a 4.0 GPA, and works for a professor in her department. She feared that prolonging the disciplinary process could jeopardize her financial aid and employment.

150.    Plaintiffs have already faced significant academic and career consequences due to the response to the protest.

151.    For example, Ms. Heilrayne, who works at the Texas State Capitol and aspires to a career in local politics, was doxed after the viral photo of her arrest. She now fears that the negative attention will impact her job prospects.

152.    Beyond academic and professional consequences, each plaintiff has experienced deep trauma from their arrest and UT's response.

153.    Ms. Heilrayne and Ms. Cisco, who remain UT Austin students, feel especially anxious and distressed when on campus for class or work.

154.    Ms. Heilrayne was diagnosed with post-traumatic stress disorder and has been in intensive trauma therapy since August 2024.

155.    Ms. Soto-Ferate's trauma was also so severe that she sought psychological counseling.

### III.    Viewpoint-Based Motivations for the Response to the April 24th Protest

156.     In the weeks, days, and hours before the April 24th protest, state actors and University officials expressed hostility towards the message of pro-Palestine student protestors around the country and took measures to ensure that no such message would be tolerated at UT Austin.

157.    The response to the protest by state actors and university officials included the separate decisions to cancel the protest, to direct the arrests of protesters, and to carry out those arrests.

158.    State actors and university officials directed the arrests despite a clear lack of probable cause, and police carried out the arrests despite a clear lack of probable cause.

## A. University Administration Attitude towards the Pro-Palestine Student Movement

### i. Past Protests at UT Austin

159.    UT has a rich history of student protests, in varied forms and across the political spectrum.

160.    In 2018, the student organization Young Conservatives of Texas ("YCT") hosted a demonstration in support of Supreme Court Justice Brett Kavanaugh's confirmation.

161.    At least 50 counter-protesters opposing the demonstration gathered, and tensions between the groups escalated to the point of allegedly ripping up each other's signs.

162.    Due to YCT's history of provocative demonstrations, attracting widespread media attention and controversy on campus, some criticized UT Austin for allowing the event to go forward.[28]

163.    In response, according to news coverage, UT Austin officials released a statement: "Free speech of UT community members is fully protected on campus. Violence and threats are not. You are able to discuss, argue and condemn those views you disagree with, but unwelcome physical contact with those who espouse them or the destruction of property is never acceptable."[29]

---

[28] Melanie Torre, *UT student rally for Kavanaugh erupts into heated dispute*, CBS AUSTIN (Oct. 3, 2018), https://cbsaustin.com/news/local/ut-student-rally-for-kavanaugh-erupts-into-heated-dispute.

[29] Gracie Awalt, *The University and some students call Young Conservatives of Texas 'provocative.' Members disagree.*, THE DAILY TEXAN (Dec. 5, 2018),

164.    Then-spokesperson and Director of Media Relations at UT Austin J.B. Bird said, "As the nation watches the Supreme Court confirmation process, many of our students are sharing their strong views about the ongoing events. We encourage a robust debate on campus in which everyone feels comfortable voicing their opinions. We want to remind students to be respectful, even of those whose views they disagree with."[30]

165.    UTPD was present at the protest, working to protect the YCT demonstrators from the much larger crowd of counter-protesters surrounding them.

166.    Upon information and belief, no additional law enforcement was called, and no arrests were made.

>    ii.    *UT Austin's Disparate Treatment of Palestine Solidarity*

167.    According to public records released by UT Austin, on April 23, 2024, at 10:22AM, Defendant Hartzell received an email from Sury Sacher with the subject, "Oh no!! They are trying to make UT Columbia." The content of the email is fully redacted.

168.    Upon information and belief, the sender is Sury Feinstein Sacher, the wife of a prominent Houston real estate developer. Her social media includes countless posts about Israel, warnings about the "pro-Hamas movement" threatening Texas, and endorsements of pro-Israel politicians.

169.    On April 23, 2024, at 12:40PM, UTPD Lt. Johanson emailed officials in the Dean of Students' office, stating:

>    Hello, we were just made aware of this event. It appears the group plans to walk out of class and occupy one of the lawns/malls. Given the recent events on the east coast that resulted in the arrest of protesters at NYU/Columbia/Yale we will need support from your

---

https://thedailytexan.com/2018/12/05/the-university-and-some-students-call-young-conservatives-of-texas-provocative-members/.

[30] Torre, *supra* note 25.

office to enforce rule violations. Do y'all have any further
information or request for a reservation from PSC?

170.   Minutes later, Aaron Voyles, Executive Director of Student Involvement, replied:

Hi Lt. Johanson. My understanding is that there is high-level
meeting going on currently and so additional details may come out
of that meeting. We can provide an update once that concludes. We
will plan to have our entire demonstration response team activated
and on-site.

171.   On April 23, 2024, at 5:26PM, UT Spokesperson Mike Rosen and his staff

discussed an email sent to Dean Mersey and the leadership of the Moody College of

Communication by a redacted student member of the campus pro-Israel group. The email states:

I understand you recently had a conversation with my mother and
uncle, [REDACTED] in Atlanta that focused on the ongoing
challenges surrounding the Israel-Palestine conflict, particularly
concerning the rise in antisemitism and antizionism on university
campuses. Beyond my academic pursuits, I am deeply committed to
advocacy through my involvement with Student Longhorns for
Israel, where I serve as the [REDACTED].

This morning, I became aware of a planned walkout organized by
the Austin Palestine Solidarity Committee (PSC) scheduled for
tomorrow at 11:40 am at Greg Plaza. According to their flyer, 'class
is canceled' during this time. My peers and I feel concerned after
watching our peers at Columbia University finish their semester
online due to ongoing threats of violence on campus. I worry that
this masked group of students, who hide their identities, can engage
in aggressive or illegal behavior without being held accountable
because it will be difficult to identify individuals who disrupt public
order and safety.

172.   On April 30, 2024, Defendant UT System Board of Regents Chairman Eltife

released a statement, claiming:

Massive crowds of students, along with outside groups with
absolutely no connection to UT, have intentionally caused
disturbances with plans to harm our campus community. In fact, the
majority of arrests to date have occurred with agitators who are not
UT students. These activities will not be allowed.  While free speech
is fundamental to our educational institutions, it is violated when it

includes threats to campus safety and security or refusal to comply with institutional policies and law. At UT Austin, I have been working closely with President Hartzell on decisions to protect its entire campus community, and we will not acquiesce on those protections under any circumstance. I appreciate our campus police officers and we cannot thank the Texas Department of Public Safety enough for all their assistance. We will continue to call upon the DPS to secure our campus when needed.

