IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| HEILRAYNE, ET AL., | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | No. 1:25-CV-00640-DAE |
| | § | |
| UNIVERSITY OF TEXAS, ET AL., | § | |
| | § | |
| *Defendants.* | § | |

---

### DEFENDANTS' MOTION TO DISMISS
### PLAINTIFFS' FIRST AMENDED COMPLAINT

---

**Ken Paxton**
Attorney General of Texas

**Brent Webster**
First Assistant Attorney General

**Ralph Molina**
Deputy First Assistant Attorney General

**Austin Kinghorn**
Deputy Attorney General for Civil Litigation

**Kimberly Gdula**
Chief, General Litigation Division

**Cole P. Wilson**
Texas State Bar No. 24122856
Cole.Wilson@oag.texas.gov

**Todd Dickerson**
Texas State Bar No. 24118368
Todd.Dickerson@oag.texas.gov

Assistant Attorneys General
Office of the Attorney General
General Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
(512) 936-1309 | Fax: (512) 320-0667

*Counsel for Defendants Greg Abbott, the University of Texas System Board of Regents and its Members, the University of Texas at Austin, Jim Davis, Jay Hartzell, Hector Luevano, Adan Zavala, Roberto Rodriguez, Reynaldo Adame, and L. Henry*

TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................................iv

INTRODUCTION ..............................................................................................................1

BACKGROUND ...............................................................................................................1

    I.   The National Background to Plaintiffs' Unlawful and Disruptive Protest. .................2

        A.  Campus protests erupt across the country...............................................2

        B.  NSJP circulates tactics for students to maximize campus disruption. ...........................3

    II.  Plaintiffs Join the "Popular University for Gaza" Protest Vowing to follow in "the footsteps of our comrades" at Other Universities. .......................................................5

    III.  University Officials Cancel the Planned Occupation out of Concerns for Disruption and Maintaining the Peace, but Plaintiffs and Others Ignore Those Directions...............................6

    IV.  After Ignoring University Administrators' Directions not to "Take" the Campus, Protestors Ignore Peace Officers' Commands to Disperse Before Arrests Begin.............................8

        A.  The protest begins, and peace officers attempt to direct the group off campus. .........8

        B.  After ignoring commands to disperse, pro-Palestine protesters  return to Speedway to continue their disruptive campus occupation...............................................9

        C.  The protest moves west to occupy the South Mall. .......................................10

    V.  Plaintiffs Baselessly Claim that Governor Abbott Ordered Their Arrests because of the Viewpoint they Expressed...............................................................11

    VI.  UT Austin Provides Plaintiffs with Notice of Student Conduct Charges and an Opportunity to Dispute the Accusations, but Plaintiffs Do Not Contest Them. ...................................12

        A.  UT Austin responds amid escalating campus disruption. ...............................12

        B.  Plaintiffs' student conduct discipline. ...................................................14

    VII.  This Lawsuit ..................................................................................15

LEGAL STANDARDS.......................................................................................................17

RULE 12(B)(1) ARGUMENTS ..........................................................................................18

    I.  Plaintiffs Lack Standing to Pursue Most Claims Against Most Defendants. ............................19

        A.  Plaintiffs cannot claim an injury from student conduct discipline they agreed to, or under Title VI for "harms" to unidentified non-parties. .........................................19

        B.  Plaintiffs cannot assert PSC's rights.....................................................20

        C.  Plaintiffs allege no facts to support causation for most claims. ...................................20

    II.  Sovereign Immunity Bars Many Claims, and *Ex parte Young* Does Not Apply.........................22

        A.  Plaintiffs sue the wrong defendants.......................................................22

        B.  Plaintiffs do not allege ongoing violations of federal law......................................25

        C.  Plaintiffs seek the wrong relief. .........................................................26

RULE 12(B)(6) ARGUMENTS ..............................................................................................27

I.    Plaintiffs Fail to Allege Personal Involvement by Each Individual-Capacity Defendant to Support their Section 1983 Claims..........................................................................................27

II.   Because Probable Cause Existed for Plaintiffs' Arrests, they Cannot Pursue a Section 1983 Claim for Unlawful Seizure or Arrest under the Fourth Amendment. .......................33

III.  Plaintiffs Fail to State any Section 1983 Claim Based on a First Amendment Violation. ........37

      A.    Plaintiffs' First Amendment claims suffer from incurable pleading defects...............37

      B.    *Nieves* bars Plaintiffs' First Amendment claims  based on their arrests because probable cause existed. ....................................................................................................43

      C.    Plaintiffs' First Amendment claims do not survive scrutiny under *Tinker*..................45

IV.   Qualified Immunity Bars Plaintiffs' Section 1983 Claims. ............................................55

      A.    Plaintiffs fail to show a clearly established Fourth Amendment violation..................55

      B.    Plaintiffs fail to show a clearly established First Amendment violation......................56

V.    Plaintiffs Fail to State a Title VI Claim..........................................................................56

      A.    Plaintiffs do not plead the basic elements of a Title VI claim. .....................................57

      B.    Emotional distress damages are unavailable in a Title VI claim..................................59

CONCLUSION & PRAYER .................................................................................................60

CERTIFICATE OF SERVICE ...............................................................................................61

TABLE OF AUTHORITIES

**Court Decisions:**                                                                    Page(s):

*A.M. ex rel. McAllum v. Cash,*
    585 F.3d 214 (5th Cir. 2009) ........................................................... 47, 48

*Abdullah v. Paxton,*
    65 F.4th 204 (5th Cir. 2023) ...............................................................19

*Aguilar v. Tex. Dep't of Crim. Justice,*
    160 F.3d 1052 (5th Cir. 1998) ............................................................22

*Air Evac EMS, Inc. v. Tex. Dep't of Ins. v. Tex. Div. of Workers' Comp.,*
    851 F.3d 507 (5th Cir. 2017) ........................................................ 22, 25

*Alexander v. Sandoval,*
    532 U.S. 275 (2001) ..................................................................... 57, 58

*Alexander v. United States,*
    509 U.S. 544 (1993) ...........................................................................38

*Anderson v. Valdez,*
    845 F.3d 580 (5th Cir. 2016) ..............................................................18

*Aplon v. City of Jasper,*
    No. 1:22-CV-18, 2022 WL 17815172 (E.D. Tex. Nov. 14, 2022) ..........45

*Ashcroft v. al–Kidd,*
    563 U.S. 731 (2011) ...........................................................................55

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) ....................................................... 18, 32, 39, 40

*Atwater v. City of Lago Vista,*
    532 U.S. 318 (2001) ...........................................................................34

*Bailey v. Ramos,*
    125 F.4th 667 (5th Cir. 2025) .............................................................56

*Barnes v. Gorman,*
    536 U.S. 181 (2002) ...........................................................................59

*Bell v. Itawamba Cnty. Sch. Bd.,*
    799 F.3d 379 (5th Cir. 2015) ........................................................ 46, 51

*Bellard v. Gautreaux,*
    675 F.3d 454 (5th Cir. 2012) ..............................................................54

*Bey v. Falk,*
    946 F.3d 304 (6th Cir. 2019) ..............................................................45

*Blackwell v. Issaquena County Bd. of Educ.,*
    363 F.2d 749 (5th Cir. 1966) ..............................................................47

*Blanks v. Lockheed Martin Corp.*,
    568 F. Supp. 2d 740 (S.D. Miss. 2007) ...................................................................58

*Block v. Tex. Bd. of Law Exam'rs*,
    952 F.3d 613 (5th Cir. 2020) ...............................................................................17

*Brinsdon v. McAllen Indep. Sch. Dist.*,
    863 F.3d 338 (5th Cir. 2017) ...............................................................................46

*Brown v. Callahan*,
    623 F.3d 249 (5th Cir. 2010) ...............................................................................55

*Bryan v. City of Madison*,
    213 F.3d 267 (5th Cir. 2000) ...............................................................................41

*Burge v. St. Tammany Parish*,
    336 F.3d 363 (5th Cir. 2003) ...............................................................................29

*Burnside v. Kaelin*,
    773 F.3d 624 (5th Cir. 2014) ...............................................................................39

*Byers v. Dallas Morning News, Inc.*,
    209 F.3d 419 (5th Cir. 2000) ...............................................................................57

*Calhoun v. Collier*,
    78 F.4th 846 (5th Cir. 2023) ...............................................................................23

*Campbell v. Lamar Inst. of Tech.*,
    No. 1:14-CV-399, 2015 WL 12942498 (E.D. Tex. Aug. 13, 2015) .......................20

*Canady v. Bossier Par. Sch. Bd.*,
    240 F.3d 437 (5th Cir. 2001) .........................................................................46, 51

*Cantu Servs., Inc. v. Roberie*,
    535 F. App'x 342 (5th Cir. 2013) .........................................................................25

*Canutillo Indep. Sch. Dist. v. Leija*,
    101 F.3d 393 (5th Cir. 1996) ...............................................................................57

*Carnaby v. City of Hous.*,
    636 F.3d 183 (5th Cir. 2011) ...............................................................................55

*Chhim v. Univ. of Tex. at Austin*,
    836 F.3d 467 (5th Cir. 2016) ...............................................................................23

*Christian Legal Soc. Chapter of the Univ. of Cal., Hastings Coll. of the Law v. Martinez*,
    561 U.S. 661 (2010) ...........................................................................................40

*City of Austin v. Paxton*,
    943 F.3d 993 (5th Cir. 2019) .........................................................................22, 24

*Clapper v. Amnesty Int'l USA*,
    568 U.S. 398 (2013) ...........................................................................................19

*Collier v. Montgomery,*
   569 F.3d 214 (5th Cir. 2009) ................................................................55

*Collins v. Morgan Stanley Dean Witter,*
   224 F.3d 496 (5th Cir. 2000) ................................................................18

*Colten v. Ky.,*
   407 U.S. 104 (1972) ................................................................42

*Cummings v. Premier Rehab Keller, P.L.L.C.,*
   596 U.S. 212 (2022) ................................................................59

*Davis v. Angelina Coll. Bd. of Trustees,*
   No. 9:17-CV-00179, 2018 WL 10111001 (E.D. Tex. June 1, 2018).................46

*Davis v. Fed. Election Comm'n,*
   554 U.S. 724 (2008) ................................................................19

*Devenpeck v. Alford,*
   543 U.S. 146 (2004) ................................................................56

*Deville v. Marcantel,*
   567 F.3d 156 (5th Cir. 2009) ................................................................34

*Doe v. Harrell,*
   841 F. App'x 663 (5th Cir. 2021)................................................................23

*Doe v. Mckesson,*
   71 F.4th 278 (5th Cir. 2023) ................................................................36

*Dorsey v. Portfolio Equities, Inc.,*
   540 F.3d 333 (5th Cir. 2008) ................................................................18

*Edwards v. City of Balch Springs, Tex.,*
   70 F.4th 302 (5th Cir. 2023) ................................................................54

*Elkins v. United States,*
   364 U.S. 206 (1960) ................................................................34

*Emory v. Tex. State Bd. of Med. Exam'rs,*
   748 F.2d 1023 (5th Cir. 1984) ................................................................22

*Esfeller v. O'Keefe,*
   391 F. App'x 337 (5th Cir. 2010) ................................................................ 46, 51

*Esmail v. Macrane,*
   53 F.3d 176 (7th Cir. 1995) ................................................................54

*Ex parte Young,*
   209 U.S. 123 (1908) ................................................................*passim*

*Fennell v. Marion Indep. Sch. Dist.,*
   804 F.3d 398 (5th Cir. 2015) ................................................................57

*Frankel v. Regents of Univ. of Cal.,*
    744 F. Supp. 3d 1015 (C.D. Cal. 2024) .................................................... 48, 51

*Frederick Douglass Found., Inc. v. D.C.,*
    82 F.4th 1122 (D.C. Cir. 2023) .................................................................... 41

*Free Speech Coal., Inc. v. Paxton,*
    No. 23-1122, 2025 WL 1773625 (U.S. June 27, 2025) ............................... 52

*Freedom from Religion Foundation v. Abbott,*
    955 F.3d 417 (5th Cir. 2020) ....................................................................... 26

*Funk v. Stryker Corp.,*
    631 F.3d 777 (5th Cir. 2011) ....................................................................... 18

*Gartenberg v. Cooper Union for the Advancement of Sci. & Art,*
    765 F. Supp. 3d 245 (S.D.N.Y. 2025) .......................................................... 51

*Gebser v. Lago Vista Indep. Sch. Dist.,*
    524 U.S. 274 (1998) ............................................................................... 58, 59

*Gerwaski v. Nev.,*
    No. 2:24-CV-00985-APG-MDC, 2025 WL 1311037 (D. Nev. May 5, 2025) .................. 51

*Glossip v. Gross,*
    576 U.S. 863 (2015) ..................................................................................... 52

*Green Valley Special Util. Dist. v. City of Schertz,*
    969 F.3d 460 (5th Cir. 2020) ....................................................................... 26

*Haverkamp v. Linthicum,*
    6 F.4th 662 (5th Cir. 2021) .......................................................................... 24

*Healthy Vision Ass'n v. Abbott,*
    138 F.4th 385 (5th Cir. 2025) ...................................................................... 22

*Healy v. James,*
    408 U.S. 169 (1972) ............................................................................... 40, 46

*Heaney v. Roberts,*
    846 F.3d 795 (5th Cir. 2017) ................................................................... 39, 40

*Hernandez ex rel. Hernandez v. Tex. Dep't of Protective & Regulatory Services,*
    380 F.3d 872 (5th Cir. 2004) ....................................................................... 32

*Hope v. Harris,*
    861 F. App'x 571 (5th Cir. 2021) ................................................................. 25

*Ill. v. Gates,*
    462 U.S. 213 (1983) ............................................................................... 34, 35

*Int'l Truck & Engine Corp. v. Bray,*
    372 F.3d 717 (5th Cir. 2004) ....................................................................... 52

*Jackson v. City of Hearne,*
  959 F.3d 194 (5th Cir. 2020) ...................................................................................41

*Jackson v. Valdez,*
  852 F. App'x 129 (5th Cir. 2021) ............................................................................33

*Jackson v. Wright,*
  82 F.4th 362 (5th Cir. 2023) .............................................................................24, 25

*Johnson v. Dallas Cnty. Hosp. Dist.,*
  No. 3:23-CV-01574-E, 2024 WL 4394772 (N.D. Tex. Oct. 3, 2024) ....................33

*Jones v. Lowndes Cnty.,*
  678 F.3d 344 (5th Cir. 2012) ...................................................................................55

*Keenan v. Tejeda,*
  290 F.3d 252 (5th Cir. 2002) ............................................................................39, 46

*Keller v. Fleming,*
  952 F.3d 216 (5th Cir. 2020) ...................................................................................33

*Kestenbaum v. President & Fellows of Harvard Coll.,*
  743 F. Supp. 3d 297 (D. Mass. 2024) ................................................................51, 58

*Kipps v. Caillier,*
  205 F.3d 203 (5th Cir. 2000) ...................................................................................20

*Kitty Hawk Aircargo, Inc. v. Chao,*
  418 F.3d 453 (5th Cir. 2005) ...................................................................................18

*Lane v. Halliburton,*
  529 F.3d 548 (5th Cir. 2008) ...................................................................................18

*Lee v. Kansas City S. Ry. Co.,*
  574 F.3d 253 (5th Cir. 2009) ...................................................................................41

*Louis D. Brandeis Ctr. for Human Rights under Law v. President & Fellows of Harvard Coll.,*
  No. CV 24-11354-RGS, 2024 WL 4681802 (D. Mass. Nov. 5, 2024) ...................51

*McGuire v. Reilly,*
  386 F.3d 45 (1st Cir. 2004) .....................................................................................41

*Mcintyre v. Castro,*
  No. 1-15-CV-1100 RP, 2016 WL 1714919 (W.D. Tex. Apr. 8, 2016) ...................30

*McLin v. Ard,*
  866 F.3d 682 (5th Cir. 2017) ...................................................................................34

*McNeal v. LeBlanc,*
  90 F.4th 425 (5th Cir. 2024) ...................................................................................56

*MDPhysicians & Assoc., Inc. v. State Bd. of Ins.,*
  957 F.2d 178 (5th Cir. 1992) ...................................................................................18

*Mi Familia Vota v. Abbott,*
   977 F.3d 461 (5th Cir. 2020) ................................................................................24

*Mi Familia Vota v. Ogg,*
   105 F.4th 313 (5th Cir. 2024) ..............................................................................23

*Mohamed for A.M. v. Irving Indep. Sch. Dist.,*
   252 F. Supp. 3d 602 (N.D. Tex. 2017) ................................................................58

*Moore v. Bryant,*
   853 F.3d 245 (5th Cir. 2017) ...............................................................................17

*Moore v. City of Kilgore, Tex.,*
   877 F.2d 364 (5th Cir. 1989) ...............................................................................38

*Morgan v. Plano Indep. Sch. Dist.,*
   589 F.3d 740 (5th Cir. 2009) ....................................................................39, 46, 51

*Morgan v. Swanson,*
   659 F.3d 359 (5th Cir. 2011) .........................................................................46, 51

*Morris v. Hines,*
   No. 5:20CV36, 2021 WL 5086369 (E.D. Tex. Aug. 13, 2021) ...........................30

*Mote v. Walthall,*
   902 F.3d 500 (5th Cir. 2018) ...............................................................................40

*Murphy v. Kellar,*
   950 F.2d 290 (5th Cir. 1992) ...............................................................................27

*Nelson v. Univ. of Tex. at Dall.,*
   535 F.3d 318 (5th Cir. 2008) ...............................................................................25

*Nichia Corp. v. VIZIO, Inc.,*
   No. 2:16-CV-1453-JRG, 2017 WL 3836141 (E.D. Tex. July 24, 2017)...............37

*Nieves v. Bartlett,*
   587 U.S. 391 (2019) .....................................................................................*passim*

*NiGen Biotech, L.L.C. v. Paxton,*
   804 F.3d 389 (5th Cir. 2015) ...............................................................................25

*Nivelo Cardenas v. Garland,*
   70 F.4th 232 (5th Cir. 2023) ................................................................................24

*Okpalobi v. Foster,*
   244 F.3d 405 (5th Cir. 2001) ...............................................................................22

*Oliver v. Scott,*
   276 F.3d 736 (5th Cir. 2002) ...............................................................................32

*Papasan v. Allain,*
   478 U.S. 265 (1986) .............................................................................................26

*Papish v. Univ. of Mo. Curators,*
    410 U.S. 667 (1973) ...................................................................................................40

*Parude v. City of Natchez,*
    72 F. App'x 102 (5th Cir. 2003) ..............................................................................54

*Pathria v. Univ. of Texas Health Sci. Ctr. at San Antonio,*
    531 F. App'x 454 (5th Cir. 2013) ............................................................................57

*Pena v. City of Rio Grande City,*
    879 F.3d 613 (5th Cir. 2018) ...................................................................................28

*Peterson v. City of Fort Worth,*
    588 F.3d 838 (5th Cir. 2009) ...................................................................................33

*Phillips v. Collin Cmty. Coll. Dist.,*
    701 F. Supp. 3d 525 (E.D. Tex. 2023) ....................................................................38

*Pineda v. City of Hous.,*
    124 F. Supp. 2d 1057 (S.D. Tex. 2000)...................................................................33

*Pineda v. City of Hous.,*
    291 F.3d 325 (5th Cir. 2002) ...................................................................................33

*Piotrowski v. City of Hous.,*
    237 F.3d 567 (5th Cir. 2001) ...................................................................................32

*Porter v. Epps,*
    659 F.3d 440 (5th Cir. 2011) .............................................................................29, 36

*Porter v. Lear,*
    751 F. App'x 422 (5th Cir. 2018)............................................................................28

*Price ex rel. Price v. La. Dept. of Educ.,*
    329 F. App'x 559 (5th Cir. 2009) ...........................................................................57

*Qaddumi v. Hartzell et al.,*
    No. 1:24-cv-1002-RP (W.D. Tex. June 13, 2025) ............................................*passim*

*Quern v. Jordan,*
    440 U.S. 332 (1979) ...................................................................................................22