173.    Defendants claim to have canceled the April 24th protest on the evening of April 23, 2024.

174.    While the protest was underway, UT Austin released to the press a cancellation notice dated April 23, 2024, but public records released by UT Austin contain this same notice dated April 24, 2024.

175.    UT Austin's First Amendment policies in effect at the time did not require prior authorization to gather for expressive purposes in outdoor campus areas. It is unclear when the revocation of this unrequired authorization occurred, but, in any case, the total preemptive cancelation of a protest is not a time, place, and manner restriction with an incidental effect on speech – it is a prior restraint.

176.    Furthermore, the cancellation of a school-sanctioned event does not necessitate a law enforcement response, arrest, and potential criminal liability for failure to comply. Defendant Hartzell and UT Austin not only cancelled their permission for the protest to go on but called in an unprecedented number of external law enforcement officers from at least three agencies to shut it down and directed them to arrest protesters.

177.    Defendant Hartzell and Eltife directed law enforcement to shut down the protest and conduct the mass arrest of protesters before it had even begun. In emails sent on April 23, 2024, and released through public records, UT administration and UTPD planned for arrests of protesters and to have the "entire demonstration response team activated and on-site."

178.    It is unclear which "entire demonstration response team" was designated to attend on April 23, whereas UTPD stated in multiple public sources they responded to criminal reports made at 11:52AM on April 24, alleging "criminal trespass" and "graffiti." See Exhibit 1-4, at 6; Exhibit 6, at 3.

---

Thursday, April 25, 2024 at 16:07:57 Central Daylight Time

**Subject:** Re: Walk Out / Protest / Occupy Lawn Tommorrow
**Date:**    Tuesday, April 23, 2024 at 12:42:19 PM Central Daylight Time
**From:**    Aaron W Voyles
**To:**      Johanson, Eric R, Dawson-Love, Sade
**CC:**      Schroeder, Erich R, Stock, Robert J, UTPD-IMD SGT, Katie McGee, Soucy, Kelly L

Hi Lt. Johanson,

My understanding is that there is a high-level meeting going on currently and so additional details may come out of that meeting. We can provide an update once that concludes.

We will plan to have our entire demonstration response team activated and on-site.

Thank you,

Aaron

--
AARON W. VOYLES, M.F.A., Ed.D.
Executive Director of Student Involvement | Office of the Dean of Students
Assistant Professor of Practice | Education Leadership and Policy
The University of Texas at Austin | 512-232-2185 | aaron.voyles@austin.utexas.edu

---

**From:** Johanson, Eric R <eric.johanson@austin.utexas.edu>
**Date:** Tuesday, April 23, 2024 at 12:40 PM
**To:** Dawson-Love, Sade <sade.dawsonlove@austin.utexas.edu>, Aaron W Voyles <aaron.voyles@austin.utexas.edu>
**Cc:** Schroeder, Erich R <erich.schroeder@austin.utexas.edu>, Stock, Robert J <Robert.Stock@austin.utexas.edu>, UTPD-IMD SGT <UTPD-IMDSGT@austin.utexas.edu>
**Subject:** Walk Out / Protest / Occupy Lawn Tommorrow

Hello,

We were just made aware of this event. It appears the group plans to walk out of class and occupy one of the lawns/malls.

Given the recent events on the east coast that resulted in the arrest of protestors at NYU/Columbia/Yale we will need support from you office to enforce rule violations.

Do y'all have any further information or request for a reservation from PSC?

ERIC JOHANSON, Lieutenant | The University of Texas at Austin | Police Department | Investigations |

1 of 2

179.    Additionally, the arrival of hundreds of DPS troopers around 12:00PM on April 24, armed with riot gear and zip ties, prior to any dispersal orders, reflects that mass arrests were ordered and planned in advance.

180.    Defendants' stated reasoning for the cancellation and police response was based either on animus towards pro-Palestine opinion, unsupported assumptions based on the protestors' perceived associations, or both.

181.    Defendants treated this protest differently than past protests expressing different viewpoints by student organizations with documented histories of organizing contentious protests, like YCT. Indeed, YCT's 2018 protest resulted in physical altercations, but did not result in cancellation or a police response.

182.    Given that the decisions to cancel and criminalize the April 24th protest were prior restraints on speech, even if Defendants could articulate a non-discriminatory interest at stake that day, total cancellation was not the least restrictive means by which to achieve it.

**C. Governor Abbott Orders the Arrest of Student Protestors Based on their Viewpoint**

183.    UT Austin did not act alone in its response to the April 24th protest, but in full collaboration with Governor Abbott and the state police under his control.

184.    DPS released a statement at 6:20PM on April 24, confirming that UT Austin requested and Defendant Abbott directed their presence at the protest:

> [DPS] responded to the UT campus in Austin today at the request of the University and at the direction of Texas Governor Greg Abbott, in order to prevent any unlawful assembly and to support UT Police in maintaining the peace by arresting anyone engaging in any sort of criminal activity, including criminal trespass.

185.    Defendant Abbott's intention was not for DPS to enforce Texas law, but to show that Texas would not tolerate a pro-Palestine protest gaining attention for any reason other than the brutal, militarized police crackdown such protests would invite.

186.    That Defendant Abbott's directive to arrest protestors was based on their viewpoint is demonstrated quite explicitly by his contemporaneous commentary on the social media platform X (formerly Twitter).

187.    At 3:51PM on April 24, 2024, Defendant Abbott retweeted a post showing video footage of DPS troopers shoving through the crowd of student protesters and referring to the students as "Pro Hamas idiots."[31]

188.    In that retweet, Defendant Abbott endorsed the original poster's message and further wrote:

> Arrests being made right now & will continue until the crowd disperses. *These protesters belong in jail.* Antisemitism will not be tolerated in Texas. Period. Students joining *hate-filled, antisemitic protests* at any public college or university in Texas should be expelled.[32]

189.    Defendant Abbott smeared the students as antisemitic and called for their arrest solely because they were protesting in support of Palestinian liberation.

190.    In 2019, Defendant Abbott zealously endorsed a Texas law protecting speech on campuses.[33]

---

[31] Greg Abbott (@GregAbbott_TX), X (Apr. 24, 2024), https://x.com/GregAbbott_TX/status/1783237229252346194?
[32] *Id.* (emphasis added).
[33] Greg Abbott (@GregAbbott_TX), X (June 9, 2019), https://x.com/GregAbbott_TX/status/1137875109362974724.