*Ramirez v. Martinez,*
    716 F.3d 369 (5th Cir. 2013) ...................................................................................55

*Ramming v. United States,*
    281 F.3d 158 (5th Cir. 2001) ...................................................................................17

*Reed v. Tex.,*
    762 S.W.2d 640 (Tex. App.—Texarkana, 1988, writ ref'd) ....................................35

*Reitz v. Woods,*
    85 F.4th 780 (5th Cir. 2023) ....................................................................................35

*Republic of Paraguay v. Allen,*
    134 F.3d 622 (4th Cir. 1998) ...................................................................26

*Reule v. Jackson,*
    114 F.4th 360 (5th Cir. 2024) ........................................................... 19, 21

*Rhines v. Salinas Const. Techs., Ltd.,*
    No. C-11-262, 2011 WL 4688706 (S.D. Tex. Oct. 3, 2011) .................18

*Ricci v. DeStefano,*
    557 U.S. 557 (2009) ...............................................................................57

*Richards v. Gelsomino,*
    814 F. App'x 607 (D.C. Cir. 2020) .......................................................45

*Rizzo v. Goode,*
    423 U.S. 362 (1977) ...............................................................................27

*Romero v. Brown,*
    937 F.3d 514 (5th Cir. 2019) ............................................................ 29, 32

*Rosas v. Bexar Cnty.,*
    No. 5:14-CV-1082-DAE, 2015 WL 1955406 (W.D. Tex. Apr. 29, 2015)...........................37

*Rubio v. Turner Unified Sch. Dist.,*
    475 F. Supp. 2d 1092 (D. Kan. 2007) .....................................................59

*Rumsfeld v. Forum for Academic and Institutional Rights,*
    547 U.S. 47 (2006) .................................................................................36

*Rusfeldt v. City of NY,*
    No. 22-CV-594 (PKC), 2024 WL 4354874 (S.D.N.Y. Sept. 30, 2024)...........................45

*Saenz v. Dallas Cnty. Cmty. Coll. Dist.,*
    No. 3:10-CV-742-O, 2011 WL 1935742 (N.D. Tex. May 16, 2011)...........................33

*Salehpour v. Univ. of Tenn.,*
    159 F.3d 199 (5th Cir. 1998) ..................................................................46

*Schaper v. City of Huntsville,*
    813 F.2d 709 (5th Cir. 1987) ..................................................................45

*Shamloo v. Miss. State Bd. of Trs. of Inst. of Higher Learning,*
    620 F.2d 516 (5th Cir. 1980) ............................................................ 46, 52

*Southland Sec. Corp. v. INSpire Ins. Sols, Inc.,*
    365 F.3d 353 (5th Cir. 2004) ..................................................................21

*Spokeo, Inc. v. Robins,*
    578 U.S. 330 (2016) ...............................................................................20

*Springola v. Tex.,*
    135 S.W.3d 330 (Tex. App.—Houston [14th Dist.], 2004, no pet.)...........................35

*Students for Just. in Palestine, at Univ. of Houston v. Abbott*,
   756 F. Supp. 3d 410 (W.D. Tex. 2024) ........................................ 25, 50, 51, 52

*Taylor v. Barkes*,
   575 U.S. 822 (2015) ........................................................................55

*Tex. All for Retired Ams. v. Scott*,
   28 F.4th 669 (5th Cir. 2022) .............................................................24

*Tex. Ent. Ass'n, Inc. v. Hegar*,
   No. 1:20-CV-707-DAE, 2023 WL 2541139 (W.D. Tex. Feb. 13, 2023) ...........41

*Thomas v. Johnson*,
   No. 5:12-CV-106, 2014 WL 2155036 (S.D. Tex. May 22, 2014) ...................53

*Thompson v. Steele*,
   709 F.2d 381 (5th Cir. 1983) .............................................................27

*Tinker v. Des Moines Indep. Comm. Sch. Dist.*,
   393 U.S. 503 (1969) ..................................................................*passim*

*Town of Chester v. Laroe Ests., Inc.*,
   581 U.S. 433 (2017) ........................................................................19

*U.S. ex rel. Lam. v. Tenet Healthcare Corp.*,
   481 F. Supp. 2d 673 (W.D. Tex. 2006) .................................................18

*United States v. Brantley*,
   803 F.3d 1265 (11th Cir. 2015) .........................................................53

*United States v. Mackey*,
   No. 5:16-CR-772, 2016 WL 9280003 (S.D. Tex. Oct. 24, 2016) ................41

*United States v. Ramirez*,
   765 F.2d 438 (5th Cir. 1985) .............................................................41

*United States v. Rice*,
   659 F.2d 524 (5th Cir. 1981) .............................................................54

*Voss v. Goode*,
   954 F.3d 234 (5th Cir. 2020) .............................................................56

*Walker v. City of Birmingham*,
   388 U.S. 307 (1967) ........................................................................39

*Webb v. Town of Saint Joseph*,
   925 F.3d 209 (5th Cir. 2019) .............................................................33

*Whitmore v. Arkansas*,
   495 U.S. 149 (1990) ........................................................................19

*Will v. Mich. Dep't of State Police*,
   491 U.S. 58 (1989) ..........................................................................23

*Williams ex rel. J.E. v. Reeves,*
   954 F.3d 729 (5th Cir. 2020) ............................................................................................26

*Williams v. City of Jackson,*
   No. 3:20-CV-785-DPJ-FKB, 2022 WL 4715706 (S.D. Miss. Sept. 30, 2022) ...................30

*Woods v. Edwards,*
   51 F.3d 577 (5th Cir. 1995) ..............................................................................................32

*York v. Welch,*
   No. 20-40580, 2024 WL 775179 (5th Cir. Feb. 26, 2024) .................................................33

## Constitutional Provisions, Statutes, and Rules:

U.S. Const.:
   amend I ...........................................................................................................*passim*
   amend. IV ........................................................................................................*passim*

42 U.S.C.:
   § 1983 .............................................................................................................*passim*
   § 2000d ........................................................................................................1, 17, 57

Fed. R. Civ. P.:
   12(b)(1) .......................................................................................................17, 18, 49
   12(b)(6) .......................................................................................................18, 27, 49

Tex. Pen. Code § 30.05(a) ..............................................................................34, 36

## Other Authorities:

*Conclusory*, BLACK'S LAW DICTIONARY 308 (8th ed. 2004)....................................................28

Daniel B. Dreyfus, Note, *A Common Judicial Standard for Student Speech Regulations,*
   102 Tex. L. Rev. 1059 (2024) ...........................................................................................46

## INTRODUCTION

Plaintiffs are four current or former University of Texas at Austin students who claim that government officials arrested them during a pro-Palestine protest to silence their campus speech, disciplined them, and otherwise discriminated against them because of their claimed associations with Palestinians and Muslims.  Plaintiffs raise three claims under 42 U.S.C. section 1983 for alleged violations of the First and Fourth Amendments to the United States Constitution, and a claim under Title VI of the Civil Rights Act of 1964, 42 U.S.C. section 2000d, based on their claimed associations with Palestinians.  Plaintiffs lack standing, sovereign immunity bars some claims, and incurable pleading defects defeat the remaining causes of action.

## BACKGROUND

Plaintiffs say that "[their] participation in the de-centralized, national movement for Palestinian liberation must be viewed in the context of [a] large surge in student activism," and that this national background "form[s] a critical backdrop against which the protest at issue in this Complaint must be understood." *First Amended Compl.*, ¶ 41 (hereinafter "*FAC*").  Defendants agree that the national context "between October 7, 2023, and April 24, 2024," *id.*, is essential to an accurate understanding of Plaintiffs' activism, the response to it, and, ultimately, the legal insufficiency of Plaintiffs' claims.  As does another Judge in this District.

Judge Robert Pitman recently found in a related case that a reasonable official "could examine the social media advertisements for the protest, consider past similar protests at UT [Austin] or around the country, form the belief that the planned protests at issue would cause substantial disruption to campus activities, and act to cancel the protest as a result."[1]  As such, Judge Pitman concluded that

---

[1] *See Qaddumi v. Hartzell et al.*, No. 1:24-cv-1002-RP, ECF 60, at 7 (W.D. Tex. June 13, 2025). A copy of Judge Pitman's Order, which is publicly available on PACER, is attached as **Exhibit A**. Judge Pitman also found that a reasonable official could lawfully "suspend a student for protesting after violating a university directive not to protest." *Id.*

qualified immunity required dismissal of all individual-capacity claims for violation of the First Amendment under Section 1983.[2]  This Court should ultimately reach the same conclusion, but we first begin with the national context that forms "the critical backdrop"[3] for analyzing Plaintiffs' claims.

## I.    The National Background to Plaintiffs' Unlawful and Disruptive Protest.

On October 7, 2023, Hamas, a Palestinian Sunni Islamist terrorist organization, launched a surprise attack from the Gaza Strip ("Gaza") into the central and southern regions of Israel, targeting and killing over 1,200 noncombatants.[4]  The following day, National Students for Justice in Palestine ("NSJP") published a "tool kit" celebrating the atrocity and providing guidance to students:

> Today, we witness a historic win for the Palestinian resistance . . . reminding each of us that total return and liberation to Palestine is near. Catching the enemy completely by surprise, the Palestinian resistance has captured over a dozen settlements surrounding Gaza . . . . **This is what it means to Free Palestine: not just slogans and rallies, but armed confrontation with the oppressors.**[5]

NSJP's playbook called on students throughout the country to eschew peaceful resistance and "disrupt" campuses, encouraging "armed struggle, general strikes, and popular demonstrations. All of it is legitimate, and all of it is necessary," since "[y]ou don't get freedom peacefully."[6]

### A.    Campus protests erupt across the country.

Following Hamas's attack, widespread unrest broke out on college and university campuses across the United States.[7]  Plaintiffs contend these protests arose in response to "Israel's genocidal

---

[2] *Id.*

[3] *FAC*, ¶ 41.

[4] Bill Hutchinson, *Israel-Hamas War: Timeline and key developments*, ABC NEWS (Nov. 22, 2023, 2:24 PM), https://tinyurl.com/nfjzh3mh.

[5] Spencer Dalke, *National Students for Justice in Palestine celebrates glider attack in 'call to action' image*, CAMPUS REFORM (Oct. 10, 2023, 12:35 PM), https://tinyurl.com/4tu3wm3x; Randy Kessler, *Language around 'Day of Resistance and Protest' leaves Jews fearful*, SEATTLE TIMES (Oct. 18, 2023, 3:34 PM), https://tinyurl.com/bd44xnxh. NSJP has since removed this language from their publication: *Day of Resistance Toolkit*, NSJP (last visited July 8, 2025), https://tinyurl.com/yhud3n6h.

[6] *Day of Resistance Toolkit*, NSJP (last visited July 8, 2025), https://tinyurl.com/yhud3n6h.

[7] Nadine El-Bawab, *How pro-Palestinian protests unfolded on college campuses across the US: A timeline*, ABC NEWS (May 4, 2024), https://tinyurl.com/29fn7kdn.

campaign and U.S. complicity therewith." *FAC*, ¶ 37.  But many "celebrated the attack before Israel had even responded,[8] as protestors took to confronting Jewish students and disrupting campuses.[9]

B.    NSJP circulates tactics for students to maximize campus disruption.

After the 2023-2024 winter break, students intensified their efforts to foreground the Israel-Hamas conflict on campus and change university policies.  Protestors also doubled down on their tactics, "commandeering campus quads and occup[ying] university buildings, . . . and creating an atmosphere of harassment, intimidation, and fear for Jewish students, faculty, and staff, and disrupting normal campus activities for all campus citizens, Jewish and non-Jewish alike."[10]  These incidents followed NSJP's call for a "National Divestment Day of Action" on February 8, 2024.[11]

NSJP targeted "[university] Administration[s]" and "Board[s] of Regents" with "sustained, long-term campaigns to push our universities to end their complicity in the genocide of Palestinians."[12]  NSJP's playbook also detailed "Escalation Tactics," which guided campus student groups on disruption methods and advised students on the level of response they could expect from university administrations and media.[13]  NSJP's tactics ranged from "Level 1," for which students should expect "[n]o significant admin or media blowback" to "Level 4," for which students should prepare for "significant admin and media blowback, . . . [and] legal consequences."[14]

NSJP's "Level 4" tactics included campus ***occupations*** and "sit-ins" where students should "[p]ick a heavily trafficked location and/or place with lots of significance; ***blockades*** focused on

---

[8] Charles Hilu, *Columbia University Students Announce Event Celebrating Hamas's Oct. 7 Attack*, WASH. FREE BEACON (Dec. 4, 2023), https://tinyurl.com/yzm34jbz.

[9] *Campus Antisemitism Surges Amid Encampments and Related Protests and Other U.S. Colleges*, ANTI-DEFAMATION LEAGUE (Mar. 22, 2024), https://tinyurl.com/2s3ykay3.

[10] Ted Deutch, *Crisis on Campus: Antisemitism, Radical Faculty, and the Failure of University Leadership*, 118 Cong. (2024), at 1, https://tinyurl.com/32cuwhtk.

[11] *National Student Day of Action for Divestment*, NSJP (Jan. 31, 2024), https://tinyurl.com/22y4sutr.

[12] *Id.* at 2.

[13] *Id.* at 8.

[14] *Id.* at 8–11.

"disrupt[ing] the function of a specific building or office," such as "an administrative building, the admissions office, the student center, or a recruitment event;" and **creative disruption** of "high-profile university events or ceremonies," which could include "[w]alk-outs, standing up and turning backs, entering en masse with signs, [and] birddogging."[15]

Just days before students attempted to set up an encampment at the University of Texas at Austin ("UT Austin"), NSJP announced a "coordinated pressure campaign against university administrators and trustees."[16]  And they made their goals explicit: "SJP chapters across the nation will seize the university and force the administration to divest . . . ."[17]  NSJP openly called upon agitators to disrupt their universities' educational mission: "The Popular University for Gaza is a coordinated mass movement of students, faculty, and staff dedicated to preventing our universities from performing their daily functions."[18]  As the Court will later see, the event that Plaintiffs joined at UT Austin on April 24, 2024 was part of this coordinated mass movement and shared the same name.

Student agitators did not hesitate to implement NSJP's guidance for maximizing university campus disruption.[19]  For example, at Yale University, police arrested approximately 45 protesters following a campus occupation on April 22, 2024, which potentially risked campus safety and university operations.[20]  At the University of Pennsylvania, pro-Palestinian protesters set up an

---

[15] *Id.* at 10–11. NSJP defined "Bird-Dogging" as "a tactic in which participants pursue their target wherever they are in order to force the target to pay attention or respond to their issue. This usually involves gathering some information on where your target might be when . . . and/or familiarizing yourself with your targets' routines." *Id.* at 19. Some refer to this colloquially as stalking and harassment.

[16] Steering Committee, *National SJP Announces the Popular University for Gaza*, NSJP (Apr. 20, 2024), https://tinyurl.com/52f2swkk.

[17] *Id.*

[18] *Id.*

[19] Hadas Gold, *Student journalists assaulted, others arrested as protests on college campuses turn violent*, CNN (May 1, 2024), https://tinyurl.com/4t96s33w.

[20] Michayla Savitt, *After arrests of pro-Palestinian protesters, Yale students vow to keep going: 'We're so angry'*, NHPR (Apr. 22, 2024), https://tinyurl.com/ymhr2eja; *see also* Josie Reich, *Salovey breaks silence on divestment protests in Sunday email*, YALE DAILY NEWS (Apr. 21, 2024), https://tinyurl.com/mh9vrwes.

encampment and vandalized a statue of Benjamin Franklin with antisemitic graffiti.[21]  Over 100 Penn students responded to a campus-wide survey within an hour of its circulation to share accounts of harassment and intimidation stemming from the encampment.[22]

Meanwhile, at Columbia University, protestors established a tent encampment causing "considerable disruption and distress."[23]  One student "described an altercation in which a woman was verbally attacked because she was holding a sign saying she was both Jewish and anti-Zionist."[24]  Another student "recounted seeing a female student wearing both a star of David and a keffiyeh being verbally assaulted."[25]  A Rabbi associated with the university's Orthodox Union Jewish Learning Initiative recommended that Jewish students return home because neither the university nor the local police could ensure their safety.[26]

## II.    Plaintiffs Join the "Popular University for Gaza" Protest Vowing to follow in "the footsteps of our comrades" at Other Universities.

As students disrupted universities across the United States with encampments, building blockades, and other demonstrations, similar confrontations spread to universities in Texas.  Public universities, such as UT Austin, reacted out of a reasonable concern that campus agitators in Texas would seek to replicate what was taking place across the country.  That concern was not misplaced, as Plaintiffs explicitly acknowledge that the Palestine Solidarity Committee ("PSC") event on April 24, 2024 "[wa]s part of a nationwide student movement" vowing to do just that. *FAC,* ¶¶ 47–48.[27]

---

[21] Katie Bartlett, *Penn calls on pro-Palestinian encampment to disband immediately, citing legal and policy violations*, DAILY PENNSYLVANIAN (Apr. 26, 2024), https://tinyurl.com/mvwxvvx2.
[22] *Id.*
[23] Kiara Alfonseca, *As Columbia University protests on Israel-Hamas war come to a head, what to know*, ABC (Apr. 30, 2024), https://tinyurl.com/mvwr7w6v.
[24] Omar Jimenez, *Columbia task force finds 'troubling' pattern of behavior toward Jewish students on campus*, CNN (Aug. 30, 2024), https://tinyurl.com/mr83p552.
[25] *Id.*
[26] Celina Tebor, Zoe Sottile and Matt Egan, *Columbia University faces full-blown crisis as rabbi calls for Jewish students to 'return home'*, CNN (Apr. 22, 2024), https://tinyurl.com/4tb87xmd.
[27] *See also* Chelsey Zhu, Becky Fogel, *Students in San Antonio and Austin join nationwide protests supporting Palestinians*, TEXAS PUBLIC RADIO (Apr. 24, 2024), https://tinyurl.com/86yv86rv.

Plaintiffs also acknowledge that PSC intended to follow "[i]n the footsteps of [their] comrades at Columbia SJP, Rutgers-New Brunswick, Yale, and countless others across the nation." *Id.*, ¶ 48. PSC's social media post advertising its protest on April 24, 2024, broadcast that "class is canceled," and that the movement would attempt to "reclaim" space by marching to "occupy" the South Lawn (read: set up an illegal encampment as their "comrades" had elsewhere):



*Id.* Photos that Plaintiffs attach to their pleading show that, by the end of the day, protesters had indeed sought to establish an unlawful encampment on campus. *See, e.g., FAC*, Ex. 2, p. 10.

## III. University Officials Cancel the Planned Occupation out of Concerns for Disruption and Maintaining the Peace, but Plaintiffs and Others Ignore Those Directions.

Plaintiffs acknowledge that UT Austin administrators were concerned first and foremost with the possibility of campus disruption and maintaining the peace. They give five helpful examples.

*First*, Plaintiffs claim that UT Austin Spokesperson Mike Rosen and his staff discussed an email by a student member of a campus pro-Israel group expressing concern about what happened at Columbia University, and that protestors would "disrupt public order and safety." *FAC*, ¶ 171.

*Second*, Plaintiffs claim that University of Texas Police Department ("UTPD") Lieutenant Johanson, whom they do not identify elsewhere in the Amended Complaint or include in the case caption, highlighted events "on the east coast that resulted in the arrest of protestors at NYU/Columbia/Yale," and requested support from the Dean of Students' office for expected

violations of campus rules. *Id.*, ¶ 169.

*Third*, the Department of Public Safety ("DPS") released a statement after the protest on April 24, explaining that UT Austin had requested their presence at the direction of Governor Greg Abbott to "prevent an unlawful assembly and to support UT Police in maintaining the peace by arresting anyone engaging in any sort of criminal activity, including criminal trespass." *Id.*, ¶ 184.

*Fourth*, over a week after the protest, on April 30, 2024, the University of Texas System Board of Regents ("UT System Board") Chairman Kevin Eltife repeated concerns about "threats to campus safety and security or refusal to comply with institutional polices and law." *Id.*, ¶ 172.