191.    Defendant Abbott's statements and actions as related to pro-Palestine protests are in stark contrast to his past statements and actions regarding freedom of speech on college campuses.[34]

## CLAIMS FOR RELIEF

### Count I: Violation of the First Amendment to the United States Constitution
### 42 U.S.C. § 1983

192.    Plaintiffs reallege and incorporate by reference the allegations set forth in paragraphs 1 through 191.

193.    "[T]he First Amendment rights of speech and association extend to the campuses of state universities." *Widmar v. Vincent*, 454 U.S. 263, 268-69 (1981). The open areas of UT Austin's campus were, on April 24, 2024, traditional public forums, "subject only to time, place, and manner regulations and a small number of enumerated content-based restrictions." *Justice for All v. Faulkner*, 410 F. 3d 760, 769 (5th Cir. 2005).

194.    It is clearly established that viewpoint discrimination violates the First Amendment in any forum.

195.    The preemptive cancellation of the April 24th protest was a content-based prior restraint on Plaintiffs' expressive activity. This prior restraint was imposed based on the viewpoint of the protest and UT Austin's predictions of what would transpire based on perceived associations among Plaintiffs and other student protestors.

---

[34] *See* John C. Moritz, *Abbott's condemnation of UT protesters contrasts with his 2019 stance on campus free speech*, AUSTIN AMERICAN-STATESMAN (Apr. 25, 2024), https://www.statesman.com/story/news/politics/state/2024/04/25/free-speech-ut-austin-protest-greg-abbott-tweet-response-protests-contrast-2019-stance/73447192007/.

196.    All the actions taken against Plaintiffs were predicated on the assertion that they engaged in an unauthorized act of protest in spaces designated by UT Austin and Texas state law as traditional public forums. That assertion does not hold.

197.    UT Austin violated the First Amendment by prohibiting Plaintiff's expressive conduct ahead of time. Each alleged dispersal order, holding aside other issues with their effectiveness, was an unlawful enforcement of UT Austin's unconstitutional prior restraint, and cannot justify Plaintiffs' arrests or discipline.

198.    Even if UT Austin's decision to cancel the protest was lawful, its subsequent decision to enforce the cancellation by directing the arrests of Plaintiffs and the other pro-Palestine protestors was not. The cancellation did not transform UT Austin's outdoor areas from traditional public forums to private property. Nor did Plaintiffs' First Amendment protections flow from the protest's initial authorization, but from their engagement in expressive conduct in a traditional public forum.

199.    As such, regardless of the cancellation, of which Plaintiffs were not aware, the First Amendment protects Plaintiffs from discipline and arrest because they engaged in speech or because of the viewpoint they expressed.

200.    The initial police report filed by UT Austin alleged that the students were engaged in "Criminal Trespass" at 11:52AM, just minutes after the first group of students arrived. *See* Exhibit 6, at 3. This allegation, made almost immediately after the protest began, was based not on any violations of UT Austin's time, place, and manner restrictions applicable to such areas, but on the protestors' presence itself. That sort of preemptive interference with expressive conduct is prohibited in a traditional public forum.

201.   UT Austin's decision to send in the police to suppress the protest and to arrest Plaintiffs and protestors was made prior to any specific rule violations except UT Austin's spurious, ad hoc rule that its traditional public forums were closed to pro-Palestine protestors on April 24, 2025.

202.   But even if UT Austin believed that the protest had the potential to become disruptive, its own rules state that "[p]otentially disruptive events can often proceed without disruption if participants, administrators, and law enforcement officials cooperate to avoid disruption without stopping the event."[35] That is precisely what the protest's organizers were doing in the Brazos area when the police directed them to continue down Speedway, only to begin making arrests minutes later.

203.   UT Austin's rules, mirroring clearly established law, further caution against viewpoint discrimination in their application, noting that "where difficult enforcement judgments are unavoidable, administrators and law enforcement officials' judgments should not be influenced by the viewpoint of those claiming disruption or of those allegedly disrupting."[36]

204.   Indeed, in enforcing time, place, and manner restrictions, public officials do not have "the type of unbridled discretion . . . to pick and choose among expressions of view the ones he will permit to use the streets and other public facilities[.]" *Cox v. City of La.*, 379 U.S. 559, 569 (1965). But that is precisely what UT Austin did, arresting pro-Palestine protestors, while permitting without any interference whatsoever pro-Israel counter-protestors to express their viewpoints in exactly the same time, place, and manner.

205.   Defendants' actions on April 24, 2025, flagrantly violated Plaintiffs' First Amendment rights. The cancellation of the protest was an unlawful prior restraint on protected

---

[35] *Institutional Rules* § 13-301(c).
[36] *Id.* § 13-301(b)(2).

activity; Defendants' directions to and effectuations of arrest on Plaintiffs and the other protestors were unlawful acts of retaliation not responding to any actual violations of law except the no-Palestine-protest law Defendants invented for the day; and, throughout each action, Defendants acted on animus towards Plaintiffs and the other protestors' viewpoint, both by disregarding its own rules on how to deal with potential disruptions and by permitting pro-Israel counter-protestors to engage in the same activities and more without interference.

*On Behalf of All Plaintiffs Against Defendants Hartzell, Eltife, and Abbott for Monetary Damages and Declaratory Relief*

206.    Defendants Hartzell and Eltife, acting under color of Texas law, unlawfully prohibited and directed a militarized police response to Plaintiffs' expressive conduct in a traditional public forum on the basis of their viewpoint and/or their perceived associations with pro-Palestine students on other campuses.

207.    Defendants Hartzell and Eltife's directives were not actions enforcing content-neutral time, place, and manner restrictions on expressive conduct in UT Austin's traditional public forums. Their directives to prevent Plaintiffs' protest and to arrest them, along with their fellow pro-Palestine protestors, were given prior to any reasonable assessment that an actual disruption to campus operations would occur and without regard for the protest organizers' cooperation with the police and a publicized, time-bound agenda for the day's events.

208.    Defendants Hartzell and Eltife only directed the arrest of pro-Palestine protestors, including Plaintiffs. They did not direct the arrest of others involved in the protest, including pro-Israel counter-protestors. Rather, upon information and belief, Defendants Hartzell and Eltife directed law enforcement to protect the pro-Israel counter-protesters expressive assembly.

209.    Defendant Abbott ordered DPS to suppress what he referred to as the "antisemitic" protest on April 24, 2024, and to assist in the arrest of who he endorsed being called "pro-Hamas idiots" until they stopped engaging in expressive conduct in a traditional public forum.

210.    On Defendant Abbott's orders, DPS did suppress Plaintiffs' expressive conduct, surrounding them throughout the day, subjecting them to intimidation, and assisting in their arrests.