*Fifth*, Plaintiffs say that UT Austin's Provost emailed the Dean's Council on April 24, 2024, to explain that the protest that day was "part of a national campaign . . . explicitly seeking to disrupt university operations nationwide by creating campus encampments." *Id.*, ¶ 53.  "As we have seen over the past few days, these illegal encampments have done just that." *Id.*  She went on:

> They have resulted in significant changes to classes, hundreds of arrests, intimidation, and calls for violence against Jewish students. The University is working to ensure this type of disruption doesn't occur on campus. As part of this effort, last evening, the Office of the Dean of Students informed the event organizer that they could not hold this event on campus. D[ean of Students] also explained that any attempt to do so would subject the organization and its attending members to discipline under the Institutional Rules . . . .

*Id.*[28]  PSC representatives received notice canceling their event on April 23, 2024. *Id.*, ¶¶ 54–55.

In its notice to PSC dated April 23, 2024, UT Austin explained that PSC had "declared its intent to violate our policies and rules, and disrupt our campus operations. Such disruptions are never allowed and are especially damaging while our students prepare for the end of the semester and final exams. *For these reasons, this event may not proceed as planned.*"[29]  Despite receiving notice canceling the

---

[28] UT Austin's rules governing student conduct are available at https://tinyurl.com/4xwkx2k7, [hereinafter "*UT Austin Institutional Rules*"].

[29] *See April 23, 2024 Event Cancellation Notice*, attached as **Exhibit B** (emphasis added); Plaintiffs reference the April 23, 2024 notice directly in the Amended Complaint at paragraph 54, and appear to believe it is evidence of intent to discriminate against groups affiliated with NSJP, such as PSC.

planned campus occupation, PSC (and Plaintiffs) carried on with it anyway.

## IV.    After Ignoring University Administrators' Directions not to "Take" the Campus, Protestors Ignore Peace Officers' Commands to Disperse Before Arrests Begin.

Reports that Plaintiffs attach to the Amended Complaint show that protestors "had already received approximately 4 warnings from [the] Dean of Students prior to UTPD arrival as well as within [the reporting officer's] presence to disperse at about 11:55." *FAC*, ¶ 76 (citing Exs. 1–4, at 6).

### A.    The protest begins, and peace officers attempt to direct the group off campus.

Plaintiffs allege that the protest began with a group of approximately 50 to 75 individuals gathering in front of Gregory Gym on East 21st Street at 11:40 a.m., including Heilrayne. *Id.*, ¶ 56. According to Plaintiffs, they intended "to turn right onto East 21st Street" while heading Southbound on Speedway from Gregory Gym, "and proceed to the [South] lawn." *Id.*, ¶ 57.

Plaintiffs claim that protestors did not go immediately to the South Lawn because "eight to ten police officers, positioned in a line with their bikes, blocked the protesters' path." *Id.*, ¶ 58. Certain unnamed police officers instead instructed them to head south on Speedway to "the edge of campus" to the Brazos Garage area. *Id.*, ¶ 60.

Reports attached to the Amended Complaint also show that DPS had issued a dispersal order:

> After the DPS mobile field force time set up on the north side of the group and the DPS Bike unit was set up on the south side of the group, a dispersal order was given over a DPS loudspeaker advising the group their conduct was in violation of Penal Code Sections 42.01 Disorderly Conduct, 42.02 Riot, 42.03 Obstructing a Highway or other passageway and 30.05 Criminal Trespass and given 10 minutes to leave the area.

*Id.*, Ex. 1, p. 7; *accord id.*, ¶ 79. Plaintiffs similarly acknowledge that an officer announced by loudspeaker at around 12:30 p.m. that the group had two minutes to disperse, and that "some departed for class or other activities." *Id.*, ¶¶ 65, 67–68. This concession reflects that protestors could have complied had they chosen to, and that protestors were indeed aware of dispersal orders. In fact, Plaintiffs also concede they attempted to comply with orders by walking south on Speedway to the edge of campus, but that they were "penned" and somehow unable to depart campus. *Id.*, ¶ 82.

B.     After ignoring commands to disperse, pro-Palestine protesters
       return to Speedway to continue their disruptive campus occupation.

Although some complied with the dispersal orders, others regrouped back on Speedway. *Id.*,

Ex. 1, p. 7.  "[A]rrests [at Speedway] began after 'the group had ignored and defied two orders of

dispersal." *FAC*, ¶¶ 73–74; *accord id.*, Ex. 1, at 7, Ex. 6, at 4.  Specifically, Plaintiffs claim that UT

Austin police began by arresting an unidentified male student. *Id.*, ¶ 83.

After the first arrest, officers "formed a phalanx in the middle of Speedway and forcefully

advanced to clear the area." *Id.*, ¶ 84.  Police also "instructed students to move out of the middle of

Speedway." *Id.*  Plaintiffs acknowledge it was clear to them they should disperse.  Nevertheless, some

protesters were encircling officers at the intersection of East 21st Street and Speedway, attacking them:

> transporting the arrestees a long with the Austin Police Department with their paddy wagon. During this time, I was advised by Sgt. █████ some in the crowd were picking up the horse excrement from DPS Mounted unit and throwing it officers. Ofc. █████ was also head butted by an arrestee causing injury (bloody nose).

*Id.*, Ex. 1, at 7.

Plaintiff Arwyn Heilrayne claims that peace officers (including Adame) seized her while she

stood on the grass beside Speedway "to observe" the protest at 1:13 p.m. *Id.*, ¶¶ 89–91.  Reports that

Plaintiffs attach to the Amended Complaint as Exhibit 1 detail some of the facts as understood by law

enforcement. *Id.*, Ex. 1, at 12.  The foregoing reflects that officers issued an additional dispersal order

by P.A. system to the crowd at 1:10:04 p.m., but that Heilrayne continued agitating the crowd. *Id.*

Officers arrested Heilrayne minutes later as she was "trying to incite the crowd." *Id.*, at 13.  Reporting

shows that she "was under arrest for Criminal Trespass, as she was making no attempt to leave after

having been given the dispersal order earlier." *Id.*[30]

Plaintiff Citlalli Soto-Ferate claims she arrived at Speedway around 1:00 p.m. *Id.*, ¶ 94.  Once

there, she alleges she stood at the edge of the thoroughfare assisting other protestors in complying

with police orders by telling them to clear the middle of the road. *Id.*  She claims she walked over to

---

[30] *See also id.*, Ex. 1, at 5; Ex. 5, at 2.

warn a friend to move aside, at which point separate groups of three to four officers (including Adame) arrested her and her friend. *Id.*, ¶ 95. Reports attached to the Amended Complaint as Exhibit 2 reflect that officers arrested Soto-Ferate at Speedway around 1:26 p.m. as she tried to prevent the arrest of other protestors. *Id.*, Ex. 2, at 12. Officers observed her "blocking the middle of the road . . . after having been given the dispersal order earlier." *Id.*, Ex. 2, at 13.[31]

C.    The protest moves west to occupy the South Mall.

"As violence and chaos escalated on Speedway between 1:00 and 2:00 [p.m.], large numbers of police and protesters gathered on the South Mall." *Id.*, ¶ 98. The South Mall[32] is the area to the south of the UT Tower, west of Speedway and north of East 21st Street, and the South Lawn is the grassy area between the academic buildings that form the South Mall, which PSC had advertised as the target of its planned campus occupation. *See id.*, ¶ 48.

Whereas arrests on Speedway occurred after protesters ignored two dispersal orders and a notice from the Dean of Students, Plaintiffs acknowledged in their Amended Complaint that police reports detail arrests at the South Mall following yet more "[d]ispersal order[s] through the UT Safety Alert system via email, text, the campus emergency PA system, loudspeakers, and social media." *Id.*, ¶ 115. Recognizing that the reality on the ground undermines their claims, Plaintiffs appear to have removed this prior acknowledgement when amending their pleading. All the same, reporting attached to their operative pleading still provides this information. *Id.*, Ex. 1, at 7. Arrests of Medrano and Cisco followed those additional orders to disperse.

Plaintiff Iliana Medrano claims to have joined the protest around 12:45 p.m. and made her way to the South Mall. *FAC*, ¶ 101. While on the South Lawn, she linked arms with other protesters

---

[31] *See also id.*, Ex. 2 at 5; Ex. 5, at 3. Reporting also states: "Soto[-Ferate] should be charged with Interference with Public Duties . . . because she was attempting to pull another female fin [*sic*] order to disrupt and impede our abilities to make the arrest." *Id.*, Ex. 2, at 13–14.

[32] Dean of Students, *South Mall*, THE UNIVERSITY OF TEXAS AT AUSTIN: FIND AN OUTDOOR SPACE (last visited August 19, 2025), https://tinyurl.com/bdvv5ub4.

as police tried to disperse the crowd. *Id.* This status quo persisted until 3:00 p.m., when "police officers rushed at [her], forcefully pulling her right arm and bringing her to the ground facedown." *Id.*, ¶ 103. She alleges that Defendant Henry was among the officers who seized her. *Id.* Reports attached to the Amended Complaint reflect officers arrested Medrano at 3:01:19 p.m. "for Criminal Trespass, as she was making no attempt to leave, by standing still locking arms with other people, after having been given multiple dispersal orders prior." *Id.*, Ex. 3, at 5, 12, 14; *see also id.*, Ex. 5, at 4.

Finally, Plaintiff Mia Cisco claims to have joined the protest later in the afternoon, arriving to a scene with a "massive police presence using bikes as a barrier to push protesters back." *FAC*, ¶ 107. Around 4:00 p.m., four or five unnamed officers arrested her. *Id.*, ¶ 110.[33] She alleges Defendant Rodriguez was among those officers. *Id.* Reports attached to the Amended Complaint show officers arrested Cisco at 4:32 p.m. on the South Lawn, by which time protestors had received numerous dispersal orders. *Id.*, Ex. 4, at 7, 12. Cisco adds the implausible allegation that she did not hear any dispersal orders while she was there. *Id.*, ¶ 107.

## V.    Plaintiffs Baselessly Claim that Governor Abbott Ordered Their Arrests because of the Viewpoint they Expressed.

DPS explained in a public statement that Governor Abbott directed their presence to UT Austin's campus "to prevent any unlawful assembly and to support UT[PD] in maintaining the peace by arresting <u>anyone</u> engaging in any sort of criminal activity, including criminal trespass." *FAC*, ¶ 184 (emphasis added). Even though this statement reflects no direction by Governor Abbott to target any specific group by viewpoint or to make unlawful arrests, Plaintiffs wish the Court to draw the baseless and unprecedented conclusion that Governor Abbott had in fact directed officers to arrest *Plaintiffs* because of their expressed viewpoint. *Id.*, ¶ 185.

---

[33] Cisco also contends she spoke with Defendant Christopher Wray while at the protest, at which point he allegedly voiced disagreement with the protesters' cause. *FAC*, ¶ 109.

Plaintiffs appear to reach this conclusion based on Governor Abbott's retweet at 3:51 p.m. on April 24, 2024, *after* each Plaintiff except for Cisco had already been seized by law enforcement. *Id.*, ¶¶ 187–88. Plaintiffs offer no allegations showing that Governor Abbott's retweet was a direction to law enforcement, no allegations showing that any officer ever read that retweet, and no allegations that any officer arrested any Plaintiff *because of* that retweet.

## VI. UT Austin Provides Plaintiffs with Notice of Student Conduct Charges and an Opportunity to Dispute the Accusations, but Plaintiffs Do Not Contest Them.

Plaintiffs agree they joined PSC's protest and that the national backdrop is "critical," but they claim they never committed any violent act, disrupted any campus activity, or damaged any property. *FAC*, ¶¶ 38, 52. Public accounts do not reinforce Plaintiffs' implausible suggestion. Rather, they show that protesters marched through campus blocking students from class.[34]

### A. UT Austin responds amid escalating campus disruption.

UT Austin's focus in responding to the protest was to end "disruptions of campus activities or operations like we have seen at other campuses."[35] The end of the year "is an important time in our semester with students finishing classes and studying for finals."[36] Officials expressed they would "act first and foremost to allow those critical functions to proceed without interruption."[37]

Plaintiffs allege that the day after the protest, April 25, 2024, a UT Austin administrator emailed and posted a notice banning the students involved in the protest from campus. *FAC*, ¶ 127. They add that the officials quickly amended that policy to permit arrested students on campus for

---

[34] Jay Janner et al., *Pro-Palestinian protest held at UT-Austin, protesters arrested. Here's what it looked like*, AUSTIN AMERICAN STATESMAN (Apr. 24, 2024), https://tinyurl.com/4c4p7hbe; Aaron E Martinez and Jay Janner. *'Whose lawn? Our lawn!' Photos from Pro-Palestinian encampment protest held on UT campus*, AUSTIN AMERICAN STATESMAN (Apr. 29, 2024), https://tinyurl.com/2r8pz27v.
[35] University Communications, *April 24 Statement from UT's Division of Student Affairs* (Apr. 24, 2024), https://news.utexas.edu/2024/04/24/april-24-statement-from-uts-division-of-student-affairs/.
[36] *Id.*
[37] *Id.*

academic reasons and fully abandoned it by Friday evening that week. *Id.*, ¶¶ 128–131.  Plaintiffs do not allege that any Defendant enforced the terms of the "policy" against them, or against any student.

Plaintiffs insert into their pleading a copy of the notice they claim they received. *Id.*, at 34.  As the notice makes clear, UT Austin was concerned with campus disruption, and the notice does not reflect any viewpoint- or content-based motivation. *See id.*

Following the protest and attendant disruption on April 24, former UT Austin President Jay Hartzell publicly observed that the national trend of campus disruptions had come to Texas:

> As the push to disrupt top universities spreads across the country, many campuses such as ours are facing similarly difficult challenges. . . . The University's decision to not allow yesterday's event to go as planned was made because we had credible indications that the event's organizers, whether national or local, ***were trying . . . to severely disrupt a campus for a long period.*** Consistent with this broader movement that is impacting so many, ***problematic aspects of the planned protest were modeled after a national organization's protest playbook.***
>
> Against this backdrop, I am reminded today that we have much to be thankful for. I'm thankful we live in a country where free expression is a fiercely protected Constitutional right. I'm grateful that our campus has seen 13 pro-Palestinian events take place during the past several months largely without incident — plus another one today[, April 25].[38]

Following Hartzell's statement, protestors quickly demonstrated that the university's concerns for public safety and campus disruption were not misplaced.

On April 29, 2024, protesters "erected a tent encampment on the South Lawn, with a barricade enclosure of tables secured by metal chains, and strategically placed tools, tents, and rocks."[39]  Police also intercepted a protestor with a handgun shoved in his waistband, a round in the chamber, and

---

[38] Jay Hartzell, *Balancing Speech, Safety and Our Mission*, UT AUSTIN OFFICE OF THE PRESIDENT, https://president.utexas.edu/2024-messages-speeches/balancing-speech-safety-and-our-mission.

[39] *University of Texas at Austin Statement Regarding Today's Protest Events*, UT NEWS (Apr. 29, 2024), https://tinyurl.com/33ncc5fs; *see also* Aaron E Martinez and Jay Janner. *'Whose lawn? Our lawn!' Photos from Pro-Palestinian encampment protest held on UT campus*, AUSTIN AMERICAN STATESMAN (Apr. 29, 2024), https://tinyurl.com/2r8pz27v.

extra magazines.[40]  Campus agitators—many of whom lacked any affiliation with UT Austin—also armed themselves with "guns, buckets of large rocks, bricks, steel enforced wood planks, mallets, and chains."[41]  They assaulted and threatened university staff, hurled excrement at peace officers, and slashed tires on police vehicles.[42]

### B.    Plaintiffs' student conduct discipline.

Plaintiffs allege that on June 14, 2024, they each received notice that they faced student misconduct charges for their participation in a protest that "disrupted/interfered with operations and violated university rules and policies." *FAC*, ¶¶ 133–34.  The notices explained that "[m]ultiple University officials told the group to disperse numerous times, but participants refused to follow these orders.  To gain compliance and eliminate the disruption, officials had to remove the student and others from campus involuntarily." *Id.*, Ex. 1, at 1; *id.*, Ex. 2, at 1; *id.*, Ex. 3, at 1; *id.*, Ex. 4, at 1.

The notices also accused Plaintiffs of violating campus rules, particularly 11-402(a)(19)(a) (Failure to Comply) and 11-402(a)(18)(a) (Disruptive Conduct). *FAC*, ¶ 135.  The notices were accompanied by a disciplinary packet including the following: a Reporting Officer Narrative, social media screenshots of PSC's Instagram posts about the event, photos of tents on a lawn, and a Case Supplement Report containing additional information specific to each Plaintiff's involvement in the protest. *Id.*, ¶ 140.

The disciplinary packets attached to each notice instructed Plaintiffs to submit a written statement addressing the allegations by June 26, 2024. *Id.*, ¶ 136.  Plaintiffs admit they did not respond to contest the rules violations. *Id.*, ¶¶ 138–39.  In July, "each plaintiff received notice that they had been found responsible for the alleged conduct violations." *Id.*, ¶ 141.

---

[40] Brianna Hollis, *Man arrested after carrying gun during UT protests, court documents say*, KXAN (May 10, 2024, 7:54 PM), https://tinyurl.com/4p7382jw.

[41] University Communications, *UT Statement Regarding Arrests from Monday's Protest and Confiscation of Weapons* (Apr. 30, 2024), https://tinyurl.com/5657cwcf.

[42] *Id.*

Following that finding, Heilrayne, Soto-Ferate, and Medrano were offered a deferred suspension that would not take effect or even appear on their final transcript, and which would conclusively resolve the student conduct process. *Id.*, ¶¶ 142–43.  Meanwhile, Cisco claims she was offered academic probation for one year. *Id.*, ¶ 144.  Accepting the offer required their agreement that future campus rules violations would result in their suspension. *Id.*, ¶ 143.  Plaintiffs add that if a student declined the offer and unsuccessfully appealed their student misconduct finding, they would face a one-year suspension. *Id.*, ¶ 145.  Each Plaintiff accepted the offer. *Id.*, ¶¶ 146–49.

## VII.    This Lawsuit

Plaintiffs sue UT Austin, the UT System Board, the UT System Board's individual members in their official capacities,[43] Board Chairman Eltife in his individual capacity, former UT Austin President Jay Hartzell in his individual capacity, and Interim UT Austin President Jim Davis in his official capacity. *FAC*, at 1, ¶¶ 15–19.  Plaintiffs also sue Hector Luevano as a supervising officer, Roberto Rodriguez, Reynaldo Adame, and L. Henry as "UTPD Officers," and Christopher Wray as a DPS Officer, all in their individual capacities. *Id.*, at 1, ¶¶ 21–24.[44]  Finally, Plaintiffs sue Governor Greg Abbott in his individual capacity. *Id.*, at 1, ¶ 20.  This motion is brought by each of these Defendants apart from Wray, who already filed a motion (Dkt. 43), and the John Doe Officers.

Plaintiffs seek compensatory and punitive damages, attorney's fees, and costs. *FAC*, at 69. Plaintiffs also ask the Court for an order requiring UT Austin to reverse its disciplinary actions against Plaintiffs, and for a declaration that "the conduct and actions described in this Complaint constitute violations of the First and Fourth Amendments to the United States Constitution," and Title VI. *Id.*

---

[43] Kevin Eltife, Janiece Longoria, James Weaver, Christina Melton Crain, Jodie Lee Jiles, Kelcy Warren, Nolan Perez, Stuart Stedman, and Robert Gauntt.

[44] Additionally, Plaintiffs sue John Doe DPS Officers A, B, C, D, and E, and John Doe UTPD Officers, A, B, C, D, E, F, G, H, and I, all in their individual capacities. *Id.*, ¶¶ 25–31.

Following Defendants' earlier motions to dismiss,[45] Plaintiffs attempted to resolve some of these concerns by amending their original complaint to add numerous conclusory allegations without supporting facts. Plaintiffs also dismissed individual-capacity claims against all members of the University of Texas System Board of Regents except for Board Chairman Kevin Eltife, and all claims against Adan Zavala. Plaintiffs' claims have not become more plausible through iteration.