211.    Defendants Hartzell, Eltife, and Abbott's actions were motivated by hostility towards Plaintiffs' pro-Palestine advocacy and their association with Palestinian students and pro-Palestine students on other campuses. Their viewpoint discrimination is evident from their disparate treatment of pro-Palestine and pro-Israel protestors, the severity of the preemptive response to this peaceful protest compared to past contentious protests, and Defendant Abbott's nakedly discriminatory statements.

212.    Defendants Hartzell, Eltife, and Abbott subjected or directed their subordinates to subject Plaintiffs to unconstitutional restrictions on their rights to express their viewpoints, to associate, and to assemble, as well as their right to be free from violent arrest without probable cause.

213.    Defendant Hartzell, Eltife, and Abbott's actions were designed to stifle political expression critical of U.S. and Israeli policies.

214.    Defendant Hartzell, Eltife, and Abbott's actions were willful, deliberate, and malicious, involved reckless or callous indifference to Plaintiffs' rights, and should be punished and deterred by an award of punitive damages to the extent permitted by law.

*On Behalf of Plaintiff Heilrayne Against Defendants Luevano, Adame, John Doe UTPD Officers A and B, and John Doe DPS Officers A, B, and C for Monetary Damages & Declaratory Relief*

215.    Defendants Adame, John Doe UTPD Officers A and B, and John Doe DPS Officers A, B, and C ("Heilrayne Defendant Officers") unlawfully curtailed Ms. Heilrayne's protected expressive activity and arrested her on the basis of her viewpoint.

216.    Upon information and belief, Defendant Luevano directed Defendants Adame and John Doe UTPD Officers A and B to arrest a minimum number of pro-Palestine protestors, including Ms. Heilrayne, to satisfy a numerical quota.

217.    Heilrayne Defendant Officers subjected Ms. Heilrayne to unconstitutional restrictions on her right to express her viewpoint, to associate, and to assemble, as well as her right to be free from violent arrest without probable cause.

218.    Heilrayne Defendant Officers' actions were motivated by hostility towards Ms. Heilrayne's pro-Palestine advocacy and her association with Palestinian students and pro-Palestine students on other campuses. Their viewpoint discrimination is evident from their disparate treatment of pro-Palestine and pro-Israel protestors, the severity of the preemptive response to this peaceful protest compared to past contentious protests, and Defendant John Doe DPS Officers A, B, and C's own statements questioning the legal basis of their actions.

219.    Heilrayne Defendant Officers' actions were willful, deliberate, and malicious, involved reckless or callous indifference to Ms. Heilrayne's rights, and should be punished and deterred by an award of punitive damages to the extent permitted by law.

*On Behalf of Plaintiff Soto-Ferate Against Defendants Luevano, Adame, and John Doe UTPD*
*Officers C and D for Monetary Damages & Declaratory Relief*

220.    Defendants Adame and John Doe UTPD Officers C and D ("Soto-Ferate Defendant Officers") unlawfully curtailed Ms. Soto-Ferate's protected expressive activity and arrested her on the basis of her viewpoint.

221.    Upon information and belief, Defendant Luevano directed Soto-Ferate Defendant Officers to arrest a minimum number of pro-Palestine protestors, including Ms. Soto-Ferate, to satisfy a numerical quota.

222.    Soto-Ferate Defendant Officers subjected Ms. Soto-Ferate to unconstitutional restrictions on her right to express her viewpoint, to associate, and to assemble, as well as her right to be free from violent arrest without probable cause.

223.    Soto-Ferate Defendant Officers' actions were motivated by hostility towards Ms. Soto-Ferate's pro-Palestine advocacy and her association with Palestinian students and pro-Palestine students on other campuses. Their viewpoint discrimination is evident from their disparate treatment of pro-Palestine and pro-Israel protestors and the severity of the preemptive response to this peaceful protest compared to past contentious protests.

224.    Soto-Ferate Defendant Officers' actions were willful, deliberate, and malicious, involved reckless or callous indifference to Ms. Soto-Ferate's rights, and should be punished and deterred by an award of punitive damages to the extent permitted by law.

*On Behalf of Plaintiff Medrano Against Defendants Luevano, Henry, and John Doe UTPD*
*Officers E, F, G, and H for Monetary Damages & Declaratory Relief*

225.    Defendants Henry and John Doe UTPD Officers E, F, G, and H ("Medrano Defendant Officers") unlawfully curtailed Ms. Medrano's protected expressive activity and arrested her on the basis of her viewpoint.

226.    Upon information and belief, Defendant Luevano directed Medrano Defendant Officers to arrest a minimum number of pro-Palestine protestors, including Ms. Medrano, to satisfy a numerical quota.

227.    Medrano Defendant Officers subjected Ms. Medrano to unconstitutional restrictions on her right to express her viewpoint, to associate, and to assemble, as well as her right to be free from violent arrest without probable cause.

228.    Medrano Defendant Officers' actions were motivated by hostility towards Ms. Medrano's pro-Palestine advocacy and her association with Palestinian students and pro-Palestine students on other campuses. Their viewpoint discrimination is evident from their disparate treatment of pro-Palestine and pro-Israel protestors and the severity of the preemptive response to this peaceful protest compared to past contentious protests.

229.    Medrano Defendant Officers' actions were willful, deliberate, and malicious, involved reckless or callous indifference to Ms. Medrano's rights, and should be punished and deterred by an award of punitive damages to the extent permitted by law.

*On Behalf of Plaintiff Cisco Against Defendants Luevano, Rodriguez, Wray, John Doe UTPD Officer I, and John Doe DPS Officers D and E for Monetary Damages & Declaratory Relief*

230.    Defendants Rodriguez, Wray, John Doe UTPD Officer I, and John Doe DPS Officers D and E ("Cisco Defendant Officers") unlawfully curtailed Ms. Cisco's protected expressive activity and/or arrested her on the basis of her viewpoint.

231.    Upon information and belief, Defendant Luevano directed John Doe UTPD Officer I to arrest a minimum number of pro-Palestine protestors, including Ms. Cisco, to satisfy a numerical quota.

232.    Cisco Defendant Officers subjected Ms. Cisco to unconstitutional restrictions on her right to express her viewpoint, to associate, and to assemble, as well as her right to be free from violent arrest without probable cause.

233.    Cisco Defendant Officers' actions were motivated by hostility towards Ms. Cisco's pro-Palestine advocacy and her association with Palestinian students and pro-Palestine students on other campuses. Their viewpoint discrimination is evident from their disparate treatment of pro-Palestine and pro-Israel protestors, the severity of the preemptive response to this peaceful protest compared to past contentious protests, and Defendant Wray's statements made moments before Ms. Cisco's arrest.