***Count I*** – Plaintiffs claim under 42 U.S.C. section 1983 that defendants deprived them of First Amendment rights to speech, assembly, and association. Specifically, they allege that Defendants Hartzell, Eltife, and Abbott (1) created a prior restraint based on Plaintiffs' pro-Palestine viewpoints and/or perceived associations with other pro-Palestine students *on other campuses*, *FAC*, ¶ 206; and (2) "directed" the arrest of only pro-Palestinian protesters while ignoring pro-Israel counter-protesters, *id.*, ¶¶ 207–09. Additionally, each Plaintiff sues various law enforcement officer defendants for unlawful arrest, restricting their rights to express a viewpoint, to associate, and to assemble, as well as to be free from arrest without probable cause. *Id.*, ¶¶ 215–34.

***Count II*** – Plaintiffs bring a second claim under 42 U.S.C. section 1983 that defendants unlawfully retaliated in response to conduct protected under the First Amendment. *FAC*, ¶¶ 237–38. First, they sue Defendants Davis and the UT System Board for injunctive relief based on student misconduct discipline. *Id.*, ¶¶ 242–47. Second, they sue Defendants Hartzell and Abbott for "unlawfully direct[ing] police to retaliate against Plaintiffs because of their expressive conduct," interfering with Plaintiffs' rights of expression, association, assembly, and to be free from arrest without probable cause. *Id.*, ¶¶ 248–57. Finally, each Plaintiff sues various law enforcement officer defendants for retaliatory arrest, restricting their rights to express a viewpoint, to associate, and to assemble, as well as to be free from arrest without probable cause. *Id.*, ¶¶ 258–82.

---

[45] Dkts. 38, 39.

***Count III*** – Plaintiffs bring a third claim under 42 U.S.C. section 1983, alleging that various officers unlawfully arrested them without probable cause, depriving them of their Fourth Amendment right to be free from unreasonable seizure or arrest. *FAC*, ¶¶ 283–315.  Plaintiffs acknowledge that they received notice to disperse but failed to do so, remaining on UT Austin's campus, but appear to think that those dispersal orders were legally inadequate to support probable cause because they did not also take the unnecessary step of informing Plaintiffs how they should depart campus. *Id.*, ¶ 285.

***Count IV*** – Finally, Plaintiffs sue UT Austin and the UT System Board for declaratory relief under Title VI of the Civil Rights Act of 1964, 42 U.S.C. section 2000d. *FAC*, ¶¶ 316–23.  They acknowledge that Title VI prohibits discrimination based on race, color, or national origin, and that they must show *they* were subjected to intentional discrimination based on those protected categories. *Id.*  Nevertheless, Plaintiffs assert this claim based on their claimed association with Palestinian and/or Muslim students at UT Austin *or other college campuses* who were themselves subject to discriminatory actions by these Defendants. *Id.*

**LEGAL STANDARDS**

***Federal Rule of Civil Procedure 12(b)(1)*** – Standing and sovereign immunity bear upon the Court's jurisdiction and are properly raised in a Rule 12(b)(1) motion to dismiss.[46]  "The burden of proof for a Rule 12(b)(1) motion to dismiss is on the party asserting jurisdiction."[47]

In deciding a Rule 12(b)(1) motion, the court may consider any of the following: (1) the complaint alone;  (2) the complaint plus undisputed facts evidenced in the record;  or (3) the complaint,

---

[46] *See, e.g.*, *Block v. Tex. Bd. of Law Exam'rs*, 952 F.3d 613, 616–17 (5th Cir. 2020) (sovereign immunity); *Moore v. Bryant*, 853 F.3d 245, 248–49 (5th Cir. 2017) (standing).

[47] *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001), *cert. denied*, 536 U.S. 960 (2002).

undisputed facts, and the court's resolution of disputed facts.[48]  On such a motion, the "trial court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case."[49]

**Federal Rule of Civil Procedure 12(b)(6) –** The remaining issues are analyzed under Rule 12(b)(6), under which a court may dismiss a complaint for "failure to state a claim upon which relief can be granted."[50]  To survive a motion under Rule 12(b)(6), a plaintiff must assert facts stating a "plausible" claim for relief.[51]  A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[52]

In deciding a Rule 12(b)(6) motion, the court can rely on: (1) the complaint;  (2) the complaint's attachments;  (3) a defendant's attachments that were referenced in the complaint and central to the plaintiff's claim;  and (4) judicially-noticeable matters.[53]  "Government websites are presumptively reliable and subject to judicial notice."[54]  And the Fifth Circuit has held that taking judicial notice of public records directly relevant to the issue in dispute is proper on a Rule 12(b)(6) and does not transform the motion into one for summary judgment.[55]

## RULE 12(B)(1) ARGUMENTS

Defendants challenge the Court's jurisdiction on grounds of sovereign immunity and standing. The key points here are as follows: (1) Plaintiffs cannot show they suffered an injury in fact based on student conduct discipline, or based on unexplained "harms" to unidentified non-parties;  (2) Plaintiffs

---

[48] *Lane v. Halliburton*, 529 F.3d 548, 557 (5th Cir. 2008).

[49] *MDPhysicians & Assoc., Inc. v. State Bd. of Ins.*, 957 F.2d 178, 181 (5th Cir. 1992) (internal quotations and citation omitted).

[50] *Anderson v. Valdez*, 845 F.3d 580, 589 (5th Cir. 2016).

[51] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

[52] *Id.*

[53] *See, e.g.*, *Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 338 (5th Cir. 2008); *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498–99 (5th Cir. 2000).

[54] *Rhines v. Salinas Const. Techs., Ltd.*, No. C-11-262, 2011 WL 4688706, at *2 n.2 (S.D. Tex. Oct. 3, 2011) (citing *Kitty Hawk Aircargo, Inc. v. Chao*, 418 F.3d 453, 457 (5th Cir. 2005)); *accord U.S. ex rel. Lam. v. Tenet Healthcare Corp.*, 481 F. Supp. 2d 673, 680–81 (W.D. Tex. 2006).

[55] *Funk v. Stryker Corp.*, 631 F.3d 777, 783 (5th Cir. 2011).

cannot establish traceability for most claims;  (3) the UT System Board, as an entity, is not a proper defendant for Plaintiffs' claim outlined in Count II;  and (4) Plaintiffs cannot satisfy *Ex parte Young*.

## I.    Plaintiffs Lack Standing to Pursue Most Claims Against Most Defendants.

To establish Article III standing, Plaintiffs must show they suffered: an injury in fact, fairly traceable to a defendant's actions, and likely to be redressed by a favorable outcome.[56]  "[S]tanding is not dispensed in gross."[57]  Rather, "a plaintiff must demonstrate standing for each claim [s]he seeks to press and for each form of relief that is sought."[58]

### A.    Plaintiffs cannot claim an injury from student conduct discipline they agreed to, or under Title VI for "harms" to unidentified non-parties.

Plaintiffs complain of discipline they received following their campus protest on April 24, 2024. *FAC*, ¶¶ 133–34.  They also add that they failed to respond to those charges due to the fear of self-incrimination in the event criminal charges might be refiled. *Id.*, ¶¶ 138–39.  Yet, elsewhere, Plaintiffs contend that criminal charges were dropped because probable cause did not support the charges. *Id.*, ¶ 126.  So which is it—was it likely a local prosecutor would pursue criminal trespass charges against Plaintiffs, or did they believe the charges were baseless and thus unlikely to be refiled?

Standing is not a difficult showing at this stage, but Plaintiffs "cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending."[59]  Nor can Plaintiffs pursue a claim based on speculative and unrealized harms, which they claim in connection with the possibility of issues when applying to graduate school *in the future*. *FAC*, ¶ 246.  The Supreme Court "has repeatedly reiterated that . . . '[a]llegations of *possible* future injury' are not sufficient."[60]

---

[56] *Abdullah v. Paxton*, 65 F.4th 204, 208 (5th Cir. 2023).
[57] *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008) (citation omitted).
[58] *Reule v. Jackson*, 114 F.4th 360, 367 (5th Cir. 2024) (quoting *Town of Chester v. Laroe Ests., Inc.*, 581 U.S. 433, 439 (2017)).
[59] *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013).
[60] *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990) (emphasis added; internal quotation marks omitted).

Plaintiffs also assert a Title VI claim based on their supposed associations with unidentified non-party "Palestinian and/or Muslim students, both at UT Austin and on *other college campuses*." *FAC*, ¶ 320 (emphasis added). A claimed association with a group advocating on behalf of Palestinians is not the same as an association with an individual who is Palestinian, and so the fact that Plaintiffs might have formed an "expressive association"[61] with PSC does not establish the altogether separate point of a personal association with any one Palestinian. Nor would the latter association establish a cognizable harm because Plaintiffs still fail to show that either UT Austin or the UT System Board discriminated against any Palestinian individual on campus. *See generally FAC.*

At any rate, Plaintiffs have not suffered a cognizable injury on this basis because a "particularized" injury "must affect *the plaintiff* in a personal and individual way."[62] While a plaintiff can show that an injury is particularized where a defendant "violated [the plaintiff's] statutory rights," they cannot make this showing based on "the statutory rights of other people."[63]

B.    <u>Plaintiffs cannot assert PSC's rights.</u>

In amending their pleading, Plaintiffs added the allegation that Governor Abbott, Eltife, and Hartzell unlawfully created a prior restraint by cancelling PSC's protest. *FAC*, ¶ 206. Plaintiffs are not PSC and cannot assert its rights.[64]

C.    <u>Plaintiffs allege no facts to support causation for most claims.</u>

To establish traceability, a plaintiff must show "a causal connection between the injury and the conduct complained of—the injury must be fairly traceable to the challenged action of the

---

[61] *See, e.g.*, *Kipps v. Caillier*, 205 F.3d 203, 204–05 (5th Cir. 2000) (outlining two classes of associations protected by the First Amendment: expressive and intimate associations) (citations omitted).
[62] *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016) (emphasis added).
[63] *Id.* at 340.
[64] *Campbell v. Lamar Inst. of Tech.*, No. 1:14-CV-399, 2015 WL 12942498, at *6 (E.D. Tex. Aug. 13, 2015), *aff'd*, 842 F.3d 375 (5th Cir. 2016) (holding a limitation on the standing doctrine is that "the plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties").

defendant, and not the result of the independent action of some third party not before the court[.]"[65]

"Standing exists where the purported injury is connected to allegedly unlawful government conduct."[66]

For many Defendants, Plaintiffs allege no facts establishing what role they could have played in the harms Plaintiffs claim they suffered. And because this point also undermines the personal involvement requirement for Plaintiffs' Section 1983 claims, Defendants do not fully set out these arguments twice. Rather, Defendants rely on the arguments set out later as if fully stated here.[67]

In summary, Plaintiffs allege no facts showing that Eltife or Hartzell had any role in their arrests, student conduct discipline, or even the decision to cancel PSC's protest. The fact that these Defendants occupied important positions at UT Austin and on the UT System Board, and expressed views about PSC's disruptive protest, does not also show they directed arrests, discipline, or protest cancellation with the specific goal of interfering with Plaintiffs' expressive rights.

Finally, as to Governor Abbott, Plaintiffs point to a statement reflecting that DPS had been asked to arrest lawbreakers, and a retweet posted after the arrests of three Plaintiffs, but neither shows he had any role in causing Plaintiffs' arrests or other alleged harms. Such threadbare assertions, without support, do not satisfy the burden Plaintiffs face. Fifth Circuit precedent is clear: "We will not 'strain to find inferences favorable to the plaintiffs.' Nor do we accept conclusory allegations, unwarranted deductions, or legal conclusions."[68]

---

[65] *Reule*, 114 F.4th at 366–67 (citation and internal quotation marks omitted).
[66] *Id.* (citation omitted).
[67] *Infra*, 27–33.
[68] *Southland Sec. Corp. v. INSpire Ins. Sols, Inc.*, 365 F.3d 353, 361 (5th Cir. 2004) (citations and internal marks omitted).

## II.    Sovereign Immunity Bars Many Claims, and *Ex parte Young* Does Not Apply.

"In most cases, Eleventh Amendment sovereign immunity bars private suits against nonconsenting states in federal court."[69]  Sovereign immunity extends to state officials or agencies where, as here, they are effectively suits against a state,[70] such as UT Austin and the UT System Board.

To overcome that immunity, Plaintiffs must show that Texas waived its immunity or Congress expressly abrogated it.[71]  But it is beyond dispute that "[t]he Eleventh Amendment bars claims against a state brought pursuant to 42 U.S.C. § 1983."[72]  Indeed, "Section 1983 does not waive the states' sovereign immunity,"[73] and "Texas has not consented to this suit."[74]  Thus, if Plaintiffs are to maintain their Section 1983 claims against UT Austin and the UT System Board, they must attempt to circumvent sovereign immunity under *Ex parte Young*.[75]

"For a suit against a state official to proceed under *Ex parte Young*, three criteria must be satisfied: (1) A plaintiff must name individual state officials as defendants in their official capacities; (2) the plaintiff must allege[ ] an ongoing violation of federal law;  and (3) the relief sought must be properly characterized as prospective."[76]  The standing and *Young* analyses "significant[ly] overlap."[77]

As explained below, Plaintiffs sue the wrong official-capacity defendants, and they do not ask for a form of relief that satisfies *Young*.

### A.    Plaintiffs sue the wrong defendants.

*Young* does not apply to suits against states or their agencies, such as the University and

---

[69] *City of Austin v. Paxton*, 943 F.3d 993, 997 (5th Cir. 2019) (citations omitted).
[70] *Id.* (citations omitted).
[71] *Id.*
[72] *Aguilar v. Tex. Dep't of Crim. Justice*, 160 F.3d 1052, 1054 (5th Cir. 1998) (citation omitted).
[73] *Id.* (citing *Quern v. Jordan*, 440 U.S. 332, 338 n.7 (1979)).
[74] *Id.* (citing *Emory v. Tex. State Bd. of Med. Exam'rs*, 748 F.2d 1023, 1025 (5th Cir. 1984)).
[75] 209 U.S. 123, 157 (1908); *see also Okpalobi v. Foster*, 244 F.3d 405, 415 (5th Cir. 2001).
[76] *Healthy Vision Ass'n v. Abbott*, 138 F.4th 385, 396 (5th Cir. 2025) (citations and internal quotation marks omitted).
[77] *Air Evac EMS, Inc. v. Tex. Dep't of Ins. v. Tex. Div. of Workers' Comp.*, 851 F.3d 507, 513–14 (5th Cir. 2017).

University System Board of Regents named here.[78]  Thus, sovereign immunity plainly bars Plaintiffs'

Section 1983 claim against the UT System Board outlined in Count II.[79]

Plaintiffs also sue Interim UT Austin President Jim Davis and the UT System Board's

members in their official capacities.  But to be a proper defendant under *Young*, a state official must

have a connection to the enforcement that a plaintiff claims.[80]

Plaintiffs attached notices of student conduct discipline to their Amended Complaint

reflecting enforcement by the Office of the Dean of Students for violations of two provisions of

Chapter 11 of UT Austin's Institutional Rules.[81]  Plaintiffs did not name UT Austin's Dean of Students

as an official-capacity defendant.  This poses a problem for them because Chapter 11 of UT Austin's

Institutional Rules provides that the "Dean of Students has primary authority and responsibility for

the administration of the university process for students alleged to have engaged in conduct that

violates this Chapter."[82]  Thus, in suing UT Austin's interim president and the UT System Board's

members, Plaintiffs named the wrong officials.

It is true that in *Jackson v. Wright*, the Fifth Circuit found that the University of North Texas's

Board of Regents members could be sued under *Young*, noting the board's "ultimate governance

authority" and its "supervisory role over the individuals who were allegedly violating constitutional

---

[78] *See Calhoun v. Collier*, 78 F.4th 846, 850–51 (5th Cir. 2023); *see also, e.g.*, *Chhim v. Univ. of Tex. at Austin*, 836 F.3d 467, 469 (5th Cir. 2016) (finding that UT Austin is a state entity protected by sovereign immunity); *Doe v. Harrell*, 841 F. App'x 663, 668 (5th Cir. 2021) (finding that UT System's Board of Regents is a state entity protected by sovereign immunity).

[79] Separately, Section 1983 applies only to "persons," which these Defendants are not. *See Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989) ("We hold that neither a State nor its officials acting in their official capacities are 'persons' under § 1983.").

[80] *Mi Familia Vota v. Ogg*, 105 F.4th 313, 325 (5th Cir. 2024) (citation and internal quotation marks omitted) ("To be a proper defendant under *Ex parte Young*, a state official must have some connection with the enforcement of the law being challenged.").

[81] *FAC*, Ex. 1, at 2; *id.*, Ex. 2, at 2; *id.*, Ex. 3, at 2; *id.*, Ex. 4, at 2; *see also UT Austin Institutional Rules*, §§ 11-402(a)(16)(a) ((originally 11-402(a)(19)(a)) & 11-402(a)(15)(a) (originally 11-402(a)(18)(a)).

[82] *UT Austin Institutional Rules*, § 11-102(a).

23

rights."[83]  But this Court should not extend *Jackson* to encompass the facts here, for four reasons.

*First*, *Jackson* is inapposite because it did not address the specific issue here, where: (1) plaintiffs trace student conduct discipline to a specific application of university policy and (2) the defendants sued were not the identified enforcement officers in that policy.[84]  Under *City of Austin*, which predates *Jackson*, the *Young* analysis "ends" in this situation.[85]  *Jackson*, as a panel decision, did not and could not overrule *City of Austin*.[86]

*Second*, while the *Jackson* panel found the board members to be proper enforcement officers due to their general authority over UNT and not because of any specific connection they had to the alleged unlawful acts at issue, it is well-settled in this circuit that a plaintiff cannot satisfy *Young* merely by looking to an official's general duties.[87]  Indeed, in *Haverkamp v. Linthicum*, the Texas Department of Criminal Justice Director of Health Services had broad supervisory authority akin to UNT's board members in *Jackson*.[88]  Yet, the Fifth Circuit still found that she was not a proper *Young* defendant, noting the "absen[ce] [of] any allegations tying Linthicum to the specific decisions at issue."[89]

*Third*, while the *Jackson* panel found the board's "authority to countermand the decisions of the subordinate UNT officials" relevant to its *Young* analysis,[90] this too was at odds with existing precedent.  For example, the panel in *Mi Familia Vota v. Abbott* found that Governor Abbott was not a proper *Young* defendant despite his ability to countermand the enforcement officers with his unfettered right to "amend or rescind" the disputed executive order.[91]

---

[83] 82 F.4th 362, 367–68 (5th Cir. 2023) (quotations omitted).

[84] *See id.*

[85] *City of Austin*, 943 F.3d at 998.

[86] *See Nivelo Cardenas v. Garland*, 70 F.4th 232, 242 n.7 (5th Cir. 2023) ("To the extent two panel decisions conflict, the earlier decision controls.").

[87] *See, e.g., Tex. All for Retired Ams. v. Scott*, 28 F.4th 669, 672 (5th Cir. 2022).

[88] 6 F.4th 662, 671 (5th Cir. 2021).

[89] *Id.*

[90] *Jackson*, 82 F.4th at 368.

[91] 977 F.3d 461, 467–68 (5th Cir. 2020).

*Finally*, *Jackson* is distinguishable from this case for other reasons.  For one thing, *Jackson* found it relevant that the plaintiff wrote to UNT's Board about his grievances, and the Board "ignored" this letter.[92] This fact is not present here—Plaintiffs do not allege that the UT System Board did anything.[93] Separately, *Jackson* involved a professor's claim for reinstatement.[94]  The Fifth Circuit has historically analyzed *Young* more leniently when an employee seeks reinstatement to a prior job or role.[95]  A similar principle is found in the context of institutional litigation involving state prisons, where the *Young* exception "is so well established" that courts "often do not even mention [it]."[96]  Here, Plaintiffs are not employees seeking reinstatement to prior roles, and this case does not involve prison litigation.