234.    Cisco Defendant Officers' actions were willful, deliberate, and malicious, involved reckless or callous indifference to Ms. Cisco's rights, and should be punished and deterred by an award of punitive damages to the extent permitted by law.

### Count II: First Amendment Retaliation
### 42 U.S.C. § 1983

235.    Plaintiffs reallege and incorporate by reference the allegations set forth in paragraphs 1 through 191.

236.    To succeed on a First Amendment retaliation claim, a plaintiff must show (1) that she engaged in constitutionally protected activity, (2) that the defendant's actions caused injury that would chill a person of ordinary firmness from continuing to engage in that activity, and (3) that the defendant's actions were substantially motivated by plaintiff's exercise of constitutionally protected conduct.

237.    Plaintiffs engaged in constitutionally protected acts of peaceful assembly and political speech by participating in the April 24th protest, organized to express opposition to U.S. support for Israel's actions in Gaza and the University's investments in weapons manufacturing.

238.    Defendants retaliated against Plaintiffs because of this protected conduct by directing a massive police force to interfere with their protest, including by intimidating and arresting them; arresting Plaintiffs without probable cause; and/or subjecting them to university disciplinary sanctions based solely on their presence at the protest. Such actions would deter a person of ordinary firmness from continuing to engage in First Amendment activities.

239.    It is clearly established that government actors may not apply content-based restrictions to speech unless those restrictions are narrowly tailored to achieve a compelling government interest.

240.    It is also clearly established that protestors are protected from retaliatory arrest without probable cause.

241.    Finally, it is clearly established that a university may not discipline a student based on the content or viewpoint of their protected speech.

*On Behalf of All Plaintiffs Against Defendants Davis and UT System Board of Regents for Injunctive Relief*

242.    UT Austin officials subjected Plaintiffs to disciplinary action because they engaged in a protected act of protest in a traditional public forum.

243.    Ms. Heilrayne, Ms. Soto-Ferate, and Ms. Medrano were punished with deferred suspension. Ms. Cisco was punished with one year of academic probation.

244.    Such disciplinary actions would deter a person of ordinary firmness from engaging in constitutionally protected activity.

245.    Ms. Heilrayne remains a student at UT Austin and subject to deferred suspension.

246.    Ms. Soto-Ferate and Ms. Medrano have graduated from UT Austin and Ms. Cisco's probationary period has ended, but these disciplinary actions remain on their academic records.

When Plaintiffs apply to graduate school or jobs that request information about their academic records, they will be obligated to disclose and explain their disciplinary records.

247.    Defendants Davis and Members of the UT System Board of Regents have the authority to expunge Plaintiffs' disciplinary records to prevent ongoing harm to Plaintiffs' academic and professional plans.

*On Behalf of All Plaintiffs Against Defendants Hartzell and Abbott for Monetary Damages and Declaratory Relief*

248.    Defendants Hartzell and Eltife, acting under color of Texas law, unlawfully directed police to retaliate against Plaintiffs because of their expressive conduct in a traditional public forum. They did so on the basis of Plaintiff's viewpoint and/or their perceived associations with pro-Palestine students on other campuses.

249.    Being subjected to intimidation by a massive contingent of armed police officers, some on horseback, and to arrest characterized by the use of unnecessary force, including arrestees being forcibly grabbed, knocked to the ground, and restrained with excessively tight zip-ties, would deter a personal of ordinary firmness from engaging in constitutionally protected activity.

250.    Defendants Hartzell and Eltife's directives were not actions enforcing content-neutral time, place, and manner restrictions on expressive conduct in UT Austin's traditional public forums. Their directives to prevent Plaintiffs' protest and to arrest them, along with their fellow pro-Palestine protestors, were given prior to any reasonable assessment that an actual disruption to campus operations would occur and without regard to the protest organizers' cooperation with the police and a publicized, time-bound agenda for the day's events.

251.    Defendants Hartzell and Eltife only directed the arrest of pro-Palestine protestors, including Plaintiffs. They did not direct the arrest of others involved in the protest, including pro-

Israel counter-protestors. Rather, upon information and belief, Defendants Hartzell and Eltife directed law enforcement to protect the pro-Israel counter-protesters' expressive assembly.

252.    Defendant Abbott ordered DPS to suppress what he referred to as the "antisemitic" protest on April 24, 2024, and to assist in the arrest of who he endorsed being called "pro-Hamas idiots" until they stopped engaging in expressive conduct in a traditional public forum.

253.    On Defendant Abbott's orders, DPS did suppress Plaintiffs' expressive conduct, surrounding them throughout the day, subjecting them to intimidation, and assisting in their arrests.

254.    Defendants Hartzell, Eltife, and Abbott's actions were intended to retaliate against Plaintiffs for expressing their views and were motivated by hostility towards Plaintiffs' pro-Palestine advocacy and their association with Palestinian students and pro-Palestine students on other campuses. Their viewpoint discrimination is evident from their disparate treatment of pro-Palestine and pro-Israel protestors, the severity of the preemptive response to this peaceful protest compared to past contentious protests, and Defendant Abbott's nakedly discriminatory statements.

255.    Defendants Hartzell, Eltife, and Abbott subjected or directed their subordinates to subject Plaintiffs to unconstitutional restrictions on their rights to express their viewpoints, to associate, and to assemble, as well as their right to be free from violent arrest without probable cause.

256.    Defendant Hartzell, Eltife, and Abbott's actions were designed to stifle political expression critical of U.S. and Israeli policies.

257.    Defendant Hartzell, Eltife, and Abbott's actions were willful, deliberate, and malicious, involved reckless or callous indifference to Plaintiffs' rights, and should be punished and deterred by an award of punitive damages to the extent permitted by law.

*On Behalf of Plaintiff Heilrayne Against Defendants Luevano, Adame, John Doe UTPD Officers A and B, and John Doe DPS Officers A, B, and C for Monetary Damages & Declaratory Relief*

258.     Defendants Adame, John Doe UTPD Officers A and B, and John Doe DPS Officers A, B, and C ("Heilrayne Defendant Officers") unlawfully retaliated against Ms. Heilrayne for her protected expressive activity and arrested her on the basis of her viewpoint.

259.     Upon information and belief, Defendant Luevano directed Defendants Adame and John Doe UTPD Officers A and B to arrest a minimum number of pro-Palestine protestors, including Ms. Heilrayne, to satisfy a numerical quota.

260.     Defendant John Doe UTPD Officer A explicitly selected Ms. Heilrayne for arrest because she "started [a] chant."

261.     Heilrayne Defendant Officers subjected Ms. Heilrayne to unconstitutional restrictions on her right to express her viewpoint, to associate, and to assemble, as well as her right to be free from violent arrest without probable cause.