In sum, *Jackson* is not binding due to the rule of orderliness, and separately because the case is distinguishable.  Either way, this Court should find that the official-capacity defendants lack the requisite enforcement connection needed under *Young*.[97]

B.    Plaintiffs do not allege ongoing violations of federal law.

A complaint "must allege that the defendant *is violating* federal law, not simply that the defendant *has done so*."[98]  Even so, the Fifth Circuit has explained that "[a]s long as the claim seeks prospective relief for ongoing harm, the fact that a current violation can be traced to

---

[92] *Jackson*, 82 F.4th at 368.

[93] *See Air Evac EMS, Inc.*, 851 F.3d at 518 (noting that an "*Ex parte Young* analysis can turn on subtle distinctions in the complaint").

[94] *See Jackson*, 82 F.4th at 366, 369.

[95] *See Nelson v. Univ. of Tex. at Dall.*, 535 F.3d 318, 322 (5th Cir. 2008) ("[T]his circuit has always treated *Ex parte Young* as an appropriate vehicle for pursuing reinstatement to a previous job position."); *see also Cantu Servs., Inc. v. Roberie*, 535 F. App'x 342, 345 (5th Cir. 2013) (noting that there were "special considerations" in the employment/reinstatement context that did not apply to an *Ex parte Young* claim concerning "an award process for a public contract").

[96] *Hope v. Harris*, 861 F. App'x 571, 578 (5th Cir. 2021).

[97] For transparency's sake, another Judge in this District rejected similar *Young* arguments in *Students for Just. in Palestine, at Univ. of Houston v. Abbott*, 756 F. Supp. 3d 410, 425 (W.D. Tex. 2024). There, Judge Pitman appears to have assumed that *Jackson* applies in this context. At the least, Defendants wish to preserve their argument that *Jackson* is distinguishable or otherwise wrongly decided.

[98] *NiGen Biotech, L.L.C. v. Paxton*, 804 F.3d 389, 394 (5th Cir. 2015) (second emphasis added).

a past action does not bar relief under . . . *Young*."[99]  Medrano and Soto-Ferate do not allege an ongoing violation because they already graduated and therefore any discipline (or alleged harm) they faced as a student has ended. *FAC*, ¶¶ 11–12.  As for Cisco, she claims she "was offered a sanction of academic probation for one year" in June 2024, which would have since ended based on her allegations. *Id.*, ¶ 114.  That leaves only Heilrayne who claims to still face harm from student conduct discipline.

C.    Plaintiffs seek the wrong relief.

To reiterate, *Young* allows suits for prospective relief against state officials in their official capacities for ongoing violations of federal law.[100]  This raises an obvious question: "what qualifies as prospective? Merely requesting injunctive or declaratory relief is not enough."[101]  Instead, courts "look to the substance rather than to the form of the relief sought."[102]  Here, looking to the substance of the requested relief undermines any hope Plaintiffs could have for meeting *Young*'s requirements.

*First*, Plaintiffs seek an order requiring UT Austin to reverse disciplinary actions against them (that they agreed to without contesting). *FAC*, at 69.  That relief—"the voiding of a final state" act or order—is "quintessentially retrospective" and thus out of bounds under *Young*.[103]  This suggests the Court may not consider student conduct discipline as a basis for prospective relief.

*Second*, Plaintiffs also seek a declaration that "the conduct and actions described in th[e] Complaint constitute violations of the First and Fourth Amendments to the United States Constitution" and Title VI. *FAC*, at 69.  Plaintiffs do not identify any ongoing actions by state officials they wish the Court to declare unconstitutional, and sovereign immunity bars district courts from declaring past acts unconstitutional,[104] so this too fails to satisfy *Young*.

---

[99] *Green Valley Special Util. Dist. v. City of Schertz*, 969 F.3d 460, 471–72 (5th Cir. 2020) (en banc) (quoting *Williams ex rel. J.E. v. Reeves*, 954 F.3d 729, 738 (5th Cir. 2020)).
[100] *Id.* at 471.
[101] *Id.*
[102] *Id.* (quoting *Papasan v. Allain*, 478 U.S. 265, 279 (1986)).
[103] *Green Valley*, 969 F.3d at 473 (citing *Republic of Paraguay v. Allen*, 134 F.3d 622, 628 (4th Cir. 1998)).
[104] *Freedom from Religion Foundation v. Abbott*, 955 F.3d 417, 425–26 (5th Cir. 2020).

**RULE 12(B)(6) ARGUMENTS**

Plaintiffs' claims fail under Rule 12(b)(6) for at least six reasons: (1) Plaintiffs fail to allege personal involvement—an essential aspect of any Section 1983 cause of action;  (2) Plaintiffs cannot establish a Fourth Amendment violation because probable cause existed to arrest them for criminal trespass;  (3) under *Nieves v. Bartlett*, the existence of probable cause precludes Plaintiffs from pursuing First Amendment claims relating to their arrests;  (4) Plaintiffs fail to show that any defendant infringed their First Amendment rights;  (5) even if Plaintiffs could show a constitutional violation to support their Section 1983 claims, qualified immunity still bars those claims;  and (6) Plaintiffs do not fall within a classification that Title VI protects and otherwise fail to plead a Title VI claim.

**I.    Plaintiffs Fail to Allege Personal Involvement by Each Individual-Capacity Defendant to Support their Section 1983 Claims.**

Plaintiffs rely on generalized allegations against all Defendants in attempting to make out their claims under Section 1983.  This poses a problem, as "[p]ersonal involvement is an essential element of a [section 1983] cause of action,"[105] and a plaintiff "cannot make generalized allegations, nor can he support a claim based on any vicarious liability theory."[106]    Indeed, in describing the "personal involvement" requirement, the Supreme Court has instructed courts to require claimants to plead "an affirmative link between an incident and some act by the defendant."[107]  Plaintiffs do not meet this standard for any of their Section 1983 claims.

***Defendants Rodriguez, Henry, and Adame –*** Cisco alleges Rodriguez arrested her, Medrano alleges Henry arrested her, and Soto-Ferate and Heilrayne allege Adame arrested them. Cisco has no claim against Henry or Adame, Medrano has no claim against Rodriguez or Adame, and Soto-Ferate and Heilrayne have no claim against Rodriguez or Henry.

---

[105] *Thompson v. Steele*, 709 F.2d 381, 382 (5th Cir. 1983) (citing *Rizzo v. Goode*, 423 U.S. 362, 371–72 (1977)).

[106] *Murphy v. Kellar*, 950 F.2d 290, 292 n.7 (5th Cir. 1992).

[107] *Rizzo*, 423 U.S. at 371 (internal quotation marks omitted).

***Defendant Luevano*** – Plaintiffs sue Luevano based on his alleged role in directing Rodriguez, Henry, Adame, and other unidentified "John Does."  To support their claim, they attached Exhibit 6 to their Amended Complaint, which is an Incident/Investigation Report where Luevano explains that protestors had ignored and defied two orders of dispersal, leading him to advise the UPTD team to begin making arrests of "the group" at the intersection of 21st and Speedway.[108]  Elsewhere, Plaintiffs claim that Luevano "directed" various officers to arrest a minimum number of pro-Palestine protesters, though they offer no factual allegations to support this separate conclusion.[109]  Plaintiffs also offer nothing to suggest that Luevano ever directed a subordinate officer to arrest any Plaintiff.

At any rate, a direction from a superior to a subordinate to arrest lawbreakers is not a direction to make unlawful arrests;  nor can that assertion alone support a Section 1983 claim.  Rather, these are conclusory accusations that the Fifth Circuit routinely dismisses,[110] as they "[e]xpress[] a factual inference without stating the underlying facts on which the inference is based."[111]

Plaintiffs simply have no claim that Luevano himself acted to deprive any Plaintiff of a constitutional right.  Plaintiffs' claims against Luevano instead depend on the proposition that supervisors may be held liable for the actions of their subordinates under Section 1983, without more.  But this is not the law.  Rather, circuit decisions show that a supervisor may only be held liable "if (1) [the supervisor] affirmatively participates in the acts that cause the constitutional deprivation, or (2) [the supervisor] implements unconstitutional policies that result in the constitutional injury."[112]

Importantly, to demonstrate that a supervisor is liable for constitutional violations committed by subordinate employees, "plaintiffs must show that the supervisor act[ed], or fail[ed] to act, with

---

[108] *FAC*, Ex. 6, at 4; *see also id.*, ¶¶ 21, 73.
[109] *Id.*, ¶¶ 216, 221, 226, 231, 259, 266, 272, 278, 294–95, 297, 302, 305, 309, 312, 314.
[110] *See, e.g.*, *Porter v. Lear*, 751 F. App'x 422, 431 (5th Cir. 2018) (holding "[b]ecause the officers did not participate in the destructive search, they cannot be liable for any resulting constitutional violations").
[111] *Conclusory*, BLACK'S LAW DICTIONARY 308 (8th ed. 2004).
[112] *Pena v. City of Rio Grande City*, 879 F.3d 613, 620 (5th Cir. 2018) (internal citation omitted).

*deliberate indifference* to violations of others' constitutional rights committed by their subordinates."[113] Whereas "proof of deliberate indifference generally requires a showing of more than a single instance of the lack of training or supervision causing a violation of constitutional rights,"[114] Plaintiffs do not plead any specific facts supporting this finding.

**Kevin Eltife and Jay Hartzell** – Plaintiffs bring two claims against UT System Board Chairman Eltife and former UT Austin President Jay Hartzell for allegedly "direct[ing] the University's and police's response to the April 24th protest at issue in this case." *FAC*, ¶¶ 17–18.  They simply offer no facts to support the finding that Eltife or Hartzell were personally involved in the decision to cancel PSC's protest, or in causing Plaintiffs' arrests merely by requesting mutual aid from DPS.

In lieu of specific factual allegations showing personal involvement, Plaintiffs instead repeat the hollow refrain that Eltife and Hartzell *directed* law enforcement to make arrests and their subordinates to subject Plaintiffs to unconstitutional restrictions.[115]  Even if this were enough (it is not), Plaintiffs also fail to allege facts supporting the inference that Eltife or Hartzell directed officers to make arrests or university administrators to impose student conduct discipline *for unlawful reasons*.

Plaintiffs appear to believe that if they repeat an unsupported conclusion enough times, the Court might relieve them of the obligation to offer specific allegations establishing personal involvement, but that is not the law.  Rather, as the Fifth Circuit explained in *Romero v. Brown*, conclusory and "general allegations" such as those Plaintiffs make here are categorically insufficient to establish liability against a supervisory official.[116]

**Governor Abbott** – As with Eltife and Hartzell, Plaintiffs do not claim that Governor Abbott was present when their arrests or student conduct discipline occurred.  They instead repeat the same

---

[113] *Porter v. Epps*, 659 F.3d 440, 446 (5th Cir. 2011) (citations omitted; emphasis in original).

[114] *Burge v. St. Tammany Parish*, 336 F.3d 363, 370 (5th Cir. 2003) (internal quotation marks omitted).

[115] *See, e.g., id.*, ¶¶ 176–77, 206, 208, 212, 248, 251, 255.

[116] 937 F.3d 514, 523 (5th Cir. 2019) (citation omitted).

familiar refrain: that Governor Abbott "directed" officers to arrest Plaintiffs and UT Austin officials to subject them to unconstitutional restrictions.[117]  This hollow conclusion is inadequate to support a finding of personal involvement, and courts have found similar allegations insufficient.[118]

In the same section of the pleading alleging that Governor Abbott directed arrests of protesters based on their viewpoint, Plaintiffs quote a DPS statement in which Governor Abbott purportedly directed law enforcement to prevent *any* unlawful assembly and to arrest *anyone* engaging in *any* sort of criminal activity. *Id.*, ¶ 184.  Plaintiffs do not show how DPS's mere presence at the April 24th protest had "adverse effects" upon any identifiable group.

And it is hard to see how simply seeking police to arrest lawbreakers at a protest that involved both pro-Palestine protesters *and counter-protesters*[119] can be deemed viewpoint discrimination.  After all, DPS stated it was present to "maintain[] the peace by arresting *anyone* engaging in any sort of criminal activity, including criminal trespass." *Id.*, ¶ 184 (emphasis added).

In this way, Plaintiffs present an argument similar to—and weaker than—the unsuccessful argument made in *Morris v. Hines*.[120]  In *Morris*, the summary judgment evidence showed that Sergeant Hines ordered officers to pepper spray the plaintiff *if* he refused to comply with two orders to stop any attempts to cut himself.[121]  At the time of the command, Sgt. Hines believed the officers had extinguished a fire at the scene.[122]  The plaintiff argued that Sgt. Hines was personally involved because other officers pepper sprayed him *through* a fire that had, in fact, continued burning.[123]  The Court

---

[117] *FAC*, ¶¶ 20, 183–91, 209–14, 252–57.
[118] *See, e.g.*, *Williams v. City of Jackson*, No. 3:20-CV-785-DPJ-FKB, 2022 WL 4715706, at *16 (S.D. Miss. Sept. 30, 2022); *Mcintyre v. Castro*, No. 1-15-CV-1100 RP, 2016 WL 1714919, at *3 (W.D. Tex. Apr. 8, 2016); *Connolly v. Reed*, No. SA-08-CA-882-FB, 2009 WL 10702848, at *15 (W.D. Tex. Sept. 14, 2009).
[119] *See, e.g.*, *FAC*, ¶¶ 57–58 (noting that there were counter-protesters at the April 24th event).
[120] *Morris v. Hines*, No. 5:20CV36, 2021 WL 5086369, at *6 (E.D. Tex. Aug. 13, 2021), report and recommendation adopted at No. 5:20-CV-00036, 2021 WL 4272327 (E.D. Tex. Sept. 21, 2021).
[121] *Id.*
[122] *Id.*
[123] *Id.*

rejected the plaintiff's argument because he had presented "no evidence that Sgt. Hines intended for the officers to pepper spray Plaintiff through a fire, much less that he ordered them to do so."[124]

Here, DPS's statement that Governor Abbott directed them to respond to UT Austin and arrest anyone committing crimes is not a direction to any officer to arrest protesters *because of* their speech or assembly and thus does not support a finding of personal involvement. That only pro-Palestine protesters flouted UT Austin's content-neutral time, place, and manner restrictions or ignored dispersal orders is not a reason to find personal involvement.

Plaintiffs also argue that Governor Abbott's retweet responding to another user somehow constitutes a direction to law enforcement to unlawfully arrest protesters. *FAC*, ¶ 188. Specifically, Plaintiffs say that Governor Abbott expressed the opinion that arrests would continue until the crowd dispersed, and that the protesters "belong in jail." *Id.*

The chronology outlined by Plaintiffs does not do the work they believe it does. Plaintiffs do not even claim that the arresting officers knew about this tweet at the time of Plaintiffs' arrests. Nor could they, as Governor Abbott posted it at 3:51 p.m. on April 24, 2024, after the arrests of three plaintiffs had occurred. *See FAC*, ¶¶ 91 (Heilrayne), 94–95 (Soto-Ferate), 103 (Medrano).

As for Cisco, for her claim to work, the officers who arrested her "sometime after 4:00PM"— actively engaged in pushing back protesters while holding bikes, *id.*, ¶¶ 107-10—would have had to pull up social media, navigate to Governor Abbott's post, interpret his commentary as a personal direction to them to arrest Cisco despite the fact that Governor Abbott had no reason to know about Cisco's involvement or viewpoint, and then decide to arrest Cisco *because* of that post. Cisco does not allege that any of this happened, but her claim would be implausible even if she did.

Plaintiffs simply fail to allege any facts showing that Governor Abbott directed *their* arrests, or that he even knew who they were. Consider, by analogy, *Woods v. Edwards*, where the Fifth Circuit

---

[124] *Id.*

affirmed dismissal of an inmate's claims against the Governor of Louisiana and three officials of the Louisiana Corrections Department related to the inmate's extended lockdown because the plaintiff failed to allege personal involvement.[125]   There, the plaintiff unsuccessfully argued that these four defendants were responsible for the acts of all officials beneath them affecting the plaintiff, even though those officials had no direct contact with him.[126]

Finally, even had Plaintiffs plausibly shown Governor Abbott's involvement in *their* arrests based on the foregoing points, their claims would still fail because Governor Abbott must have "undertak[en] a course of action because of, not merely in spite of, the action's adverse effects upon an identifiable group."[127]   Plaintiffs do not establish this point either.

**The Official-Capacity Defendants –** Plaintiffs also sue the individual Board members and Interim UT Austin President Davis in their official capacities. *FAC*, at 1.  Yet "individual officials may be liable only for implementing a policy that is itself a repudiation of constitutional rights and the moving force of the constitutional violation."[128]

The "moving force" analysis turns on two issues.   *First*, an entity can be liable when it promulgated a policy "with deliberate indifference to the known or obvious consequences that constitutional violations would result."[129]   But again, Plaintiffs do not identify any formal "policy" adopted by UT Austin or the UT System Board that caused their alleged injuries. And regardless, a deliberate indifference showing is a "significantly high burden for plaintiffs to overcome,"[130] and generally requires that a supervisor be aware of "a pattern of similar violations."[131]

---

[125] 51 F.3d 577, 583 (5th Cir. 1995).

[126] *Id.*

[127] *Iqbal*, 556 U.S. at 676–77 (quotations and brackets omitted).

[128] *Oliver v. Scott*, 276 F.3d 736, 742 (5th Cir. 2002).

[129] *Piotrowski v. City of Hous.*, 237 F.3d 567, 579 (5th Cir. 2001).

[130] *Hernandez ex rel. Hernandez v. Tex. Dep't of Protective & Regulatory Services*, 380 F.3d 872, 882 (5th Cir. 2004).

[131] *Romero*, 937 F.3d at 523–24 (quotations omitted).

*Second*, a plaintiff can also show official liability by way of "custom." But to prevail on a "custom" argument, Plaintiffs must "show a widespread practice that is so common and well-settled as to constitute a custom that fairly represents [UT Austin or UT System] policy."[132] "The Fifth Circuit has set the bar very high for the number of prior incidents necessary for a finding" that the defendant operated under a custom.[133] Indeed, "[t]he Fifth Circuit has repeatedly required more than two isolated incidents in a single year."[134] Thus, the Fifth Circuit has found no custom present even when there were: 27 incidents over a four-year period;[135] 11 incidents over a four-year period;[136] 6 incidents over a five-year period;[137] and 30 incidents over a ten-year period.[138] Here, Plaintiffs only identify one instance of alleged misconduct—UT Austin's response to the April 24th protest.

## II.    Because Probable Cause Existed for Plaintiffs' Arrests, they Cannot Pursue a Section 1983 Claim for Unlawful Seizure or Arrest under the Fourth Amendment.

Plaintiffs allege that various officers wrongfully arrested them without probable cause. *FAC*, ¶¶ 283–315. Plaintiffs' unlawful arrest claims implicate the Fourth Amendment's prohibition on unreasonable seizures as the basis for a constitutional violation.[139]

In analyzing a Section 1983 unlawful arrest claim, courts begin by asking whether a seizure occurred.[140] Under the Fourth Amendment, "a seizure occurs when, under the totality of the circumstances, a reasonable person would have thought he was not free to leave."[141] But here,

---

[132] *Webb v. Town of Saint Joseph*, 925 F.3d 209, 215 (5th Cir. 2019).
[133] *Saenz v. Dallas Cnty. Cmty. Coll. Dist.*, No. 3:10-CV-742-O, 2011 WL 1935742, at *8 (N.D. Tex. May 16, 2011).
[134] *Johnson v. Dallas Cnty. Hosp. Dist.*, No. 3:23-CV-01574-E, 2024 WL 4394772, at *8 n.6 (N.D. Tex. Oct. 3, 2024) (citing cases).
[135] *Peterson v. City of Fort Worth*, 588 F.3d 838, 852 (5th Cir. 2009).
[136] *Pineda v. City of Hous.*, 291 F.3d 325, 329 (5th Cir. 2002); *see also Pineda v. City of Hous.*, 124 F. Supp. 2d 1057, 1076 (S.D. Tex. 2000) (noting that the incidents in question occurred between 1995–98).
[137] *Jackson v. Valdez*, 852 F. App'x 129, 135–36 (5th Cir. 2021).
[138] *York v. Welch*, No. 20-40580, 2024 WL 775179, at *5 (5th Cir. Feb. 26, 2024).
[139] U.S. Const. amend. IV.
[140] *See Keller v. Fleming*, 952 F.3d 216, 222 (5th Cir. 2020) (citations omitted).
[141] *Id.* (citations omitted).