262.     Being subject to intimidating police tactics and to arrest without probable cause for engaging in expressive conduct would deter a person of ordinary firmness from engaging in constitutionally protected activity.

263.     Heilrayne Defendant Officers' actions were motivated by hostility towards Ms. Heilrayne's pro-Palestine advocacy and her association with Palestinian students and pro-Palestine students on other campuses. Their viewpoint discrimination is evident from their disparate treatment of pro-Palestine and pro-Israel protestors, the severity of the preemptive response to this peaceful protest compared to past contentious protests, and Defendant John Doe DPS Officers A, B, and C's own statements questioning the legal basis of their actions.

264.    Heilrayne Defendant Officers' actions were willful, deliberate, and malicious, involved reckless or callous indifference to Ms. Heilrayne's rights, and should be punished and deterred by an award of punitive damages to the extent permitted by law.

*On Behalf of Plaintiff Soto-Ferate Against Defendants Luevano, Adame, and John Doe UTPD Officers C and D for Monetary Damages & Declaratory Relief*

265.    Defendants Adame and John Doe UTPD Officers C and D ("Soto-Ferate Defendant Officers") unlawfully retaliated against Ms. Soto-Ferate's for her protected expressive activity and arrested her on the basis of her viewpoint.

266.    Upon information and belief, Defendant Luevano directed Soto-Ferate Defendant Officers to arrest a minimum number of pro-Palestine protestors, including Ms. Soto-Ferate, to satisfy a numerical quota.

267.    Soto-Ferate Defendant Officers subjected Ms. Soto-Ferate to unconstitutional restrictions on her right to express her viewpoint, to associate, and to assemble, as well as her right to be free from violent arrest without probable cause.

268.    Being subject to intimidating police tactics and to arrest without probable cause for engaging in expressive conduct would deter a person of ordinary firmness from engaging in constitutionally protected activity.

269.    Soto-Ferate Defendant Officers' actions were motivated by hostility towards Ms. Soto-Ferate's pro-Palestine advocacy and her association with Palestinian students and pro-Palestine students on other campuses. Their viewpoint discrimination is evident from their disparate treatment of pro-Palestine and pro-Israel protestors and the severity of the preemptive response to this peaceful protest compared to past contentious protests.

270.     Soto-Ferate Defendant Officers' actions were willful, deliberate, and malicious, involved reckless or callous indifference to Ms. Soto-Ferate's rights, and should be punished and deterred by an award of punitive damages to the extent permitted by law.

*On Behalf of Plaintiff Medrano Against Defendants Luevano, Henry, and John Doe UTPD Officers E, F, G, and H for Monetary Damages & Declaratory Relief*

271.     Defendants Henry and John Doe UTPD Officers E, F, G, and H ("Medrano Defendant Officers") unlawfully retaliated against Ms. Medrano for her protected expressive activity and arrested her on the basis of her viewpoint.

272.     Upon information and belief, Defendant Luevano directed Medrano Defendant Officers to arrest a minimum number of pro-Palestine protestors, including Ms. Medrano, to satisfy a numerical quota.

273.     Medrano Defendant Officers subjected Ms. Medrano to unconstitutional restrictions on her right to express her viewpoint, to associate, and to assemble, as well as her right to be free from violent arrest without probable cause.

274.     Being subject to intimidating police tactics and to arrest without probable cause for engaging in expressive conduct would deter a person of ordinary firmness from engaging in constitutionally protected activity.

275.     Medrano Defendant Officers' actions were motivated by hostility towards Ms. Medrano's pro-Palestine advocacy and her association with Palestinian students and pro-Palestine students on other campuses. Their viewpoint discrimination is evident from their disparate treatment of pro-Palestine and pro-Israel protestors and the severity of the preemptive response to this peaceful protest compared to past contentious protests.

276.    Medrano Defendant Officers' actions were willful, deliberate, and malicious, involved reckless or callous indifference to Ms. Medrano's rights, and should be punished and deterred by an award of punitive damages to the extent permitted by law.

*On Behalf of Plaintiff Cisco Against Defendants Luevano, Rodriguez, Wray, John Doe UTPD Officer I, and John Doe DPS Officers D and E for Monetary Damages & Declaratory Relief*

277.    Defendants Rodriguez, Wray, John Doe UTPD Officer I, and John Doe DPS Officers D and E ("Cisco Defendant Officers") unlawfully retaliated against Ms. Cisco for her expressive activity and arrested her on the basis of her viewpoint.

278.    Upon information and belief, Defendant Luevano directed John Doe UTPD Officer I to arrest a minimum number of pro-Palestine protestors, including Ms. Cisco, to satisfy a numerical quota.

279.    Cisco Defendant Officers subjected Ms. Cisco to unconstitutional restrictions on her right to express her viewpoint, to associate, and to assemble, as well as her right to be free from violent arrest without probable cause.

280.    Being subject to intimidating police tactics and to arrest without probable cause for engaging in expressive conduct would deter a person of ordinary firmness from engaging in constitutionally protected activity.

281.    Cisco Defendant Officers' actions were motivated by hostility towards Ms. Cisco's pro-Palestine advocacy and her association with Palestinian students and pro-Palestine students on other campuses. Their viewpoint discrimination is evident from their disparate treatment of pro-Palestine and pro-Israel protestors, the severity of the preemptive response to this peaceful protest compared to past contentious protests, and Defendant Wray's statements made moments before Ms. Cisco's arrest.

282.    Cisco Defendant Officers' actions were willful, deliberate, and malicious, involved reckless or callous indifference to Ms. Cisco's rights, and should be punished and deterred by an award of punitive damages to the extent permitted by law.

### Count III: Fourth Amendment Unlawful Seizure/False Arrest
### 42 U.S.C. § 1983

283.    Plaintiffs reallege and incorporate by reference the allegations set forth in paragraphs 1 through 191.

284.    An officer violates the Fourth Amendment when he arrests an individual without actual probable cause, and he was objectively unreasonable in believing that there was probable cause for the arrest.

285.    Each plaintiff was arrested for allegedly violating Tex. Pen. Code § 30.05 Criminal Trespass. Such a trespass occurs when an individual remains on the property of another after having "received notice to depart by fail[ing] to do so." Tex. Pen. Code § 30.05(a)(2). Other than the 12:30PM order to disperse from the Brazos Street area allegedly because the group was obstructing a highway, no dispersal order given on April 24, 2024, indicated where Plaintiffs or the other protesters were trespassing or where they could go to stop trespassing.