Defendants do not dispute for purposes of this motion that officers seized Plaintiffs after they ignored repeated orders to disperse from the area. *FAC*, Ex. 1, at 12–13, *id.*, Ex. 2, at 12–14, *id.*, Ex. 3, at 12–14, *id.*, Ex. 4, at 6–7, 12.

Even so, Plaintiffs' Fourth Amendment claims still fail because officers were aware of facts creating a reasonable basis to arrest them.  This precludes a wrongful seizure claim because "what the Constitution forbids is not all searches and seizures, but unreasonable searches and seizures."[142]

A.     Probable cause existed to seize Plaintiffs.

For Plaintiffs to allege an *unreasonable* seizure, their allegations must make it plausible to conclude that arresting officers lacked probable cause to arrest them.  "[P]robable cause is the sum total of layers of information and the synthesis of what police have heard, what they know, and what they observed as trained officers,"[143] and "requires only a probability or substantial chance of criminal activity, not an actual showing of such activity."[144]

Nor are officers limited to felonies in making arrests on probable cause.  Rather, "[a]n officer may conduct a warrantless arrest based on probable cause that an individual has committed even a minor offense, including misdemeanors."[145]

The police reports attached to the Amended Complaint show that officers arrested Plaintiffs for criminal trespass pursuant to Texas Penal Code section 30.05.  A person commits criminal trespass if "the person enters or remains on or in property of another. . . without effective consent and the person: . . . received notice to depart but failed to do so."[146]  Texas courts have found

---

[142] *Elkins v. United States*, 364 U.S. 206, 222 (1960).
[143] *McLin v. Ard*, 866 F.3d 682, 694 (5th Cir. 2017) (citations and internal quotation marks omitted).
[144] *Ill. v. Gates,* 462 U.S. 213, 244 n.13 (1983).
[145] *Deville v. Marcantel*, 567 F.3d 156, 165 (5th Cir. 2009) (citing *Atwater v. City of Lago Vista,* 532 U.S. 318, 354 (2001)).
[146] Tex. Pen. Code § 30.05(a).

in this context that an individual "violate[s] the criminal trespass statute by remaining on University property after being asked to leave,"[147] without more.

Nor would it be any argument against probable cause that an individual "thought that [s]he was entitled to remain in the area where [s]he was speaking; [and] therefore [that s]he had no intent to commit a crime."[148]  That is because "[n]o culpable mental state is required [] for a conviction under section 30.05 other than a volitional refusal to leave when requested."[149]  Thus, a seizure under Texas's criminal trespass statute is reasonable under the Fourth Amendment wherever an officer believes, based on *their* perception, that an individual has been told to leave but has refused.

Applied here, the police reports that Plaintiffs attach to their pleading establish what the arresting officers knew at the time of Plaintiffs' arrests. Officers understood both (a) that UT Austin's Dean of Students had advised PSC the day prior to the protest that the event was cancelled because of the group's intent to disrupt campus operations and, ultimately, violate UT Institutional Rules, and (b) that "[d]ispersal orders were given through a PA system, social media and the siren system."[150] Officers attempted to escort protesters off the property by heading south on Speedway to the edge of campus, but protesters slipped back onto campus to continue their unlawful protest. *FAC*, ¶¶ 60–65.

"[P]robable cause requires only a probability or substantial chance of criminal activity,"[151] or, as the Fifth Circuit more recently explained, "more than a bare suspicion but less than a preponderance of evidence."[152]  Plaintiffs have supplied the Court with more than ample support for the conclusion that officers could be virtually certain that each Plaintiff was criminally trespassing on campus.

---

[147] *Springola v. Tex.*, 135 S.W.3d 330, 336 (Tex. App.—Houston [14th Dist.], 2004, no pet.) (citations omitted).
[148] *Id.*
[149] *Id.* (citing *Reed v. Tex.*, 762 S.W.2d 640, 646 (Tex. App.—Texarkana, 1988, writ ref'd)).
[150] *FAC.*, Ex. 1, at 6, *id.*, Ex. 2, at 6, *id.*, Ex. 3, at 6, *id.*, Ex. 4, at 6.
[151] *Gates,* 462 U.S. at 244 n.13.
[152] *Reitz v. Woods*, 85 F.4th 780, 790 (5th Cir. 2023).

Because Plaintiffs cannot make a claim against any of the UTPD officers on this basis, they also cannot establish that any other individual-capacity defendant deprived them of rights under the Fourth Amendment for allegedly "directing" other officials or "failing to intervene" to prevent a seizure or arrest. That is for the obvious reason that no degree of alleged participation by a supervisory official (here, Luevano) can support liability in the absence of an underlying deprivation.[153]

B.    Plaintiffs' expression does not immunize them from criminal laws.

Plaintiffs appear to suggest that, whatever other laws they broke, no officer could arrest them because they happened to be protesting. That is contrary to black-letter law in this circuit: "It is well-established that expressive activity is not a defense to an individual's own unlawful conduct."[154]

Consider also, for example, *Rumsfeld v. Forum for Academic and Institutional Rights*, where the Supreme Court explained that an individual cannot express their disapproval of the Internal Revenue Service by refusing to pay income taxes as a form of protest.[155] Rather, if a person chose to protest in this way, they could still be prosecuted notwithstanding the claim that they had intended to engage in protected expression.

Here, the facts alleged show that Plaintiffs were trespassing at UT Austin because they remained at the April 24th protest despite UT Austin canceling the event and notifying encampment organizers and attendees that they had to disperse.[156] Plaintiffs admit several times that they were aware of UT Austin's dispersal orders. *FAC*, ¶¶ 66, 68, 80, 85, 87. Regardless, after announcing orders to disperse over loudspeaker and by other means, it was reasonable for any officer to believe that Plaintiffs had heard the instructions but refused to comply, and thus to arrest them.

---

[153] *Porter*, 659 F.3d at 446 (citations omitted).

[154] *Doe v. Mckesson*, 71 F.4th 278, 293 (5th Cir. 2023) (citations omitted).

[155] 547 U.S. 47, 66 (2006).

[156] *See FAC*, ¶¶ 54–55, 67, 75–78, 81, 200; Ex. 1; *see also* Tex. Pen. Code § 30.05(a) (making it unlawful for a person to "enter[] or remain[] on or in property of another . . . without effective consent" if the person "(1) had notice that the entry was forbidden; or (2) received notice to depart but failed to do so").

Cisco is the only Plaintiff to raise a question about whether she received notice to disperse, as she contends that "[s]he did not hear any dispersal orders or instructions from police while she was [at the South Mall]." *Id.*, ¶ 107. On the one hand, the allegation about Cisco's lack of notice conflicts with the allegation that all Plaintiffs saw some protesters being arrested while "attempt[ing] to comply." *Id.,* ¶ 68. And on the other, she is silent on whether she received notice *before* she went to the South Mall, such as through UT Austin's letter to PSC. *See id.*, ¶ 54. This Court need not credit Cisco's contradictory allegation that she did not receive notice to disperse.[157]

## III. Plaintiffs Fail to State any Section 1983 Claim Based on a First Amendment Violation.

Plaintiffs advance two theories for a First Amendment violation—retaliation and viewpoint discrimination—based on speech, assembly, and association. Both claims fail for at least three reasons.

*First*, Plaintiffs do not plead facts establishing that any Defendant deprived them of speech or associational rights. *Second*, even had Plaintiffs made such a showing, *Nieves v. Bartlett* bars any arrest-based First Amendment claims where, as here, a plaintiff cannot show the absence of probable cause for their seizure.[158] *Finally*, and independently of the preceding points, *Tinker v. Des Moines Independent Community School District* would have permitted a reasonable official to restrict Plaintiffs' expression upon forecasting a substantial disruption of campus operations.[159]

### A. Plaintiffs' First Amendment claims suffer from incurable pleading defects.

Plaintiffs contend they were arrested and later disciplined for violating: Texas Penal Code Section 30.05's prohibition on criminal trespass; UT Austin Institutional Rule 11-402(a)(19)(a)'s requirement that students comply with authorized university directives; and UT Austin Institutional

---

[157] *See, e.g., Nichia Corp. v. VIZIO, Inc.*, No. 2:16-CV-1453-JRG, 2017 WL 3836141, at *1 (E.D. Tex. July 24, 2017) ("[T]he Court need not accept as true conclusory allegations and allegations contradicted by other allegations within Plaintiff's own complaint."); *Rosas v. Bexar Cnty.*, No. 5:14-CV-1082-DAE, 2015 WL 1955406, at *5 (W.D. Tex. Apr. 29, 2015) (same).
[158] 587 U.S. 391, 401 (2019).
[159] 393 U.S. 503, 514 (1969).

Rule 11-402(a)(18)(a)'s bar on disruptive conduct.[160]  They also claim that Defendants Hartzell, Eltife, and Abbott created a prior restraint based on Plaintiffs' pro-Palestine viewpoints and/or perceived associations with other pro-Palestine students *on other campuses*. *FAC*, ¶ 206.  Plaintiffs claim both retaliation and purposeful discrimination, but they do not plausibly allege animus.

> **1. There was no prior restraint.**  Setting aside the fact that Plaintiffs do not have standing to assert PSC's rights, discussed earlier,[161] the actions alleged in the Amended Complaint also do not constitute a prior restraint.  As the Supreme Court recognized in *Alexander v. United States*, "[t]he term prior restraint is used to describe *administrative* and *judicial orders* forbidding certain communications when issued in advance of the time that such communications are to occur."[162]

The Fifth Circuit has declined to extend the definition of a prior restraint to policies regulating employee speech, for example.[163]  And as the Court explained in *Moore*, even when speech policies threaten employees with termination for violating a policy, those policies are not prior restraints because they are not as severe as government actions directly prohibiting speech, like shutting down printing presses or subjecting a speaker to a court-ordered injunction.[164]  Rather, these sorts of policies threatening "after-the-fact" sanctions do not receive the suspect treatment given to prior restraints.[165]

The same holds true here.  Plaintiffs do not claim that any of them received a letter that they, personally, were prohibited from expressing certain opinions on April 24, 2024, and the notice letter provided to PSC (*FAC*, ¶¶ 54, 174) and verbal directives given to Plaintiffs are not "administrative or judicial orders."  What Plaintiffs mistakenly characterize as a "prior restraint" was instead simply the permissible application of UT Austin's content-neutral time, place, and manner rules to a protest

---

[160] *See, e.g.*, Dkt. 42-1, at 2.

[161] *Supra*, 20.

[162] 509 U.S. 544, 550 (1993) (emphasis added).

[163] *Moore v. City of Kilgore, Tex.*, 877 F.2d 364, 392 (5th Cir. 1989).

[164] *Id.*

[165] *Id.*; s*ee also Phillips v. Collin Cmty. Coll. Dist.*, 701 F. Supp. 3d 525, 536 (E.D. Tex. 2023) (holding college policies not prior restraint).

advertised as seeking to shut down campus and cancel classes.[166]

Even assuming there was a prior restraint, the collateral bar rule would be fatal to the claim. The collateral bar rule provides for the general principle that when an individual faced with a prior restraint must challenge that restraint directly without first violating it.[167]  To the extent a plaintiff chooses to violate an order restraining expression, even if she believes that order to be unconstitutional, subsequent punishment is distinguishable from an unconstitutional prior restraint.[168]

**2. Plaintiffs do not establish retaliation or viewpoint discrimination.**  To establish First Amendment retaliation claims, plaintiffs generally must show that: "(1) they were engaged in constitutionally protected activity, (2) the defendants' actions caused them to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity, and (3) the defendants' adverse actions were substantially motivated against the plaintiffs' exercise of constitutionally protected conduct."[169]  In the retaliatory arrest context, the defendants' retaliatory animus "must be a 'but-for' cause" of the adverse action.[170]

Similarly, "[v]iewpoint discrimination exists when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction."[171]  Per *Ashcroft v. Iqbal*, "[w]here the claim is invidious discrimination in contravention of the First . . . Amendment[], . . . the plaintiff must plead and prove that the defendant acted with discriminatory purpose."[172]  The Court

---

[166] *See Morgan v. Plano Indep. Sch. Dist.,* 589 F.3d 740, 745 (5th Cir. 2009) (holding "time, place and manner" is the proper standard for evaluating content and viewpoint neutral regulations of student speech).

[167] *See Walker v. City of Birmingham,* 388 U.S. 307, 320 (1967) (holding that until unconstitutionality has been judicially declared, one cannot disregard or violate the order or decree with immunity).

[168] *See, e.g., id.,* at 316 (explaining that an ordinance enjoining protesters from parading without a permit could not be challenged collaterally during contempt proceedings).

[169] *Keenan v. Tejeda,* 290 F.3d 252, 258 (5th Cir. 2002); *see also Burnside v. Kaelin,* 773 F.3d 624, 626 (5th Cir. 2014) (explaining that a First Amendment association claim has "similar elements" to a First Amendment free-speech retaliation claim).

[170] *Nieves,* 587 U.S. at 399.

[171] *Heaney v. Roberts,* 846 F.3d 795, 802 (5th Cir. 2017) (quotations omitted).

[172] 556 U.S. at 676.

continued: "[Purposeful discrimination] involves a decisionmaker's undertaking a course of action because of, not merely in spite of, the action's adverse effects upon an identifiable group."[173]

Both Plaintiffs' retaliation and discrimination claims depend upon a showing of protected activity. Plaintiffs say they were engaged in protected activity, specifically, their "associat[ion] with PSC and its members" to express a viewpoint criticizing Israel's response to Hamas's October 7, 2023 attack and "U.S. complicity therewith." *FAC*, ¶¶ 37, 51. An expressive association[174] claim is analyzed similarly to, and often merges with, a speech claim.[175] Plaintiffs likewise claim that defendants' conduct was tantamount to an effort to chill their speech and deter further advocacy. *FAC*, ¶ 238.

This Court should conclude from Plaintiffs' allegations that violations of content-neutral time, place, and manner restrictions—not Plaintiffs' speech, association, or assembly—drove the response to their actions. Plaintiffs refer to statements by university officials and law enforcement discussing the disruption that PSC, and by association, Plaintiffs, intended to (and did) cause. *FAC*, ¶¶ 53–55, 169, 171, 184. Those officials never raised PSC's or Plaintiff's viewpoint or expression as the reason for the university's actions, and it is well-established that a governmental entity may apply reasonable time, place, and manner restrictions on speech, so long as the restriction "does not discriminate against speech on the basis of viewpoint."[176]

**3. Plaintiffs fail to allege discriminatory animus.** Plaintiffs do not plead facts directly establishing that their viewpoint motivated officers to arrest them or university officials to hold them accountable in the student conduct process.[177] Instead, Plaintiffs attempt to make this showing

---

[173] *Id.* at 676–77 (quotations and brackets omitted).

[174] *See Mote v. Walthall*, 902 F.3d 500, 506 (5th Cir. 2018) (explaining that the First Amendment protest both "expressive" and "intimate" associations).

[175] *See Christian Legal Soc. Chapter of the Univ. of Cal., Hastings Coll. of the Law v. Martinez*, 561 U.S. 661, 680 (2010).

[176] *Heaney*, 846 F.3d at 802; *see also Papish v. Univ. of Mo. Curators*, 410 U.S. 667, 670 (1973) (citing *Healy v. James*, 408 U.S. 169, 192–93 (1972)) (holding Universities specifically have "legitimate authority to enforce reasonable regulations as to the time, place, and manner of speech and its dissemination.").

[177] *Iqbal*, 556 U.S. at 678.

circumstantially, alleging that other protesters were treated more favorably than they were. *See FAC*, ¶¶ 118–24, 159–66. Plaintiffs' First Amendment claims therefore sound in differential treatment, which courts analyze under a "selective enforcement" theory of liability.[178]

To assert a viable selective enforcement claim (also known as a selective prosecution claim),[179] a plaintiff generally must show she was singled out for enforcement "while others similarly situated who committed the same crime were not prosecuted."[180] A plaintiff must then show their selection was "invidious" or in "bad faith,"[181] reflecting "the desire to prevent the exercise of a constitutional right."[182] The Fifth Circuit characterizes this test "as a heavy burden."[183]

Plaintiffs do not plausibly allege that any named defendant took adverse acts against them due to discrimination or retaliation, for two reasons.

*First*, Plaintiffs cite a small protest in 2018 concerning Justice Brett Kavanaugh's confirmation as one comparator,[184] and pro-Israel counter-protesters on April 24, 2024 as another.[185] These proposed comparisons fail because Plaintiffs do not (and cannot) show that either the 2018 Kavanaugh demonstration or the mild counter-protest on April 24, 2024 was of "comparable seriousness" to PSC's attempted occupation.[186] Plaintiffs do not identify other demonstrations where

---

[178] *See Tex. Ent. Ass'n, Inc. v. Hegar*, No. 1:20-CV-707-DAE, 2023 WL 2541139, at *6 (W.D. Tex. Feb. 13, 2023) (noting the overlap between a First Amendment claim that "the government discriminatorily enforces [a] regulation against only particular . . . speakers" and a Fourteenth Amendment "selective enforcement" claim); *see also Frederick Douglass Found., Inc. v. D.C.*, 82 F.4th 1122, 1145–46 (D.C. Cir. 2023) (similar); *McGuire v. Reilly*, 386 F.3d 45, 62–63 (1st Cir. 2004) (similar).

[179] *See, e.g., United States v. Mackey*, No. 5:16-CR-772, 2016 WL 9280003, at *3 (S.D. Tex. Oct. 24, 2016) ("A selective-enforcement claim requires proof of essentially the same elements as a selective-prosecution claim.") (quotations omitted) (citing cases).

[180] *Jackson v. City of Hearne*, 959 F.3d 194, 201 (5th Cir. 2020).

[181] *Id.*

[182] *Bryan v. City of Madison*, 213 F.3d 267, 277 (5th Cir. 2000); *see also United States v. Ramirez*, 765 F.2d 438, 439–40 (5th Cir. 1985); *Jackson*, 959 F.3d at 201.

[183] *Ramirez*, 765 F.2d at 439.

[184] *FAC*, ¶¶ 159–66.

[185] *Id.*, ¶¶ 118–24.

[186] *Lee v. Kansas City S. Ry. Co.*, 574 F.3d 253, 261 (5th Cir. 2009).

protesters: proclaimed they wanted to "occupy" UT Austin; stated their intent was to "cancel" classes at the university;  wanted to follow in the footsteps of protesters who had recently caused severe disruptions at other colleges and harassment of other students; or continued their protest despite being ordered to disperse.[187]

*Second*, Plaintiffs fail to show that bad faith clouded their arrests.  They were participating in a prohibited protest, officers told them to disperse, and they failed to do so.  Arresting individuals who are trespassing is not tantamount to bad faith selection.

As for Soto-Ferate, she also does not plausibly allege she was engaged in expressive activity because she admits she was merely watching the April 24th protest.  Binding precedent holds that observing police activity is not protected activity.

The Supreme Court's *Colten v. Kentucky* decision is the most relevant case on this point which involved a group of protesters who left a demonstration and were driving in a procession of cars.[188] A police officer pulled one of the drivers over for an expired license plate.[189]  Another motorist in the entourage (Colten), went over to observe the traffic stop and ask questions.[190]  Other students joined him, and an officer asked the group to disperse.[191]  Colten did not depart and was arrested.[192]  Colten argued that his action of "observing the issuance of a traffic citation" was activity protected by the First Amendment.[193]   The Supreme Court stated that this was "a strained, near-frivolous contention."[194]  Thus, the Court found that Colten was not arrested for engaging in protected activity,

---

[187] *Compare FAC*, ¶¶ 159–66, *with id.*, ¶¶ 48, 54, 66, 73, 76, 87, 115, *with supra*, 4–5 (discussing prior protests at other schools, like Columbia University).
[188] 407 U.S. 104, 106 (1972).
[189] *Id.*
[190] *Id.* at 106, 109.
[191] *Id.* at 106–07.
[192] *Id.* at 107.
[193] *Id.* at 109.
[194] *Id.*

reasoning that "[h]e had no constitutional right to observe the issuance of a traffic ticket."[195]

*Colten* forecloses Soto-Ferate's First Amendment claims. She alleges she stood at the "edge" of "Speedway" after her class was dismissed. *FAC,* ¶ 94. For context, the bulk of the protest occurred in the *middle* of Speedway. *Id.,* ¶¶ 84–85. Soto-Ferate says she "assisted other protesters in complying with police orders by warning them to clear the middle of Speedway," and that police arrested her when she "walked over to warn her friend to move." *Id.,* ¶¶ 94–95.