286.    Furthermore, the crowds gathered in the areas presumably subject to the dispersal order given at 1:10PM included hundreds of people, including pro-Palestine protestors, pro-Israel counter-protestors, and bystanders. The order however only seems to have been intended to apply to pro-Palestine protestors and indeed was only enforced against them. In a traditional public forum, enforcement of even time, place, and manner restrictions cannot be viewpoint discriminatory. The belief that only pro-Palestine protestors were trespassing, but that pro-Israel counter-protestors and bystanders unaffiliated with any protest were not, is objectively unreasonable and cannot support a probable cause determination.

*On Behalf of Plaintiff Heilrayne Against Defendants Luevano, Adame, John Doe UTPD Officers
A and B, and John Doe DPS Officers A, B, C, D, and E for Monetary Damages & Declaratory
Relief*

287.    Defendants Adame, John Doe UTPD Officers A and B, and John Doe DPS Officers

A, B, and C ("Heilrayne Defendant Officers") unlawfully arrested Ms. Heilrayne because she

engaged in expressive conduct on UT Austin's campus on April 24, 2024.

288.    Upon information and belief, Defendant Luevano directed Defendants Adame and

John Doe UTPD Officers A and B to arrest a minimum number of pro-Palestine protestors,

including Ms. Heilrayne, to satisfy a numerical quota.

289.    Ms. Heilrayne was arrested around 1:15PM on Speedway despite her compliance

with every police directive. After initially joining the protest in front of Gregory Gym, Ms.

Heilrayne complied with the directive to move south on Speedway that was the result of a

conversation among the protest's organizers, university administrators, and the police. She walked

to the edge of campus where she and the group were corralled onto Brazos Street where they were

blocked in by police on either side between a parking garage and the Blanton Museum.

290.    Around 12:30PM, a dispersal order was broadcasted over the PA system, informing

the protestors that they were allegedly in violation of Tex. Pen. Code § 42.03 Obstructing a

Highway or Other Passageway and had two minutes to comply. Ms. Heilrayne did so and left the

Brazos Street area, walking down Speedway through the crowd which at that point now included

hundreds of other passersby.

291.    Ms. Heilrayne's Case Supplement Report, Exhibit 1, alleges that a new dispersal

order was given over the PA system at 1:10PM on Speedway. Ms. Heilrayne did not hear this order,

but in any case, was arrested at 1:13PM, just three minutes later. Even assuming this dispersal

order was lawful, compliance was simply not possible before her arrest took place.

292.     Heilrayne Defendant Officers did not have probable cause to arrest Ms. Heilrayne, and all charges against her were dropped for that reason. Defendant John Doe Officers A, B, and C themselves questioned what, if anything, the protestors, including Ms. Heilrayne, were doing that was unlawful. Defendant John Doe UTPD Officer A explicitly stated that Ms. Heilrayne was arrested because she "started [a] chant."

293.     Heilrayne Defendant Officers used more force than was reasonably necessary to effectuate Ms. Heilrayne's arrest, subjecting her to violent police tactics, including being forcibly grabbed, knocked to the ground, and restrained with excessively tight zip-ties. These actions resulted in injury and trauma.

294.     Defendant Luevano, a UTPD lieutenant, directed and encouraged Heilrayne Defendant Officers to arrest a minimum number of protestors, including Ms. Heilrayne, on the basis of their viewpoint and without probable cause.

295.     Defendant Luevano and Heilrayne Defendant Officers' actions were willful, deliberate, and malicious, involved reckless or callous indifference to Ms. Heilrayne's rights, and should be punished and deterred by an award of punitive damages to the extent permitted by law.

*On Behalf of Plaintiff Soto-Ferate Against Defendants Luevano, Adame, and John Doe UTPD Officers C and D for Monetary Damages & Declaratory Relief*

296.     Defendants Adame and John Doe UTPD Officers C and D ("Soto-Ferate Defendant Officers") unlawfully arrested Ms. Soto-Ferate because she engaged in expressive conduct on UT Austin's campus on April 24, 2024.

297.     Upon information and belief, Defendant Luevano directed Defendants Adame and John Doe UTPD Officers C and D to arrest a minimum number of pro-Palestine protestors, including Ms. Soto-Ferate, to satisfy a numerical quota.

298.    Ms. Soto-Ferate arrived at the outskirts of the protest in the Speedway area around 1:00PM. Unaware of any dispersal orders, Ms. Soto-Ferate observed a friend standing by the McCombs building as a large group of officers was advancing, forcing a large crowd towards the building. She attempted to warn her friend to get out of the way when Soto-Ferate Defendant Officers arrested her.

299.    Ms. Soto-Ferate's redacted Case Supplement Report, Exhibit 2, contains no visible allegation that she had disobeyed a dispersal order.

300.    Soto-Ferate Defendant Officers did not have probable cause to arrest Ms. Soto-Ferate, and all charges against her were dropped for that reason.

301.    Soto-Ferate Defendant Officers used more force than was reasonably necessary to effectuate Ms. Soto-Ferate's arrest, subjecting her to violent police tactics, including being forcibly grabbed, knocked to the ground, and restrained with excessively tight zip-ties. These actions resulted in injury and trauma.

302.    Defendant Luevano, a UTPD lieutenant, directed and encouraged Soto-Ferate Defendant Officers to arrest a minimum number of protestors, including Ms. Soto-Ferate, on the basis of their viewpoint and without probable cause.

303.    Defendant Luevano and Soto-Ferate Defendant Officers' actions were willful, deliberate, and malicious, involved reckless or callous indifference to Ms. Soto-Ferate's rights, and should be punished and deterred by an award of punitive damages to the extent permitted by law.

*On Behalf of Plaintiff Medrano Against Defendants Luevano, Henry, and John Doe UTPD Officers E, F, G, and H for Monetary Damages & Declaratory Relief*

304.    Defendants Henry, John Doe UTPD Officers E, F, G, and H ("Medrano Defendant Officers") unlawfully arrested Ms. Medrano because she engaged in expressive conduct on UT Austin's campus on April 24, 2024.

305.    Upon information and belief, Defendant Luevano directed Medrano Defendant Officers to arrest a minimum number of pro-Palestine protestors, including Ms. Medrano, to satisfy a numerical quota.

306.    Ms. Medrano was arrested on the South Mall around 3:00PM prior to the 5:25PM dispersal order—the only one relevant to that area. Medrano Defendant Officers seem to have selected Ms. Medrano for arrest at random from the group of pro-Palestine protestors. Her Case Supplement Report, Exhibit 3, does not provide any clarity, indicating only that she had linked arms with the people next to her.

307.    Medrano Defendant Officers did not have probable cause to arrest Ms. Medrano, and all charges against her were dropped for that reason.