As *Colten* shows, Soto-Ferate's mere observation of a protest is not protected activity. On top of this, she alleges she was simply trying to get others to *comply* with UT Austin's dispersal orders. Of course, she cannot plausibly contend that Defendants discriminated or retaliated against her due to her speech *aiding* the police officers' efforts to disperse the protest.

B.    *Nieves* bars Plaintiffs' First Amendment claims
       <u>based on their arrests because probable cause existed.</u>

Shown earlier, probable cause supported Plaintiffs' seizures, precluding a First Amendment violation per the Supreme Court's decision in *Nieves v. Bartlett.* As the Supreme Court explained, a plaintiff must "plead and prove the absence of probable cause for the arrest" to assert a viable First Amendment retaliatory arrest claim.[196] This is because "retaliatory arrest cases . . . present a tenuous causal connection between the defendant's alleged animus and the plaintiff's injury."[197]

To this end, the "[absence of probable cause] will—as in retaliatory prosecution cases— generally provide weighty evidence that the officer's animus caused the arrest, whereas the presence of probable cause will suggest the opposite."[198] The probable cause inquiry must focus on "whether the circumstances, viewed objectively, justify the [defendant's] challenged action."[199]

---

[195] *Id.*
[196] 587 U.S. at 402.
[197] *Id.* at 401.
[198] *Id.*
[199] *Id.* at 403 (quotations and brackets omitted).

The *Nieves* Court acknowledged a slim exception to its test "where officers have probable cause to make arrests, but typically exercise their discretion not to do so."[200]  Plaintiffs here do not satisfy this exception for the simple reason that they do not allege that criminal trespass is endemic at UT Austin but rarely enforced.

By way of analogy, *Nieves* hypothesized one situation where this exception would apply.  The Court noted that "jaywalking is endemic but rarely results in arrest."[201]  "If an individual who has been vocally complaining about police conduct is arrested for jaywalking at such an intersection, it would seem insufficiently protective of First Amendment rights to dismiss the individual's retaliatory arrest claim on the ground that there was undoubted probable cause for the arrest."[202]  Thus, the Court concluded that "the no-probable-cause requirement should not apply when a plaintiff presents *objective* evidence that he was arrested when otherwise similarly situated individuals not engaged in the same sort of protected speech had not been."[203]

Plaintiffs do not present objective evidence that they were treated less favorably than other similarly situated comparators, as discussed above.  Nor can they point to allegations that any defendant was subjectively biased or otherwise improperly motivated[204] to escape *Nieves*'s bar to liability.  That is because a *Nieves* analysis turns on *objective*, not *subjective*, animus evidence.[205]

*Nieves* also bars Plaintiffs' arrest-based viewpoint discrimination and association claims, which arise from the same facts as their First Amendment retaliatory arrest claim,[206] for two reasons.

*First*, applying *Nieves* to viewpoint discrimination claims arising from an arrest is consistent with the principles underlying the Supreme Court's decision.  *Nieves* required a plaintiff to prove the

---

[200] *Id.* at 406.
[201] *Id.* at 407.
[202] *Id.*
[203] *Id.* (emphasis added).
[204] *See, e.g., FAC,* ¶¶ 53–55, 93, 97, 114, 172, 188–90.
[205] *See Nieves,* 587 U.S. at 403.
[206] *See, e.g., FAC,* ¶¶ 215–34.

absence of probable cause for their arrest because probable cause is firm evidence of the reasonableness of an officer's decision to make an arrest.  The same can be said for viewpoint discrimination claims regarding an arrest.  The weight of authority indicates that *Nieves* extends to any arrest-based claims, not just First Amendment retaliation claims.[207]

*Third*, any contrary ruling would render *Nieves* a nullity, as any plaintiff could avoid its holding by simply pleading his retaliation claim under a viewpoint discrimination theory.  For example, in *Schaper v. City of Huntsville*, the Fifth Court rejected a plaintiff's attempt to avoid the *Parratt/Hudson* doctrine by pleading his procedural due process claim under a substantive due process theory.[208]  The Court reasoned that any other conclusion "would effectively eviscerate the holding of *Parratt*," as plaintiffs could easily sidestep this decision by asserting their procedural due process claims under a substantive due process rubric.[209]  The same reasoning applies here, and the Court should find that *Nieves* bars all Plaintiffs' First Amendment claims arising from their arrests.

    C.    <u>Plaintiffs' First Amendment claims do not survive scrutiny under *Tinker*.</u>

Assuming for purposes of argument that Plaintiffs had shown a First Amendment claim and that *Nieves* would not preclude liability, Plaintiffs' claims would still fail under *Tinker*.[210]

*1.* **Tinker *governs Plaintiffs' First Amendment claims.*  In *Tinker*, the Supreme Court held that school officials may restrict student speech upon showing "facts which might reasonably have led school authorities to forecast [that the proscribed speech would cause] substantial disruption of or material interference with school activities."[211]  *Tinker* governs various types of school-based First

---

[207] *See, e.g.*, *Richards v. Gelsomino*, 814 F. App'x 607, 609–11 (D.C. Cir. 2020); *Bey v. Falk*, 946 F.3d 304, 320 (6th Cir. 2019) (citing *Nieves*, 587 U.S. at 401); *Rusfeldt v. City of NY*, No. 22-CV-594 (PKC), 2024 WL 4354874, at *9 (S.D.N.Y. Sept. 30, 2024) (citing *Nieves*, 587 U.S. at 397–98); *Aplon v. City of Jasper*, No. 1:22-CV-18, 2022 WL 17815172, at *12–14 (E.D. Tex. Nov. 14, 2022).

[208] 813 F.2d 709, 716 (5th Cir. 1987).

[209] *Id.* at 718.

[210] 393 U.S. 503.

[211] *Id.* at 514.

Amendment claims, including viewpoint discrimination,[212] association,[213] and retaliation.[214]  The Fifth

Circuit and many other courts have applied *Tinker* to cases involving college students.[215]

      *Tinker's* standard is lenient.  An official prevails so long as he could reasonably forecast that

the restricted speech would substantially disrupt the school.[216]  An official's decision on this point

must be afforded deference.[217]  The reasoning is that officials need leeway so they can "react quickly

and efficiently to protect students and faculty from threats, intimidation, and harassment intentionally

directed at the school community."[218]

      To justify a speech restriction under *Tinker*, an official must be able to point to "a specific and

significant fear of disruption, not just some remote apprehension of disturbance."[219]  Where an official

reasonably forecasts substantial disruption, a First Amendment claim fails as the underlying speech is

"not immunized by the constitutional guarantee of freedom of speech."[220]

---

[212] *See Morgan*, 589 F.3d at 745; *see also Morgan v. Swanson*, 659 F.3d 359, 402 (5th Cir. 2011) (Elrod, J., writing for the majority and dissenting in part); *Esfeller v. O'Keefe*, 391 F. App'x 337, 341 (5th Cir. 2010); *Canady v. Bossier Par. Sch. Bd.*, 240 F.3d 437, 442 (5th Cir. 2001).

[213] *Healy*, 408 U.S. at 188–91.

[214] *Brinsdon v. McAllen Indep. Sch. Dist.*, 863 F.3d 338, 351 (5th Cir. 2017); *Davis v. Angelina Coll. Bd. of Trustees*, No. 9:17-CV-00179, 2018 WL 10111001, at *7–8 (E.D. Tex. June 1, 2018) (*Keenan*, 290 F.3d at 258).

[215] *See Esfeller*, 391 F. App'x at 341–42; *Shamloo v. Miss. State Bd. of Trs. of Inst. of Higher Learning*, 620 F.2d 516, 521–22 (5th Cir. 1980); *see also Salehpour v. Univ. of Tenn.*, 159 F.3d 199, 208 (5th Cir. 1998) ("Plaintiff's claim fails at the inception where his alleged speech, i.e., his conduct of disrupting the classroom milieu for the sole purpose of advancing and pursuing his admitted 'power struggle' with the University, was not protected activity" citing *Tinker*); Daniel B. Dreyfus, Note, *A Common Judicial Standard for Student Speech Regulations*, 102 Tex. L. Rev. 1059, 1075 n.100 (2024) (citing circuit court cases that applied or confirmed *Tinker's* applicability to First Amendment cases involving universities).

[216] *Bell v. Itawamba Cnty. Sch. Bd.*, 799 F.3d 379, 397 (5th Cir. 2015).

[217] *Id.*

[218] *Id.* at 393.

[219] *Id.* at 397 (quotations omitted). *Tinker* also has a "rights of others" prong that may independently justify a school's speech restriction without any showing that the expression would substantially disrupt the school's activities. *See, e.g., Doe v. Valencia Coll.*, 903 F.3d 1220, 1229–31 (11th Cir. 2018); *C.R. v. Eugene Sch. Dist. 4J*, 835 F.3d 1142, 1152–53 (9th Cir. 2016).

[220] *Tinker*, 393 U.S. at 513.

***2. Defendants' alleged response to the protest was constitutional.*** Two Fifth Circuit cases upholding speech restrictions under *Tinker* provide helpful context for showing why Defendants' alleged response to the April 24th protest was constitutional.

In *Blackwell v. Issaquena County Board of Education*, the Fifth Circuit analyzed a high school's ban on the wearing of "freedom buttons."[221] The Court noted that these buttons led to: students nosily talking in the hall; students trying to pin the buttons on others who did not want them; a general disruption of classroom instruction; one bus driver entering a class without permission to offer buttons to the students; some students throwing the buttons into the building through the windows; and one student being deliberately absent from class without permission.[222] The Court found that the school could constitutionally ban these buttons under the circumstances: "It is always within the province of school authorities to provide by regulation the prohibition and punishment of acts calculated to undermine the school routine."[223]

Next, in *A.M. ex rel. McAllum v. Cash*, a high school banned displays of the Confederate flag due to instances of racial strife among students at the school.[224] The Fifth Circuit found the policy constitutional under *Tinker*.[225] In doing so, the Court focused on the "racial hostility and tension" at the school,[226] finding the following "ample" evidence supported the school's decision: Racially hostile graffiti and vandalism; multiple disciplinary referrals involving racial epithets; a physical confrontation between white students from the school and African-American students of another high school; a student waving the Confederate flag in the direction of an opposing school's volleyball team, which

---

[221] 363 F.2d 749, 750 (5th Cir. 1966).
[222] *Id.* at 750–52.
[223] *Id.* at 753.
[224] 585 F.3d 214, 217 (5th Cir. 2009).
[225] *Id.* at 221–24.
[226] *Id.* at 222.

had African-American members; Confederate flags being flown on the school's flagpole on Martin Luther King Jr. Day; and a white student simulating the lynching of an African-American student.[227]

Applied here, the "substantial disruption" analysis is simple. PSC admitted on its social media account that its intent was to "cancel" class and to "reclaim" UT Austin by "occupy[ing]" it.[228] They also threatened to follow "[i]n the footsteps" of SJP protests at other colleges.[229] As UT Austin's Provost explained, those other recent protests had "resulted in significant changes to classes, hundreds of arrests, intimidation, and calls for violence against Jewish students."[230] UT Austin merely wanted to "ensure this type of disruption doesn't occur on [its] campus."[231]

The First Amendment allowed UT Austin to protect itself and its students from a group that expressly stated its intent to "follow" other protesters at other universities who were so disruptive that they *completely shut down their college* in some instances.[232] And at UCLA, for example, another federal district court had to enter an injunction in favor of Jewish students whom pro-Palestine protestors had "excluded from portions of the UCLA campus because they refused to denounce their faith" when crossing an academic quad through an encampment.[233] The two cases cited above—*Blackwell* and *A.M. ex rel. McAllum*—show that Defendants' actions here to prevent this potential catastrophe were reasonable and well within their authority under *Tinker*.

**3. The Qaddumi case** – Mentioned earlier, Judge Pitman recently addressed *Tinker*'s applicability in the university context in *Qaddumi*. There, the plaintiff was a PSC member who attended

---

[227] *Id.*
[228] *FAC*, ¶ 48.
[229] *Id.*
[230] *Id.*
[231] *Id.*
[232] *Supra*, 4–5.
[233] *Frankel v. Regents of Univ. of Cal.*, 744 F. Supp. 3d 1015, 1025 (C.D. Cal. 2024).

the April 24th protest.[234]  He was arrested for criminal trespass and later suspended by UT Austin for "engag[ing] in inciting conduct and fail[ing] to comply with [UT Austin's] directive."[235]

Qaddumi sued certain UT Austin officials (Hartzell and Sharon Wood) for damages under Section 1983, claiming they violated the First Amendment by discriminating against his viewpoints and retaliating against him for his protected activity.[236]  He also sought equitable relief against Interim UT Austin President Davis in his official capacity.[237]

The defendants moved to dismiss under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).[238] Addressing the motion, Judge Pitman discussed the contours of a "substantial disruption" *Tinker* analysis based on allegations brought by a student involved in the very same protest as Plaintiffs were here.  Specifically, he found that a reasonable official "could examine the social media advertisements for the protest, consider past similar protests at UT [Austin] or around the country, form the belief that the planned protests at issue would cause substantial disruption to campus activities, and act to cancel the protest as a result."[239]  He also found that a reasonable official could "suspend a student for protesting after violating a university directive not to protest."[240]

Although Judge Pitman ultimately concluded that qualified immunity protected defendants from individual-capacity claims for damages, he also found that the plaintiff had alleged plausible claims against the defendants in their official capacities.[241]  Judge Pitman's qualified immunity finding was correct, but he erred in finding that Qaddumi pleaded plausible First Amendment viewpoint discrimination and retaliation claims against Davis in his official capacity.[242]

---

[234] Ex. A, at 1–2.
[235] *Id.* at 2–3.
[236] *Id.* at 3, 11.
[237] *Id.*
[238] *Id.*
[239] *Id.*, at 7.
[240] *Id.*
[241] *Id.*, at 8–15.
[242] *Id.*, at 8–15.

In reaching that erroneous conclusion, Judge Pitman found that Qaddumi had adequately alleged discriminatory and retaliatory animus by UT Austin,[243] crediting Qaddumi's allegations that:

- There was "a heightened environment amongst UT officials surrounding disciplining students for protesting in support of Palestinian rights";

- "UT officials were motivated to restrict the speech of pro-Palestine student groups in particular, because Governor Abbott ordered that universities adopt policies that limit pro-Palestine protests and student groups";

- The court had, in a different lawsuit, "recognized that the Governor's [GA-44] order to universities likely violated the First Amendment as a form of viewpoint discrimination";[244]

- Qaddumi alleged that he was a member of the PSC, not the SJP, and that the two groups "share political views but no other affiliation, and that they do not employ the same tactics, nor do they typically collaborate"; and

- Qaddumi identified "counter-protestors on the scene who were not disciplined," and he also alleged "that UT has permitted students to similarly protest about other topics, like UT workers' conditions and racial justice, without later suspending them for protesting."[245]

Citing his decision from a year prior, Judge Pitman reasoned that a viewpoint-based restriction on student speech "may be outcome determinative" when performing a *Tinker* analysis.[246]

This Court should dismiss Plaintiffs' First Amendment official-capacity claims on inadequate pleading grounds. To this end, seven reasons support rejecting *Qaddumi*'s official-capacity analysis.

*First*, Judge Pitman's *Tinker* analysis was inconsistent. He found that UT Austin's alleged conduct was unconstitutional, and yet he also found that UT Austin officials reasonably believed that the April 24th protest would cause a substantial disruption, and thus that the university's response was reasonable.[247] But this latter finding is all that was needed for a university's restriction to be

---

[243] *Id.*, at 13.
[244] GA-44 is discussed in *Students for Justice in Palestine, at University of Houston v. Abbott*, 756 F. Supp. 3d 410, 414 (W.D. Tex. 2024) [hereinafter "*Students for Justice in Palestine*"]. GA-44 is available publicly at https://gov.texas.gov/news/post/governor-abbott-fights-antisemitic-acts-at-texas-colleges-universities.
[245] Ex. A, at 12–13.
[246] *Id.*, at 10 (citing *Students for Justice in Palestine*, 756 F. Supp. 3d at 425–26).
[247] *Id.*, at 7.

constitutional under *Tinker*, which "allows a school . . . to discipline a student for speech that either causes a substantial disruption *or reasonably is forecast to cause one*."[248]

 *Second*, there is seemingly no meaningful precedent supporting the contention that viewpoint discrimination is "outcome determinative" to a *Tinker* analysis in the university setting. Judge Pitman cited his decision on the issue.[249] But there are numerous cases applying *Tinker* to both content- and viewpoint-based restrictions.[250] Indeed, *Tinker's* test was created in response to a viewpoint-based restriction—a school policy banning armbands worn to object to the Vietnam war.[251]

 Judge Pitman's analysis raises a larger question: What, exactly, was UT Austin supposed to do given that its officials reasonably predicted that the April 24th protest would substantially disrupt university activities? Should its officials have stood by and done nothing? Many colleges tried that; they later got sued by Jewish students under Title VI for deliberate indifference to rampant antisemitic harassment occurring on campuses at the time.[252] And other universities are currently under investigation by the U.S. Department of Education for the same reason.[253] Was UT Austin constitutionally *required* to subject itself to the fates of these other, less diligent schools?

---

[248] *Bell*, 799 F.3d at 397 (emphasis added).

[249] *See* Ex. A, at 10; *Students for Justice in Palestine*, 756 F. Supp. 3d at 426.

[250] *See, e.g., Morgan*, 659 F.3d at 402; *Esfeller*, 391 F. App'x at 341; *Morgan*, 589 F.3d at 745; *Canady*, 240 F.3d at 442.

[251] *Tinker*, 393 U.S. at 504.

[252] *See Gartenberg v. Cooper Union for the Advancement of Sci. & Art*, 765 F. Supp. 3d 245, 267–68 (S.D.N.Y. 2025); *Gerwaski v. Nev.*, No. 2:24-CV-00985-APG-MDC, 2025 WL 1311037, at *10–11 (D. Nev. May 5, 2025); *Kestenbaum v. President & Fellows of Harvard Coll.*, 743 F. Supp. 3d 297, 307–11 (D. Mass. 2024); *Frankel*, 744 F. Supp. 3d at 1025; *Louis D. Brandeis Ctr. for Human Rights under Law v. President & Fellows of Harvard Coll.*, No. CV 24-11354-RGS, 2024 WL 4681802, at *5–6 (D. Mass. Nov. 5, 2024).

[253] *U.S. Department of Education Probes Cases of Antisemitism at Five Universities*, U.S. DEPARTMENT OF EDUCATION (Feb. 3, 2025), https://www.ed.gov/about/news/press-release/us-department-of-education-probes-cases-of-antisemitism-five-universities.

*Tinker* says "no."    Under *Tinker*, if UT Austin reasonably believed protesters would substantially disrupt its activities, it could protect itself—even if the disruption stemmed from one group whose members shared the same viewpoint.[254]  Judge Pitman erred in finding otherwise.