308.    Medrano Defendant Officers used more force than was reasonably necessary to effectuate Ms. Medrano's arrest, subjecting her to violent police tactics, including being forcibly grabbed, knocked to the ground, and restrained with excessively tight zip-ties. These actions resulted in injury and trauma. Ms. Medrano was bruised and left without feeling in her hands for several days.

309.    Defendant Luevano, a UTPD lieutenant, directed and encouraged Medrano Defendant Officers to arrest a minimum number of protestors, including Ms. Medrano, on the basis of their viewpoint and without probable cause.

310.    Defendant Luevano and Medrano Defendant Officers' actions were willful, deliberate, and malicious, involved reckless or callous indifference to Ms. Medrano's rights, and should be punished and deterred by an award of punitive damages to the extent permitted by law.

*On Behalf of Plaintiff Cisco Against Defendants Luevano, Rodriguez, John Doe UTPD Officer I, and John Doe DPS Defendants D and E for Monetary Damages & Declaratory Relief*

311.    Defendants Rodriguez, John Doe UTPD Officer I, and John Doe DPS Officers D and E ("Cisco Defendant Officers") unlawfully arrested Ms. Cisco because she engaged in expressive conduct on UT Austin's campus on April 24, 2024.

312.    Upon information and belief, Defendant Luevano directed Defendants Rodriguez and John Doe UTPD Officer I to arrest a minimum number of pro-Palestine protestors, including Ms. Cisco, to satisfy a numerical quota.

313.    Ms. Cisco was arrested on the South Mall sometime after 4:00PM prior to the 5:25PM dispersal order—the only one relevant to that area. Cisco Defendant Officers seem to have selected Ms. Cisco for arrest at random from the group of pro-Palestine protestors. Her Case Supplement Report, Exhibit 4, does not provide any clarity.

314.    Defendant Luevano, a UTPD lieutenant, directed and encouraged Cisco Defendant Officers to arrest a minimum number of protestors, including Ms. Cisco, on the basis of their viewpoint and without probable cause.

315.    Defendant Luevano and Cisco Defendant Officers' actions were willful, deliberate, and malicious, involved reckless or callous indifference to Ms. Cisco's rights, and should be punished and deterred by an award of punitive damages to the extent permitted by law.

### Count IV: Violation of Title VI of the Civil Rights Act of 1964
### 42 U.S.C. § 2000d

*On Behalf of All Plaintiffs Against Defendants UT Austin and UT System Board of Regents for Declaratory Relief*

316.    Plaintiffs reallege and incorporate by reference the allegations set forth in paragraphs 1 through 191.

317.    Title VI of the Civil Rights Act of 1964 prohibits discrimination on the basis of race, color, or national origin in programs and activities receiving federal financial assistance.

318.    To establish a claim under Title VI, a plaintiff must demonstrate that they were subjected to intentional discrimination based on race, color, or national origin, including shared ancestry, by an entity receiving federal funds.

319.    Title VI prohibits discrimination not only against individuals based on their own race, color, or national origin, including shared ancestry, but also against those who are or are perceived to be associated with a protected group.

320.    Plaintiffs, who are or are associated, or perceived to be so, with Palestinian and/or Muslim students, both at UT Austin and on other college campuses, were subjected to discriminatory actions by Defendants UT Austin and UT System Board of Regents.

321.    Plaintiffs participated in a peaceful Palestine solidarity protest to express opposition to U.S. support for Israel's actions in Gaza and the universities' investments in weapons manufacturing.

322.    Defendants UT Austin and UT System Board of Regents unlawfully targeted Plaintiffs for arrest and discipline, including campus bans, administrative holds, and threats of suspension, based on their association with Palestinians and/or Muslims perceived through their pro-Palestine advocacy.

323.    Title VI of the Civil Rights Act of 1964 permits Plaintiffs to recover compensatory damages and to obtain declaratory relief to remedy the discriminatory actions taken against them.

## REQUEST FOR RELIEF

Plaintiffs respectfully request that this Court hold a jury trial and grant the following relief:

a. Entry of a declaratory judgment that the conduct and actions described in this Complaint constitute violations of the First and Fourth Amendments to the United States Constitution, the Ku Klux Klan Act, 42 U.S.C. § 1983, and Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d;

b. An order requiring UT Austin to reverse the disciplinary actions against Plaintiffs;

c. An award of all available compensatory damages to Plaintiffs in an amount to be determined at trial;

d. An award of all available punitive damages in an amount that would punish Defendants for the willful, wanton, and reckless conduct alleged in this Complaint, and that would effectively deter similar conduct in the future;

e. An award of Plaintiffs' reasonable attorney's fees and costs and expenses pursuant to 42 U.S.C. § 1988 and any other applicable statutes or rules of law; and

f. Such other and further relief, including all appropriate and equitable relief, as this Court may deem just and proper.

Respectfully submitted this 23rd day of July 2025.

*/s/ Rebecca Webber*
Rebecca Webber
Texas Bar No. 24060805
Webber Law
4228 Threadgill St.
Austin, TX 78723
Tel: (512) 537-8833
Fax: (202) 333-6470
rebecca@rebweblaw.com

*/s/ Christopher Godshall-Bennett*
Christopher Godshall-Bennett
D.C. Bar No. 1780920
American-Arab Anti-Discrimination Committee (ADC)
910 17th St. NW, Ste. 1000
Washington, D.C. 20002
Tel: (202) 244-2990
Fax: (202) 333-6470
cgb@adc.org

*/s/ Christina A. Jump*
Christina A. Jump
Texas Bar No. 00795828
*/s/ Chelsea Glover*
Chelsea Glover
Texas Bar No. 24097738
Constitutional Law Center for Muslims in
America[†]
100 North Central Expy., Ste. 1010
Richardson, TX 75080
Tel: (972) 914-2507
Fax: (972) 692-7454
cjump@clcma.org
cglover@clcma.org

[†]Legal Division of Muslim Legal Fund of
America

*/s/ Maria Kari*
Maria Kari
Texas Bar No. 24127161
Project TAHA
5300 N Braeswood Blvd., Ste. 4-191
Houston, TX 77096
Tel: (205) 862-8005
Fax: (202) 333-6470
info@mariakari.org
Attorneys for Plaintiffs

**CERTIFICATE OF SERVICE**

I, Christopher Godshall-Bennett, certify that on July 23, 2025, I electronically filed the foregoing on the Court's CM/ECF system, that all participants in the case are represented by registered CM/ECF users, and that service for those parties will be accomplished by the CM/ECF system.

*/s/ Christopher Godshall-Bennett*
Christopher Godshall-Bennett
Attorney for Plaintiffs