*Third*, the Fifth Circuit has held that *Tinker* applies to universities.  Judge Pitman found this to be an open question, but only because he considered *Shamloo*'s analysis on this point to be dictum.[255]  This is inaccurate.  In *Shamloo*, the Fifth Circuit ruled in the plaintiffs' favor, finding that they were disciplined for violating an unconstitutional university regulation.[256]  But the Court only reached this conclusion because it found, under *Tinker*, that there was a genuine dispute on whether the plaintiffs' demonstration was a "substantial disruption."[257]  If the Court had found such a disruption, the plaintiffs' "demonstration [would] not constitute activity protected under the First Amendment," and their claim would *have* to be dismissed for lack of protected activity.[258]  Thus, the Fifth Circuit's *Tinker* discussion was essential to its First Amendment analysis and ultimate holding that the plaintiffs were likely to succeed on the merits of their First Amendment claim.  As such, the Fifth Circuit's *Tinker* analysis cannot be considered dictum.[259]

*Fourth*, Judge Pitman did not analyze Qaddumi's claims under a "selective enforcement" rubric, likely because the defendants did not raise this argument.[260]  As noted earlier, Plaintiffs' First

---

[254] *See Free Speech Coal., Inc. v. Paxton*, No. 23-1122, 2025 WL 1773625, at *9 (U.S. June 27, 2025) (stating that if a government has constitutional authority to act in a certain manner, then there "must be a constitutional means of carrying . . . out [that authority]") (citing *Glossip v. Gross*, 576 U.S. 863, 869 (2015)).

[255] *Students for Justice in Palestine*, 756 F. Supp. 3d at 425.

[256] *Shamloo*, 620 F.2d at 524.

[257] *Id.* at 522.

[258] *See id.*; *Tinker*, 393 U.S. at 513.

[259] *See Int'l Truck & Engine Corp. v. Bray*, 372 F.3d 717, 721 (5th Cir. 2004) ("A statement is dictum if it could have been deleted without seriously impairing the analytical foundations of the holding and being peripheral, may not have received the full and careful consideration of the court that uttered it. A statement is not dictum if it is necessary to the result or constitutes an explication of the governing rules of law.") (citations and quotations omitted).

[260] *See* Ex. A.

Amendment claims are properly analyzed under a selective enforcement theory, and Plaintiffs did not plead plausible claims under this theory.

Nor did Judge Pitman address arguments like the ones above: that *Nieves* bars Plaintiffs' arrest-based claims as they did not plausibly allege the absence of probable cause;[261] that Plaintiffs were not free to commit criminal trespass merely because they were engaged in protected activity;[262] and that Soto-Ferate does not allege she was engaged in expressive activity during the April 24th protest.[263]

*Fifth*, Judge Pitman found that Qaddumi plausibly showed discriminatory and retaliatory animus largely due to allegations aimed at GA-44, which the court believed to be a form of viewpoint discrimination itself.[264] But Plaintiffs offer no similar allegations here. Thus, their "animus" allegations are weaker still than those in *Qaddumi*.

*Sixth*, Judge Pitman found discriminatory and retaliatory animus in part due to Qaddumi's allegations that UT Austin did not discipline counter-protesters at the April 24th event or protesters on "UT workers' conditions and racial injustice"[265] But his analysis did not address whether the "comparators'" situations were of similar seriousness to PSC's April 24th protest.[266] He also did not review whether the officials who decided UT Austin's response to the April 24th protest also decided how to respond to the "racial injustice" protest.[267]

---

[261] *Supra*, 33–36.

[262] *Supra*, 40–41.

[263] *Supra*, 39–40.

[264] Ex. A, at 13.

[265] *Id.*, at 12.

[266] *See supra*, 39 (explaining that the two situations must be of "comparable seriousness" to create an inference that an improper motive was at play).

[267] Courts can apply Title VII caselaw to analyze whether a comparator is similarly situated to the plaintiffs for purposes of a selective enforcement claim. *See, e.g.*, *United States v. Brantley*, 803 F.3d 1265, 1271–72 (11th Cir. 2015) (applying a Title VII comparator analysis to a selective prosecution claim brought under the Fifth Amendment); *see also Thomas v. Johnson*, No. 5:12-CV-106, 2014 WL 2155036, at *10 n.14 (S.D. Tex. May 22, 2014) (explaining that adverse acts by different decisionmakers generally are not probative of discriminatory intent as "different decisionmakers often exercise their discretion differently.").

Judge Pitman's analysis regarding the pro-Israeli counter-protesters at the April 24th event also missed the mark for another reason. Per the Fifth Circuit, a plaintiff cannot show selective enforcement merely because the defendant "fail[ed] to prosecute all known lawbreakers" or "concentrate[ed] on the most newsworthy lawbreakers."[268] The Fifth Circuit has likewise found that "it is not unconstitutionally selective to focus . . . upon a group that on objective examination is much more likely than at random to have committed [unlawful conduct]."[269] Thus, UT Austin could constitutionally focus its attention on PSC protesters—the group that had specifically stated it wanted to cancel class and follow in the footsteps of the severely disruptive protesters at other colleges.

*Seventh*, Judge Pitman correctly stated that for Qaddumi's official-capacity claims, he would need to show that an "official policy or custom was the operational force behind the constitutional violation."[270] Judge Pitman appeared to cite GA-44 as the "policy" underlying the alleged constitutional violations.[271] But GA-44 is not at issue here.

Even if GA-44 were at issue, there is nothing facially unconstitutional about the order as it does not "affirmatively allow[] or compel[] unconstitutional conduct."[272] Nor does GA-44 itself apply to students, as the executive order instead directed universities to adopt policies rather than apply GA-44 itself to regulate student conduct.[273] Plaintiffs here identify no other policies that the Court could feasibly consider facially unconstitutional under this standard, and thus the Court should find that Plaintiffs fail to state any official-capacity claims.

---

[268] *Parude v. City of Natchez*, 72 F. App'x 102, 105 (5th Cir. 2003) (quoting *Esmail v. Macrane*, 53 F.3d 176, 178–79 (7th Cir. 1995)).
[269] *United States v. Rice*, 659 F.2d 524, 527 (5th Cir. 1981).
[270] Ex. A, 8 n.2 (quoting *Bellard v. Gautreaux*, 675 F.3d 454, 462 (5th Cir. 2012)).
[271] *See* Ex. A, at 13.
[272] *See Edwards v. City of Balch Springs, Tex.*, 70 F.4th 302, 309 (5th Cir. 2023).
[273] *Supra*, note 244.

**IV.    Qualified Immunity Bars Plaintiffs' Section 1983 Claims.**

Public officials are protected from suit by qualified immunity so long as their conduct does not violate a clearly established constitutional right.[274]  "The qualified immunity defense has two prongs: whether an official's conduct violated a constitutional right of the plaintiff; and whether the right was clearly established at the time of the violation."[275]  It is the plaintiff's burden to negate a properly raised qualified immunity defense.[276]

Shown earlier, Plaintiffs fail to state any violation of a federal constitutional or statutory right and thus fail to overcome qualified immunity on the first prong. And as shown below, even if Plaintiffs could identify a violation of their constitutional rights, they could not show that any such right was clearly established at the time.

"A right is clearly established when 'it would be clear to a reasonable [official] that his conduct was unlawful in the situation he confronted.'"[277]  "When properly applied, [qualified immunity] protects all but the plainly incompetent or those who knowingly violate the law."[278]  While there is no requirement that caselaw directly on point exist, "existing precedent must have placed the statutory or constitutional question beyond debate."[279]

A.    Plaintiffs fail to show a clearly established Fourth Amendment violation.

Even had Plaintiffs shown that arresting officers lacked *actual* probable cause, their Fourth Amendment claims would still fail.  That is because "[t]he Supreme Court instructs that police officers who reasonably but mistakenly conclude that probable cause is present are entitled to qualified

---

[274] *Carnaby v. City of Hous.*, 636 F.3d 183, 187 (5th Cir. 2011).
[275] *Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010).
[276] *Collier v. Montgomery*, 569 F.3d 214, 217–18 (5th Cir. 2009).
[277] *Ramirez v. Martinez*, 716 F.3d 369, 375 (5th Cir. 2013) (quoting *Jones v. Lowndes Cnty.*, 678 F.3d 344, 351 (5th Cir. 2012)).
[278] *Taylor v. Barkes*, 575 U.S. 822, 825 (2015) (quoting *Ashcroft v. al–Kidd*, 563 U.S. 731, 743 (2011)).
[279] *Id.*

immunity."[280]  "There must not even arguably be probable cause for the . . . arrest for the immunity to be lost."[281]  Plaintiffs cannot clear this "significant hurdle."[282]  Plaintiffs attached police reports to their pleading that show officers were aware of facts establishing that each Plaintiff had ignored orders to disperse.  Those reports also showed that several Plaintiffs had interfered with officers' public duties—an altogether separate crime under Texas Penal Code section 38.15(a)(1), which also supported the arrest of several Plaintiffs.[283]  Probable cause is an obvious conclusion here.

B.     Plaintiffs fail to show a clearly established First Amendment violation.

Plaintiffs admit they sought to associate with a protest that intended to shut down campus and cancel classes. *FAC*, ¶¶ 48, 51.  Proactively preventing planned rule violations intended to cause a substantial disruption is allowed under a plain reading of *Tinker*.  Plaintiffs struggle to avoid this dispositive fact by alleging they *did not intend* to violate the rules, and that they did not commit any violent act or disruption. *Id.*, ¶¶ 38–39, 52.  But this conclusory assertion does not help them even at this stage because what matters is whether officials could reasonably forecast disruption.[284]  There is no conceivable argument that Defendants had the requisite "fair warning" to be liable on Plaintiffs' First Amendment individual-capacity claims.[285]

## V.     Plaintiffs Fail to State a Title VI Claim.

Plaintiffs complain that UT Austin and the UT System Board "unlawfully targeted [them] for arrest and discipline, including campus bans, administrative holds, and threats of suspension, based

---

[280] *Bailey v. Ramos*, 125 F.4th 667, 677 (5th Cir. 2025) (citation and internal quotation marks omitted).
[281] *Id.* (citation and internal quotation marks omitted).
[282] *Id.* (citation and internal quotation marks omitted).
[283] Because "an arresting officer's state of mind . . . is irrelevant to the existence of probable cause," there is "no basis in precedent or reason" to require an officer to justify an arrest with reasons given at the scene. *Devenpeck v. Alford*, 543 U.S. 146, 153 (2004); *accord Voss v. Goode*, 954 F.3d 234, 238 (5th Cir. 2020).
[284] *Supra*, 47.
[285] *See McNeal v. LeBlanc*, 90 F.4th 425, 433 (5th Cir. 2024) ("The touchstone at this prong is 'fair warning' to the official that his conduct deprived his victim of a constitutional right.") (quotations omitted).

on their association with Palestinians and/or Muslims and their pro-Palestine advocacy." *FAC*, ¶ 322. They contend that the foregoing supports a Title VI claim. *Id.*, ¶¶ 316–23.

Plaintiffs' Title VI claims suffer two main defects. *First*, they do not plausibly allege that any UT Austin or UT System Board officials intentionally discriminated against them based on *their* race, color, or national origin. *Second*, even if Plaintiffs could establish a viable Title VI claim, they cannot recover damages for emotional distress.

A.    Plaintiffs do not plead the basic elements of a Title VI claim.

Section 601 of Title VI provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."[286] The statute "prohibits only intentional discrimination" based on the above categories.[287]

To prevail on a Title VI claim, a plaintiff must prove the defendant engaged in intentional discrimination based on race, color, or national origin, and the defendant received federal financial assistance.[288]  "[A] Title VI plaintiff must prove discriminatory intent,"[289] and subjective beliefs, without more, are insufficient.[290]  Rather, the facts alleged "must allow [the Court] reasonably to infer that the alleged discrimination was motivated by h[er] national origin."[291]

---

[286] 42 U.S.C. § 2000d; *see also Fennell v. Marion Indep. Sch. Dist.*, 804 F.3d 398, 407 (5th Cir. 2015).

[287] *Alexander v. Sandoval*, 532 U.S. 275, 280 (2001); *see also Fennell*, 804 F.3d at 408.

[288] *See Canutillo Indep. Sch. Dist. v. Leija*, 101 F.3d 393, 397 (5th Cir. 1996); *cf. Price ex rel. Price v. La. Dept. of Educ.*, 329 F. App'x 559, 561 (5th Cir. 2009) (explaining that the proper defendant in a Title VI case is the entity receiving federal financial assistance, not individual employees of the entity).

[289] *Leija*, 101 F.3d at 397.

[290] *See, e.g., Byers v. Dallas Morning News, Inc.,* 209 F.3d 419, 427 (5th Cir. 2000) ("Byers urges this Court to rely on his subjective belief that Brown discriminated against him because he was white. This Court will not do so.").

[291] *Pathria v. Univ. of Texas Health Sci. Ctr. at San Antonio*, 531 F. App'x 454, 455 (5th Cir. 2013) (citing *Ricci v. DeStefano,* 557 U.S. 557, 577 (2009)).

Cisco claims to be Muslim, but "Title VI, on its face, does not prohibit religious discrimination,"[292] and "lower courts may not recognize causes of action when 'a statute has not created them.'"[293]  No Plaintiff claims to be Palestinian. *FAC*, ¶¶ 11–14.  This basic defect precludes Plaintiffs from pursuing a Title VI claim.  As for Plaintiffs' claim of associational discrimination, *id.*, ¶¶ 319–22, the undersigned has found no caselaw in this circuit approving of such a claim under Title VI.  Even so, Plaintiffs also do not identify any *personal* relationship with a Palestinian that could support their claim, let alone a claim of discrimination based on *that* relationship.[294]

Plaintiffs also assert a Title VI claim based on their pro-Palestine advocacy.  As they tell it, they faced arrest and discipline, administrative holds, and threats of suspension because they protest "to express opposition to U.S. support for Israel's actions in Gaza and the universities' investments in weapons manufacturing. *Id.*, ¶¶ 321–22.  But as another district court recently explained, such a claim is, "is one of viewpoint discrimination, which is not actionable under Title VI."[295]

And even had Plaintiffs adequately alleged intentional discrimination based on *their* national origin, color, or race, by one or another university administrators, entities such as UT Austin and the UT System Board "cannot be held vicariously liable under Title VI."[296]  Thus, insofar as Plaintiffs base their Title VI claim against these defendants on a theory of vicarious liability for the actions of one or another university official whom Plaintiffs do not identify, "dismissal is required."[297]

To properly make out a Title VI claim, Plaintiffs would have needed to allege facts showing an "appropriate person" was "aware of unlawful discrimination" by an administrator but "responded

---

[292] *Mohamed for A.M. v. Irving Indep. Sch. Dist.*, 252 F. Supp. 3d 602, 627 (N.D. Tex. 2017) (citing 42 U.S.C. § 2000(d) (prohibiting discrimination "on the grounds of race, color, or national origin")).
[293] *Id.* (citing *Alexander*, 532 U.S. at 291).
[294] *See, e.g.*, *Blanks v. Lockheed Martin Corp.*, 568 F. Supp. 2d 740, 745–46 (S.D. Miss. 2007) (discussing the personal relationship requirement in the context of Title VII associational discrimination claims).
[295] *Kestenbaum*, 743 F. Supp. 3d at 311 (citing *Alexander*, 532 U.S. at 280).
[296] *Mohamed for A.M.*, 252 F. Supp. 3d at 628 (citing *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 285–88 (1998)).
[297] *Id.*

with 'deliberate indifference.'"[298]   Plaintiffs fail to do so. And even had they established that a UT Austin official was aware and showed deliberate indifference, that conclusion would not establish the altogether separate point of deliberate indifference by the UT System Board.

Finally, for the same reasons discussed earlier, Plaintiffs also cannot rely on misplaced comparisons with a minor protest of Justice Kavanaugh's Supreme Court nomination in 2018[299] or a gathering of a small number of Jewish students on April 24, 2024, to counter-protest Plaintiffs' intended campus occupation,[300] to create a circumstantial inference of discriminatory animus.  Indeed, even if the Court adopted the strained assumption that these other protests were comparable with a protest PSC advertised as cancelling class and occupying the South Lawn (*FAC*, ¶ 48), Plaintiffs still offer no support to show they were treated differently because of *their* race, color, or national origin.

B.    Emotional distress damages are unavailable in a Title VI claim.

Plaintiffs seek "all available compensatory damages." *FAC*, at 69.   In *Cummings v. Premier Rehab Keller, P.L.L.C.*, the Supreme Court held that emotional distress damages are unavailable to plaintiffs for claims brought under statutes Congress enacts pursuant to the Spending Clause.[301]   The Supreme Court has explained elsewhere that "Title VI invokes Congress's power under the Spending Clause, U.S. Const., Art. I, § 8, cl. 1, to place conditions on the grant of federal funds."[302]   Even if the Court permits Plaintiffs' Title VI claim to proceed, it therefore should still dismiss Plaintiffs' claim for emotional distress damages.

---

[298] *Id.* (quoting *Gebser*, 524 U.S. at 290, and citing *Rubio v. Turner Unified Sch. Dist.*, 475 F. Supp. 2d 1092, 1099 (D. Kan. 2007) (holding that school district is not liable under Title VI for the actions of a principal who allegedly prohibited students from speaking Spanish because the school district did not know the principal had engaged in that behavior)).
[299] *Supra*, 41–42.
[300] *Supra*, 54.
[301] 596 U.S. 212, 230 (2022).
[302] *Barnes v. Gorman*, 536 U.S. 181, 185–86 (2002) (citation omitted).

## CONCLUSION & PRAYER

Plaintiffs feel it necessary to repeat throughout their Amended Complaint that their movement is nonviolent. *FAC*, ¶¶ 38–39, 52. Claims of nonviolence are difficult to sustain when protest participants are armed and carry items that can cause harm to individuals and property, such as bricks, hammers, and guns. Plaintiffs' claims are also at odds with the national context, which reflected pro-Palestine agitators directing violent and discriminatory tactics towards Jewish students.

The national movement has not abandoned those tactics. Whether the Court focuses on the recent May 21, 2025 shooting in Washington, D.C.—where a suspect allegedly shouted "Free, free Palestine" while firing 21 rounds at two Israeli embassy staffers, killing them[303]—or the June 1, 2025 firebombing of a peaceful demonstration in Boulder, Colorado commemorating Israeli hostages in Hamas's custody—where the suspect is said to have yelled "Free Palestine" as he threw incendiary devices into a crowd[304]—Plaintiffs cannot honestly contend their movement eschews violence to bring attention to their cause. Rather, as one journalist put it, theirs is a movement that "embrace[s] violence as a means of expression."[305]

Defendants respectfully request this Court to dismiss all claims with prejudice.

Dated:  August 20, 2025                                   Respectfully submitted,
        Austin, Texas

**Ken Paxton**                                           **Kimberly Gdula**
Attorney General of Texas                                Chief, General Litigation Division

**Brent Webster**                                        */s/ Cole P. Wilson*
First Assistant Attorney General                         **Cole P. Wilson**
                                                         Texas State Bar No. 24122856
                                                         Cole.Wilson@oag.texas.gov

---

[303] Thomas et al., *2 Israeli Embassy staffers killed in 'act of terror' in Washington, DC* (May 22, 2025), https://tinyurl.com/.
[304] Ward, Cooke & Maela, *Man attacks Colorado crowd with firebombs, 8 people injured* (June 2, 2025), https://tinyurl.com/euvdap29.
[305] Bari Weiss, *Welcome to the Global Intifada*, THE FREE PRESS (May 22, 2025), https://tinyurl.com/n3cjbj9p; *see also* Tucker et al., *Court papers say suspect in embassy killings declared, 'I did it for Palestine, I did it for Gaza'* (May 22, 2025), https://tinyurl.com/2s4673w3.

**Ralph Molina**
Deputy First Assistant Attorney General

**Austin Kinghorn**
Deputy Attorney General for Civil Litigation

**Todd Dickerson**
Texas State Bar No. 24118368
Todd.Dickerson@oag.texas.gov

Assistant Attorneys General
Office of the Attorney General
General Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
(512) 979-5738 | Fax: (512) 320-0667

*Counsel for Defendants Greg Abbott, the University of Texas System Board of Regents and its Members, the University of Texas at Austin, Jim Davis, Jay Hartzell, Hector Luevano, Adan Zavala, Roberto Rodriguez, Reynaldo Adame, and L. Henry*

### CERTIFICATE OF SERVICE

I certify that a copy of the document above was served on all counsel of record who have entered an appearance on August 20, 2025, using the CM/ECF system.

/s/ *Cole P. Wilson*