IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| ARWYN HEILRAYNE, *et al.*, | § | |
| *Plaintiffs*, | § | |
| | § | |
| v. | § | |
| | § | No. 1:25-cv-640-DAE |
| UNIVERSITY OF TEXAS AT | § | |
| AUSTIN, *et al.*, | § | |
| *Defendants*. | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| | § | |

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS'
MOTIONS TO DISMISS

Before the Court are two Motions to Dismiss: one filed by Texas
Department of Public Safety ("DPS") Trooper Christopher Wray (Dkt. # 43),
and one filed by the remaining Defendants (Dkt. # 48), including the University
of Texas ("UT") at Austin; UT System Board of Regents and its Members;
Governor of the State of Texas, Greg Abbott; Interim President of UT Austin,
Jim Davis; Former UT Austin President, Jay Hartzell; UT Police Department
("UTPD") Lieutenant, Hector Luevano; and UTPD Officers Roberto Rodrigeuz,
Reynaldo Adame, and L. Henry.  The motions are ripe for resolution.  The Court
finds this matter suitable for disposition without a hearing.

After careful consideration of the filings and the relevant law, the
Court **GRANTS** Defendant Wray's Motion to Dismiss, (Dkt. # 43), and

1

**GRANTS IN PART** and **DENIES IN PART** the remaining Defendants'

Motion to Dismiss (Dkt. # 48) for the reasons below.

<u>BACKGROUND</u>

This case concerns an April 24, 2024 protest at UT Austin initiated

by the Palestine Solidarity Committee ("PSC"), a student organization at UT

Austin, about American involvement in ongoing violence in Gaza.  (Dkt. # 42 at

¶ 47–48.)  Plaintiffs are students or recent graduates of UT Austin who attended

the protest and were subsequently arrested at or near the protest areas.  (Dkt. #

42 at ¶¶ 90, 95, 103, 110.)

I.    <u>The April 24, 2024 Protest</u>

On April 23, 2024, the PSC at UT posted a notice on their

Instagram account describing a protest for the following day.  (<u>Id.</u> at ¶ 48.)  The

notice advertised a walk-out of class, a meeting at Greg Plaza, and a "march to

occupy the lawn."  (<u>Id.</u>)  The post stated: "In the footsteps of our comrades at

Columbia SJP, Rutgers-New Brunswick, Yale, and countless others across the

nation, we will be establishing THE POPULAR UNIVERSITY FOR GAZA

and demanding our administration divest from death."  (<u>Id.</u>)  On April 24, the

PSC posted again with a proposed schedule of events, including a walk-out of

class, a guest speaker, two teach-ins, an art workshop, and study and food

breaks, with the final event scheduled for 7:00 p.m.  (<u>Id.</u> at ¶ 49.)

In response, UT preemptively cancelled the event by sending

notices to PSC student representatives, with one such notice dated April 23,

2024, and four others dated April 24, 2024.  (<u>Id.</u> at ¶¶ 54–55.)  In those notices,

UT states its reasons for cancellation as follows:

> The Palestine Solidarity Committee student organization's event "Popular
> University for Gaza," which is planned for tomorrow, has declared intent
> to violate our policies and rules, and disrupt our campus operations.  Such
> disruptions are never allowed and are especially damaging while our
> students prepare for the end of the semester and final exams.  For these
> reasons, this event may not proceed as planned.

(Dkt. # 48-2.)[1]  However, Plaintiffs allege such notice was not communicated to

the broader student body or public until the protest was underway, at which time

UT released its Event Cancellation Notice, dated April 23, 2024, to the press.

(Dkt. # 42 at ¶ 54.)

## II.    <u>Resulting Disciplinary Actions</u>

Plaintiffs allege they were arrested and initially charged with

criminal trespass but that their charges were later dropped due to a lack of

probable cause.  (<u>Id.</u> at ¶ 126.)  They allege they have experienced "significant

academic and career consequences" and "deep trauma" from their arrests and

UT's response to the protest.  (<u>Id.</u> at ¶¶ 150, 152.)

---

[1] A court ruling on a 12(b)(6) motion may rely on the complaint, its proper
attachments, "documents incorporated into the complaint by reference, and
matters of which a court may take judicial notice." <u>Dorsey v. Portfolio Equities,
Inc.</u>, 540 F.3d 333, 338 (5th Cir. 2008) (citations and internal quotation marks
omitted).  Although the full notice was not attached as an exhibit to Plaintiffs'
Amended Complaint, the Court finds it may properly consider this document as
one incorporated into the complaint by reference.  <u>See id.</u>; (Dkt. # 42 at ¶ 54-
55.)

Each Plaintiff alleges that on June 14, 2024, they received a notice from UT Austin stating they faced academic discipline for their participation in the April 24, 2024 protest.  (Id. at ¶ 133.)  The notice identified violations of two UT rules: Failure to Comply and Disruptive Conduct.  (Id. at ¶ 135.) Plaintiffs were found responsible for these rule violations in July of 2024.  (Id. at ¶ 141.)

As a result, Plaintiff Cisco was offered a sanction of academic probation for one year, and Plaintiffs Heilrayne, Soto-Ferate, and Medrano were offered a choice between deferred suspension or the chance to appeal their suspension.  (Id. at ¶ 142, 144.)  Under the deferred suspension option, the charge and punishment would not appear on their final transcripts.[2]  (Id. at ¶ 143.)  However, if Plaintiffs chose to appeal and were unsuccessful, they faced a one-year suspension.  (Id. at ¶ 145.)  All Plaintiffs "reluctantly accepted the offer of deferred suspension or probation, fearing a harsher sanction or a prolonged disciplinary process, despite disagreeing with UT Austin's allegations."  (Id. at ¶ 146.)  Several Plaintiffs allege they were motivated to accept the deferred suspension or probation disciplinary options because they feared it would further delay access to transcripts, degree conferral, financial aid, and employment opportunities.  (Id. at ¶¶ 147–49.)

---

[2] Although the deferred suspension punishment does not show up on a student's final transcript, Plaintiffs allege that the discipline still remains on their full academic records.  (Dkt. # 42 at ¶¶ 143, 246).

III.    Plaintiffs' Claims and Relief Requested

Plaintiffs assert four causes of action against various Defendants.

A. *First Amendment Violations under 42 U.S.C. § 1983 (Count I)*

Plaintiffs first assert violations of their First Amendment rights of speech and association under 42 U.S.C. § 1983. (Dkt. # 42 at 46–54.) They allege the University's preemptive cancellation of the April 24th protest was an improper "content-based prior restraint on Plaintiffs' expressive activity" and constituted viewpoint discrimination. (Id. at ¶ 194–96.) All Plaintiffs seek monetary damages and declaratory relief against Jay Hartzell and Greg Abbott in their individual capacities, and Kevin Eltife in his official and individual capacities. (Id. at 49). Each Plaintiff also brings a claim on behalf of herself against various officers, each in their individual capacities, for monetary damages and declaratory relief. (Id. at 51–54.)

B. *First Amendment Retaliation under 42 U.S.C. § 1983*

Plaintiffs next assert First Amendment retaliation claims, alleging Defendants were arrested and disciplined based on engagement in protected First Amendment activities. (Id. at 54–55.) The following claims are brought on behalf of all Plaintiffs: (1) Against Defendants Jim Davis in his individual and official capacities, and the UT System Board of Regents Members in their official capacities, for injunctive relief; and (2) Against Jay Hartzell and Greg Abbott in their individual capacities for monetary damages and declaratory relief. (Id. at 55–56.) Each Plaintiff also brings a claim on her own behalf

5

against various officers, each in their individual capacities, for monetary damages and declaratory relief. (Id. at 58–62.)

### C. *Fourth Amendment Unlawful Seizure/False Arrest under 42 U.S.C. § 1983*

Plaintiffs next assert violations of the Fourth Amendment for their arrests without probable cause. (Id. at 62.) They allege the dispersal order was only enforced against pro-Palestine protestors, and "[t]he belief that only pro-Palestine protestors were trespassing, but that pro-Israel counter-protestors and bystanders unaffiliated with any protest were not, is objectively unreasonable and cannot support a probable cause determination." (Id. at ¶ 286.) Each Plaintiff brings a claim on her own behalf against various officers in their individual capacities. (Id. at 63–67.)

### D. *Title VI Violation*

Plaintiffs' fourth and final cause of action is brought pursuant to Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d. (Id. at 67.) Plaintiffs allege they were discriminated against on the basis of their actual or perceived associations with Palestinian and/or Muslim students. (Id. at 68.) All Plaintiffs bring this cause of action against UT Austin and the UT System Board of Regents, seeking declaratory relief. (Id. at 67–68.)

### E. *Plaintiffs' Request for Relief*

In their Request for Relief, Plaintiffs ask this Court to enter declaratory judgment finding the conduct and actions described violate the First

and Fourth Amendments, 42 U.S.C. § 1983, and Title VI, and reversing the disciplinary actions against Plaintiffs.  (Id. at 69.)  They further request compensatory damages, punitive damages, and attorney's fees.  (Id.)


## LEGAL STANDARD

I.    Motion to Dismiss under Rule 12(b)(1)

Federal Rule of Civil Procedure 12(b)(1) authorizes dismissal of a complaint for lack of subject-matter jurisdiction.  When evaluating a Rule 12(b)(1) motion, the Court may dismiss a suit "for lack of subject matter jurisdiction on any one of three separate bases: (1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts."  Freeman v. United States, 556 F.3d 326, 334 (5th Cir. 2009) (quoting Williamson v. Tucker, 645 F.2d 404, 413 (5th Cir. 1981)).

Where "the defense merely files a Rule 12(b)(1) motion, the trial court is required merely to look to the sufficiency of the allegations in the complaint because they are presumed to be true."  Paterson v. Weinberger, 644 F.2d 521, 523 (5th Cir. 1981).  In such a case, "review is limited to whether the complaint is sufficient to allege the jurisdiction."  Id.  The "plaintiff bears the burden of proof that jurisdiction does in fact exist."  Menchaca v. Chrysler Credit Corp., 613 F.2d 507, 511 (5th Cir. 1980).  "When a Rule 12(b)(1) motion is filed in conjunction with other Rule 12 motions, the court should consider the

Rule 12(b)(1) jurisdictional attack before addressing any attack on the merits." Ramming v. United States, 281 F.3d 158, 161 (5th Cir. 2001); Hitt v. City of Pasadena, 561 F.2d 606, 608 (5th Cir. 1977).

## II.    Motion to Dismiss under Rule 12(b)(6)

In deciding a Rule 12(b)(6) motion to dismiss for failure to state a claim, the court "accepts all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff." In re Katrina Canal Breaches Litig., 495 F.3d 191, 205 (5th Cir. 2007) (internal quotation marks omitted). The Supreme Court has explained that a complaint must contain sufficient factual matter to "state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id.

"The tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions," and courts "are not bound to accept as true a legal conclusion couched as a factual allegation." Iqbal, 556 U.S. at 678 (internal quotations and citations omitted). Thus, although all reasonable inferences will be resolved in favor of the plaintiff, the plaintiff must plead "specific facts, not mere conclusory allegations." Tuchman v. DSC Commc'ns Corp., 14 F.3d 1061, 1067 (5th Cir. 1994); see also Plotkin v.

IP Axess Inc., 407 F.3d 690, 696 (5th Cir. 2005) ("We do not accept as true conclusory allegations, unwarranted factual inferences, or legal conclusions.").

In determining whether a plaintiff's claims survive a Rule 12(b)(6) motion to dismiss, the factual information to which the court addresses its inquiry is limited to the (1) facts set forth in the complaint, (2) documents attached to the complaint, and (3) matters of which judicial notice may be taken under Federal Rule of Evidence 201. Walker v. Beaumont Indep. Sch. Dist., 938 F.3d 724, 735 (5th Cir. 2019).

## DISCUSSION

The Texas Defendants bring their Motion to Dismiss pursuant to Federal Rule of Civil Procedures 12(b)(1) for lack of subject matter jurisdiction, and under 12(b)(6) for the remaining issues. Defendant Wray brings his separate Motion to Dismiss pursuant to 12(b)(6), claiming qualified immunity. Plaintiffs respond that in cases where "the issue of jurisdiction is intertwined with the merits, district courts should 'deal with the objection as a direct attack on the merits of the plaintiff's case under either Rule 12(b)(6) or Rule 56." M.D.C.G. v. United States, 956 F.3d 763, 768–69 (5th Cir. 2020) (quoting Montez v. Dep't of Navy, 392 F.3d 147, 150 (5th Cir. 2004)). As an initial matter, the Court finds it necessary to clarify the appropriate standard.

I.    Appropriate Legal Standard

        Generally, the Court would address a jurisdictional attack before turning to the merits of a case in which a party asserts both 12(b)(1) and 12(b)(6) in a motion to dismiss. Fort Bend County v. U.S. Army Corps of Eng'rs, 59 F.4th 180, 188 (5th Cir. 2023). "When the issue of jurisdiction is intertwined with the merits, however, the court 'must assume jurisdiction and proceed to the merits' of the plaintiff's claims under Rule 12(b)(6)." Southwest Airlines Pilots Assoc. v. Southwest Airlines Co., 120 F.4th 474, 481 (5th Cir. 2024) (quoting Pickett v. Tex. Tech Univ. Health Scis. Ctr., 37 F.4th 1013, 1030 (5th Cir. 2022)). Although this principle was initially applied mainly within the context of FTCA claims, the Fifth Circuit has extended the principle to other types of claims depending on "the extent to which the jurisdictional question is intertwined with the merits." S. Recycling, LLC v. Aguilar, 982 F.3d 374, 380 (5th Cir. 2020) (applying the rule in the context of a Limitation of Liability Act claim); Pickett, 37 F.4th at 1031 (applying the rule in an ADA context).

        Questions of jurisdiction and the merits are intertwined when "issues of fact are central both to subject matter jurisdiction and the claim on the merits." Montez, 392 F.3d at 150. In the Fifth Circuit, a court utilizes a three-factor test to determine whether the jurisdictional and merits analyses are "intertwined." Southwest Airlines Pilots Assoc., 120 F.4th at 483. Pickett described the test as follows:

> We asked three questions to decide whether the issues were inextricably intertwined: First, does the "statutory source of jurisdiction differ[] from the source of the federal claim?" Second, can the "the jurisdictional issue . . . be extricated from the merits and tried as a separate issue? Third, does "judicial economy favor early resolution of the jurisdictional issue?"

Pickett, 37 F.4th at 1030–31; see also Southwest Airlines Pilots Assoc., 120 F.4th at 481 n.3 (citing the Pickett test as the relevant analysis to decide whether the two issues are intertwined).

There are two jurisdictional issues raised by Defendants' Motion to Dismiss: standing and sovereign immunity. (Dkt. # 48 at 18–19.) As Plaintiffs concede in their reply, sovereign immunity is purely a legal question not intertwined with the merits of their claims and may be properly considered using the 12(b)(1) standard. (Dkt. # 46 at 12.) However, as to standing, there is a question of whether that jurisdictional issue is inextricably intertwined.

Here, as to the first factor, Plaintiffs invoke jurisdiction under 28 U.S.C. §§ 1331 and 1343 because all their claims are brought pursuant to 42 U.S.C. § 1983 and Title VI of the Civil Rights Act of 1964. (Dkt. # 42 at ¶ 9.) Jurisdiction, therefore, relies on the success of the very statutes that are the basis for the merits of Plaintiffs' claims; thus, the first factor weighs heavily in favor of assuming jurisdiction. See Clark v. Tarrant County, Texas, 798 F.2d 736, 742 (finding questions of subject matter jurisdiction and merits were intertwined where the same statute "both convey[ed] jurisdiction and create[d] a cause of action.").

11

The thrust of the second factor is "whether the legal issues are 'identical.'" Pickett, 37 F.4th at 1031 (quoting S. Recycling, 982 F.3d at 381). Here, the jurisdictional issue likely cannot be extricated from the merits, where Defendants raise concerns about the sufficiency and traceability of the students' injuries; whether Defendants were injured depends on the merits of their constitutional claims.

Third, the court in Pickett explained that "[t]he third question is 'closely related' to the second. Judicial economy is served by resolving contested fact issues at the pleading stage where, for instance, the jurisdictional question is much simpler than the merits question." 37 F.4th at 1031.

In weighing these factors, the Court determines that while it is appropriate to consider Defendants' sovereign immunity arguments using the 12(b)(1) standard, 12(b)(6) is the appropriate standard for the remaining issues. See Eubanks v. McCotter, 802 F.2d 790, 793 (5th Cir. 1986) (finding that a case in which Plaintiffs asserted federal question jurisdiction pursuant to 42 U.S.C. § 1983 was a "classic example of a case in which the federal cause of action and federal jurisdiction are interdependent"); Sheffield v. Bush, 604 F.Supp.3d 586, 599–600 (S.D. Tex. May 23, 2022) (finding a constitutional violation brought under 42 U.S.C. § 1983 was intertwined "where factual issues determinative of jurisdiction are intertwined with or identical to factual issues determinative of the merits") (quoting Worldwide Parking, Inc. v. New Orleans City, 123 F.App'x 606, 608 (5th Cir. 2005)).

II.   <u>Sovereign Immunity</u>

Defendants argue that many of Plaintiffs' claims are barred by sovereign immunity and that <u>Ex parte Young</u> does not apply.  (Dkt. # 48 at 22.) They contend that "Plaintiffs sue the wrong official-capacity defendants, and they do not ask for a form of relief that satisfies <u>Young</u>."  (<u>Id.</u>)  The Court finds that Plaintiffs' claims against UT and the UT Board of Regents are barred by sovereign immunity; however, their claims against Jim Davis and the UT Board Members in their official capacities are not.

The Eleventh Amendment typically deprives federal courts of jurisdiction over "suits against a state, a state agency, or a state official in his official capacity unless that state has waived its sovereign immunity or Congress has clearly abrogated it."  <u>Moore v. La. Bd. Of Elementary & Secondary Educ.</u>, 743 F.3d 959, 963 (5th Cir. 2014).  Under the <u>Ex parte Young</u> exception to sovereign immunity, lawsuits may proceed in federal court when a plaintiff requests prospective relief against state officials in their official capacities for ongoing federal violations.  209 U.S. 123, 159–60 (1908).  "For the [<u>Ex parte Young</u>] exception to apply, the state official, 'by virtue of his office,' must have 'some connection with the enforcement of the [challenged] act, or else [the suit] is merely making him a party as a representative of the state, and thereby attempting to make the state a party.'"  <u>City of Austin v. Paxton</u>, 943 F.3d 993, 997 (5th Cir. 2019) (quoting <u>Ex parte Young</u>, 209 U.S. at 157).

13

A. <u>Whether Official-Capacity Defendants are Proper</u>

Defendants first argue that Plaintiffs cannot overcome sovereign immunity in their claims against UT and the UT Board of Regents because <u>Ex parte Young</u> does not apply to suits against states or their agencies. (Dkt. # 48 at 22–23) (citing <u>Calhoun v. Collier</u>, 78 F.4th 846, 850–51 (5th Cir. 2023)). Second, Defendants say claims brought against Interim President Jim Davis and the UT System Board's members in their official capacities are likewise barred by sovereign immunity because none of the named state officials have a sufficient connection to the enforcement. (<u>Id.</u> at 23) (citing <u>Mi Familia Vota v. Ogg</u>, 105 F.4th 313, 325 (5th Cir. 2024)).

1. <u>Defendants UT and the UT System Board of Regents</u>

Defendants argue sovereign immunity "plainly bars Plaintiffs' section 1983 claim" against UT and the UT System Board because both are state entities and not state officials. (Dkt. # 48 at 23.) The Court agrees. <u>See Doe v. Harrell</u>, 841 F.App'x 663, 667 (5th Cir. 2021); <u>Chhim v. University of Texas at Austin</u>, 836 F.3d 467, 469 (5th Cir. 2016). Finding the <u>Ex parte Young</u> exception does not apply to UT and the UT System Board of Regents itself, Plaintiffs' claims against these Defendants are **DISMISSED** for lack of subject matter jurisdiction.

14

2. <u>Defendants Jim Davis and the Board of Regents Members</u>

Defendants argue that the remaining Board of Regents Members and Jim Davis lack the necessary connection to the enforcement to fall under the <u>Ex parte Young</u> exception. (Dkt. # 48 at 23.) The Court disagrees.

Under Fifth Circuit law, neither a specific grant of enforcement authority nor a history of enforcement is required to establish a sufficient connection. <u>City of Austin</u>, 943 F.3d at 1001. Rather, there need be only a "scintilla of enforcement by the relevant state official" for <u>Ex parte Young</u> to apply, <u>City of Austin</u>, 943 F.3d at 1002, and the official must have more than the "general duty to see that the laws of the state are implemented." <u>Jackson v. Wright</u>, 82 F.4th 362, 367 (5th Cir. 2023) (quoting <u>City of Austin</u>, 943 F.3d at 999–1000). Actual threat of or imminent enforcement is "not required." <u>Air Evac EMS, Inc. v. Tex. Dep't of Ins., Div. of Workers' Comp.</u>, 851 F.3d at 519.

Although Defendants argue that the Fifth Circuit's decision in <u>Jackson</u> is distinguishable or otherwise wrongfully decided, the Court finds it to be instructive and binding precedent. (<u>See</u> Dkt. # 48 at 24–25; n.97); <u>see also Students for Just. In Palestine, at Univ. of Houston v. Abbott</u>, 756 F. Supp. 3d 410, 425 (W.D. Tex. Oct. 28, 2024) (finding <u>Jackson</u> applicable under similar circumstances). In <u>Jackson</u>, the Fifth Circuit found the <u>Ex parte Young</u> exception applicable to board members of the University of North Texas ("UNT") where they had "direct governing authority over the UNT officials that are allegedly continuing to violate [Plaintiff's] First Amendment rights." 82

F.4th at 368.  In doing so, the Court of Appeals distinguished the circumstances in that case from <u>Mi Familia Vota</u> and <u>Haverkamp</u>—both cases that Defendants use in support of their argument—by noting that in the prior cases, "the sued state officials had *no* role whatsoever in the alleged constitutional violations." (<u>See</u> Dkt. # 48 at 24); <u>Mi Familia Vota v. Abbott</u>, 977 F.3d 461 (5th Cir. 2020); <u>Haverkamp v. Linthicum</u>, 6 F.4th 662 (5th Cir. 2021).

Defendants argue that Plaintiffs' failure to name the Dean of Students as a Defendant is fatal to their claims since that official "has primary authority and responsibility" for the disciplinary actions taken against them. (Dkt. # 48 at 23) (quoting the UT Austin Institutional Rules § 11-102(a)). However, the Board Members here do have supervisory authority over the decisionmakers such as the Dean of Students pursuant to the authority vested in them by Tex. Educ. Code. § 95.01: "The organization, control, and management of the state university system is vested in the Board of Regents, Texas State University System."  Like in <u>Jackson</u> where UNT officials were found to have a sufficient connection because of their authority over "the organization, control, and management of the University of North Texas System," the Board's grant of authority is sufficient to make them proper defendants under <u>Ex parte Young</u>.

Similarly, with respect to Interim UT President Jim Davis, his status as the Chief Executive Officer of UT, and presumably his oversight of the Office of Student Affairs and thus, the disciplinary process at UT, also establishes a sufficient connection to make him a proper defendant.  (<u>See</u> Dkt. #

16

42 at ¶ 19.)  For these reasons, the Court finds that Jim Davis also has "the required 'scintilla of enforcement' due to [his] governing authority" over student disciplinary records within the UT system.  See Jackson, 82 F.4th at 367.

B.  Whether Plaintiffs Seek Appropriate Relief under Ex Parte Young

Ex parte Young "only affords prospective relief to stop future harms."  United States v. Abbott, 85 F.4th 328, 336 (5th Cir. 2023).  Here, Plaintiffs seek injunctive relief against Defendants Davis and the Board Members related to the expungement of their disciplinary records.  (Dkt. # 42 at 55–56.)

Defendants argue that Plaintiffs Medrano and Soto-Ferate fail to allege any ongoing harm because they have since graduated; they further argue Plaintiff Cisco fails to allege ongoing harm because the period of her academic probation is now over.  (Dkt. # 48 at 26.)  Defendants assert that only Heilrayne remains harmed by her student conduct discipline.  (Id.)  This Court disagrees.

The Fifth Circuit recently addressed a similar question in a due process context in Overdam v. Texas A&M Univ., 43 F.4th 522 (5th Cir. 2022). In Overdam, the Court found a cognizable liberty interest after a plaintiff had graduated where he there was "continued reputational harm that may impede future employment" due to his school disciplinary record.  Id. at 529.  Indeed, Plaintiffs in this case allege "continued reputational harm" due to their disciplinary records, noting that their success in job or graduate school

17

applications often depends on disclosure and review of academic records.  (Dkt. # 42 at ¶ 246.)  Thus, under the same logic, the Court likewise finds that although Plaintiffs Medrano and Soto-Ferate have graduated and Plaintiff Cisco's probation period has ended, their requests to amend their disciplinary records constitutes prospective relief appropriate under Ex parte Young.[3]  Accordingly, Plaintiffs' claims against Interim President Jim Davis and the Board Members may proceed.

### III.    Defendants' 12(b)(6) Arguments

Defendants further argue that any remaining claims do not survive dismissal because Plaintiffs fail to state a claim upon which relief can be granted.  (Dkt. # 48 at 27.)  Defendants first assert that Plaintiffs' § 1983 causes of action fail because Plaintiffs do not sufficiently allege personal involvement of each Defendant.  (Dkt. # 48 at 27.)  They then set forth various arguments as to why Plaintiffs' individual claims fail on claim-specific rationales.  (Id.)  Finally, they argue qualified immunity bars Plaintiffs' remaining claims.[4]  (Id.)

---

[3] The Court notes that although the deferred punishments do not appear on Plaintiffs' final transcripts, (Dkt. # 42 at ¶ 143), their academic records are still affected by the disciplinary measures taken against them.  (Id. at ¶ 246).  Plaintiffs plead that although some students have graduated and the probation period for Plaintiff Cisco has ended, "these disciplinary actions remain on their academic records."  (Id.)  Thus, the Court finds that Plaintiffs' request for expungement of their records still constitutes prospective relief since the reputational harm related to their academic and disciplinary records is ongoing.  See Overdam, 43 F.4th at 529.

[4] Plaintiffs make a sixth argument in their Motion to Dismiss related to Plaintiffs' Title VI claims.  However, because their Title VI claim was only brought against UT and the Board of Regents, and the Court has found claims

Plaintiffs assert three separate 1983 claims for (1) First Amendment violations based on right of free speech and association; (2) First Amendment retaliation; and (3) Fourth Amendment unlawful seizure/false arrest.  To properly plead a Section 1983 claim, a plaintiff must allege a violation of a right secured by the Constitution or laws of the United States and demonstrate that the alleged deprivation was committed by a person acting under color of state law.  Whitley v. Hanna, 726 F.3d 631 (5th Cir. 2013).  The Court will first address the issue of personal involvement, which is common to all three remaining claims.  The Court will then address each cause of action in turn.

A. Defendants' Personal Involvement

"In order to state a cause of action under section 1983, the plaintiff must identify defendants who were either personally involved in the constitutional violation or whose acts are causally connected to the constitutional violation alleged."  Woods v. Edwards, 51 F.3d 577, 583 (5th Cir. 1995).  Defendants argue Plaintiffs have not alleged facts showing the personal involvement of each Defendant in Plaintiffs' "arrests, student conduct discipline, or even the decision to cancel PSC's protest."  (Dkt. # 48 at 21.)  The Court will address each remaining Defendant in turn.

---

against those Defendants are barred by sovereign immunity, Plaintiffs' Title VI claims have already been dismissed.  Thus, the Court declines to address arguments directed at Plaintiffs' Title VI claims further.

1.  Defendants Rodriguez, Henry, and Adame

Defendants Rodriguez, Henry, and Adame are all officers of UTPD who are alleged to have arrested Plaintiffs.  (Dkt. # 42 at ¶¶ 22–24.)  Defendant Rodriguez is alleged to have arrested Cisco, (Id. at ¶ 110), Defendant Henry is alleged to have arrested Medrano, (Id. at ¶ 103), and Defendant Adame is alleged to have arrested both Heilrayne, (Id. at ¶ 91), and Soto-Ferate.  (Id. at ¶ 95.)  Defendants' MTD argues "Cisco has no claim against Henry or Adame, Medrano has no claim against Rodriguez or Adame, and Soto-Ferate and Heilrayne have no claim against Rodriguez or Henry."  (Dkt. # 48 at 27.)

However, upon reviewing Plaintiffs' Amended Complaint, the Court finds no instance where any Plaintiff asserted claims against an Officer not involved in her arrest.  (See Dkt. # 42.)  Instead, Defendants Rodriguez, Henry, and Adame are only named in the causes of action on behalf of each Plaintiff against her alleged arresters.  (Id.)  Thus, Defendants' argument is unpersuasive here; surely alleging Defendants Rodriguez, Henry, and Adame's participation in Plaintiffs' individual arrests is enough to satisfy the "personal involvement" requirement for stating a claim under § 1983. Cf. Woods, 51 F.3d at 583 (5th Cir. 1995).

2.  Defendant Wray

Unlike Defendants Rodriguez, Henry, or Adame, Defendant Wray is not alleged to have been the arresting officer of any Plaintiff.  Instead, Defendant Wray is only sued by Plaintiff Cisco, who alleges that Wray "assisted

in the interference with [her] expressive conduct on the basis of her viewpoint."
(Dkt. # 42 at ¶ 29.)  Plaintiff Cisco alleges that Defendant Wray was "near her
in the line of bike unit officers forming the barricade and restricting the
protestors' movement, close to where she would soon be arrested."  (Id. at ¶
109.)  Cisco's allegations further describe an interaction with him in which
Defendant Wray "expressed disdain for the protestors' cause and made
unsolicited remarks about Palestine, Islam, and the Middle East."  (Id.)  While
these allegations may be relevant to Plaintiffs' claims against other Defendants,
simply alleging that Defendant Wray was an officer at the protest and that he
engaged in a conversation with Plaintiff does not sufficiently allege his personal
involvement in Plaintiff Cisco's allegedly retaliatory arrest.

Accordingly, Defendant Wray is **DISMISSED** for lack of personal
involvement necessary to state a § 1983 claim.

### 3.  Defendant Luevano

The Court next turns to Defendant Luevano, a lieutenant within
UTPD who is alleged to have been present and acted as the supervising officer
at the April 24th protest.  (Dkt. # 42 at ¶ 21.)  Defendants argue that Plaintiffs
have not alleged that Luevano himself deprived any Plaintiff of a constitutional
right.  (Dkt. # 48 at 28.)  To the extent Plaintiffs allege Luevano directed his
subordinates to arrest protestors, Defendants say such allegations are conclusory
and are insufficient to support a § 1983 claim.  (Id.)  The Court disagrees.

"Under section 1983, supervisory officials are not liable for the actions of subordinates on any theory of vicarious liability." Thompkins v. Belt, 828 F.2d 298, 303 (5th Cir. 1987).  However, supervisors may be held liabile under § 1983 where they "(1) [] affirmatively participate[] in the acts that cause the constitutional deprivation, or (2) [] implement[] unconstitutional policies that causally result in the constitutional injury." Peña v. City of Rio Grande City, 879 F.3d 613, 620 (5th Cir. 2018) (quoting Gates v. Tex. Dep't of Prot. & Reg. Servs., 537 F.3d 404, 435 (5th Cir. 2008)).  "In order to establish supervisor liability for constitutional violations committed by subordinate employees, plaintiffs must show that the supervisor act[ed], or fail[ed] to act, with *deliberate indifference* to violations of others' constitutional rights committed by their subordinates." Porter v. Epps, 659 F.3d 440, 446 (5th Cir. 2011) (internal quotation marks and citation omitted, alterations and emphasis in original).

Plaintiffs adequately allege that Defendant Luevano ordered the arrests of protestors at the April 24th protest, supported by Luevano's own incident report stating he "advised [the] UTPD team to begin arrests of the group." (See, e.g., Dkt. # 42 at ¶¶ 73, 216, 221); (Dkt. # 42-2.)  Defendants argue that "a direction from a superior to a subordinate to arrest lawbreakers is not a direction to make unlawful arrests" and call Plaintiffs' allegations against Luevano conclusory, arguing they "[e]xpress[] a factual inference without stating the underlying facts on which the inference is based." (Dkt. # 48 at 28.)

22

However, Plaintiffs do allege underlying facts to support the inference that Luevano gave an order to make unlawful arrests. In detailing their arrests, Plaintiffs allege that Plaintiff Heilrayne "overheard officers mention a quota of 50 student arrests," (Dkt. # 42 at ¶ 93), Plaintiff Soto-Ferate "overheard an officer in the front say they needed to arrest eight more people to meet their quota of ten," (Id. at ¶ 97), and Plaintiff Cisco "overheard officers discussing the need to meet a numerical quota of arrests." (Id. at ¶ 114.) These allegations lay the factual foundation necessary to make Plaintiffs' later allegations that Defendant Luevano "directed [UTPD Officers] to arrest a minimum number of pro-Palestine protestors . . . to satisfy a numerical quota" rise above a "mere conclusory allegation." (See, e.g., Dkt. # 42 at ¶ 216); see Tuchman, 14 F.3d at 1067.

Accordingly, the Court finds Plaintiffs adequately alleged the personal involvement of Defendant Luevano in a manner sufficient to survive a motion to dismiss and declines to dismiss Defendant Luevano on such a basis.

### 4. Defendants Eltife and Hartzell

Plaintiffs also bring individual capacity claims against Kevin Eltife, Chairman of the UT System Board of Regents, and Jay Hartzell, former President of UT Austin at the time of the April 24, 2024 protest. (Dkt. # 42 at ¶¶ 17–18.) Defendants argue that Plaintiffs "offer no facts to support the finding that Eltife or Hartzell were personally involved in the decision to cancel

PSC's protest, or in causing Plaintiffs' arrests merely by requesting mutual aid from DPS." (Dkt. # 48 at 29.)

However, Plaintiffs do allege that Eltife released a statement on the relevant protests, seeming to claim responsibility for at least some of the decision-making around PSC's protest: "At UT Austin, I have been working closely with President Hartzell on decisions to protect its entire campus community[.]" (Dkt. # 42 at ¶ 172.) Plaintiffs further allege that Hartzell and Eltife "directed law enforcement to shut down the protest and conduct the mass arrest of protestors before it had even begun," referencing emails released through public records between UT Administration and UTPD. (Id. at ¶ 177.) They additionally allege that Hartzell was involved in the cancellation of the protest. (Dkt. # 42 at ¶ 176.) The Court finds these allegations sufficient to allege Hartzell and Eltife's personal involvement with the contested actions.

### 5. Defendant Abbott

For similar reasons, Plaintiffs also sufficiently allege Governor Abbott's involvement in the decision to cancel the protest and in directing arrests. Plaintiffs' Amended Complaint alleges that Governor Abbott "directed [DPS's] presence at the protest," supporting their allegation with DPS's own statement, which said they acted "at the direction of Texas Governor Greg Abbott." (Id. at ¶ 184.) Plaintiffs further allege that Defendant Abbott's directive to arrest protectives was based on the protestor's viewpoint; they point to tweets published during the protests calling for protestors' arrests on the basis

24

that the protests were "hate-filled" and "antisemitic." (Id. at ¶¶ 186–189.) The Court finds these allegations sufficient to allege Governor Abbott's personal involvement with the contested actions at this stage.

### 6. Official-Capacity Defendants: Jim Davis & Board of Regents Members

Defendant Jim Davis is sued in his official capacity as the current President of UT. (Id. at ¶¶ 186–89.) Davis is substituted for Defendant Jay Hartzell, the former President of UT, under Federal Rule of Civil Procedure 25(d). Fed. R. Civ. P. 25(d) (requiring that when a public officer who is a party in an official capacity resigns or ceases to hold office, "[t]he officer's successor is automatically substituted as a party.") Accordingly, the Court construes Plaintiffs' allegations made against Jay Hartzell in his official capacity as President of UT as allegations against Jim Davis in his official capacity as the current President of UT. Since the Court has already found sufficient allegations to support the personal involvement of Defendant Hartzell above, and because Hartzell was acting as the President of UT at the time of the referenced allegations, the Court finds these allegations sufficient to maintain Defendant Jim Davis's personal involvement as an official-capacity defendant.

Additionally, the same is true for Defendant Eltife, who is sued both in his individual and official capacities. Having found above that Plaintiffs alleged sufficient facts to find Defendant Eltife had personal involvement in the

at-issue actions, the Court finds that claims against him in his official capacity may proceed for the same reasons.

However, the same cannot be said for the remaining official-capacity Defendants.  Although Plaintiffs' allegations are enough to allege a "mere scintilla of enforcement" for purposes of sovereign immunity, there are not allegations to support the inference that the remaining Board members were personally involved.  See supra Section II.A.2.  Unlike for Defendant Eltife, who is alleged to have collaborated with Defendant Hartzell on the contested decisions, Plaintiffs provide no further allegations suggesting that the remaining Board Members were involved either in the cancellation of the protest or the subsequent discipline of the students involved.   Plaintiffs only allege that the official-capacity defendants have the authority to expunge their disciplinary records.  (Dkt. # 42 at ¶ 247.)  While the Court draws reasonable inferences in Plaintiffs' favor, "[w]e will not 'strain to find inferences favorable to the plaintiffs.'"  Southland Sec. Corp. v. INSpire Ins. Sols, Inc., 365 F.3d 353, 361 (5th Cir. 2004) (citations and internal marks omitted).

Thus, Plaintiffs have not alleged enough facts on personal involvement to state a claim against the remaining Board Members in their official capacities, with the exception of Defendant Eltife.  The remaining Board Members are, therefore, **DISMISSED**.

B. <u>Fourth Amendment Unlawful Seizure/False Arrest</u>

Count III of Plaintiff's complaint alleges that Plaintiffs' Fourth Amendment rights were violated because they were arrested without probable cause. (Dkt. # 42 at ¶¶ 283–315.)

The Fourth Amendment provides: "The right of the people to be secure in their persons, . . . against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the . . . persons or things to be seized." U.S. Const. Amend. IV. "The right to be free from arrest without probable cause is a clearly established constitutional right." <u>Mangieri v. Clifton</u>, 29 F.3d 1012, 1016 (5th Cir. 1994). To bring a false-arrest claim, Plaintiffs must allege, as they do here, that they were arrested without probable cause. <u>See</u> <u>Brown v. Lyford</u>, 243 F.3d 185, 189 (5th Cir. 2001). "Probable cause exists 'when the totality of the facts and circumstances within a police officer's knowledge at the moment of arrest are sufficient for a reasonable person to conclude that the suspect had committed or was committing an offense.'" <u>Westfall v. Luna</u>, 903 F.3d 534, 542–43 (5th Cir. 2018) (quoting <u>Glenn v. City of Tyler</u>, 242 F.3d 307, 313 (5th Cir. 2001)).

Each Plaintiff was arrested for violation of Tex. Pen. Code § 30.05, Criminal Trespass. (Dkt. # 42 at ¶ 285.) Tex. Pen. Code § 30.05(a)(2) states: A person commits an offense if the person enters or remains on or in property of another . . . without effective consent and the person . . . received notice to

27

depart but failed to do so." Id.  Plaintiffs allege that the officer Defendants

lacked probable cause for their individual arrests because (a) Plaintiff Heilrayne

was attempting to comply with dispersal orders when she was arrested, or, in the

alternative, her compliance was not possible within the amount of time given

for dispersal, (Dkt. # 42 at ¶¶ 289–91); (b) Plaintiff Soto-Ferate was unaware of

any dispersal orders and was arrested in an area not subject to the only dispersal

orders alleged to have been given, (id. at ¶ 298); (c) Plaintiffs Medrano and

Cisco were arrested on the South Mall before any dispersal orders were given

for that area, (id. at ¶¶ 306, 313); and (d) all Plaintiffs were arrested to satisfy a

numerical quota of pro-Palestine protestor arrests rather than because of their

individual behavior.  (Id. at ¶¶ 294, 302, 309, 314.)

Defendants urge that it is no defense that Plaintiffs thought they

were entitled to remain in the area because there is no culpable mental state

required for conviction under section 30.05.  (Dkt. # 48 at 35.)  However,

Plaintiffs do more than allege they thought they could remain in an area; they

allege that Plaintiffs Soto-Ferate, Medrano, and Cisco never "received notice to

depart" as required under 30.05(a)(2).  (See Dkt. # 42 at ¶ 298 (alleging Plaintiff

Soto-Ferate was not at the protest at the time dispersal orders were given); id. at

¶¶ 306, 313 (alleging Plaintiffs Medrano and Cisco were arrested at the South

Mall before a dispersal order was given).)  Further, Plaintiff Heilrayne alleges

she complied with the only dispersal order she received by leaving the Brazos

area, and was arrested on Speedway, on which she had received no notice to disperse.  (Id. at ¶¶ 290–91.)

Although these facts appear to adequately allege that the officers lacked probable cause for each Plaintiff's arrest, the officers are entitled to qualified immunity "unless there was no actual probable cause for the arrest *and* the officers were objectively unreasonable in believing there was probable cause for the arrest."  Davidson v. City of Stafford, Texas, 848 F.3d 384, 391 (5th Cir. 2017) (citing Crostley v. Lamar Cty., 717 F.3d 410, 422–23 (5th Cir. 2013)) (emphasis added).  "[E]ven law enforcement officials who reasonably but mistakenly conclude that probable cause is present are entitled to immunity." Club Retro, LLC v. Hilton, 568 F.3d 181, 206 (5th Cir. 2009).

As to Plaintiff Heilrayne's arrest, the only dispersal order she alleges she received was the 12:30 PM dispersal order under Tex. Pen. Code § 42.03 for obstructing a highway in the Brazos area.  (Dkt. # 42 at ¶¶ 290–91.) However, elsewhere in the Complaint, Plaintiffs also appear to acknowledge there was a police order to clear the middle of Speedway.  (See id. at ¶¶ 87, 94.) This is further supported by the Case Supplement Report, which notes that a dispersal order was given via the P.A. system at 1:10 p.m.  (Dkt. # 42-1 at 12.) Thus, in light of the 1:10 p.m. dispersal order, even if officers lacked probable cause for their arrests, the officers were not unreasonable in their belief that they had probable cause to arrest Plaintiffs Heilrayne and Soto-Ferate, who was also arrested on Speedway.  See Davidson, 848 F.3d at 391.  Even taking Plaintiffs'

allegations as true, an officer present at the time of the dispersal order was not unreasonable in his belief that he had probable cause to arrest individuals who remained present on the property following the order.  See Skinner v. Gragg, 650 Fed. App'x 214, 217 (5th Cir. 2011) (citing Brown v. Lyford, 243 F.3d 185, 190 (5th Cir. 2001)).  The same logic applies for Plaintiff Soto-Ferate who, like Heilrayne, was arrested in the Speedway area.  (Dkt. # 42 at ¶ 298.)

Plaintiffs Medrano and Cisco's Fourth Amendment claims do not survive despite the fact they were arrested in a different location that was less clearly covered by a dispersal order.  Indeed, the Incident Report states there were multiple dispersal orders and suggests that South Mall was covered under those orders.  (See Dkt. # 42-3 at 6; 42-4 at 6.)  Although it is a close question whether the officers were thus unreasonable in their belief that they had probable cause to arrest Plaintiffs Medrano and Cisco in the South Mall area, qualified immunity presents a high bar.  See Messerschmidt v. Millender, 565 U.S. 535, 546 (2012) ("Qualified immunity 'gives government officials breathing room to make reasonable but mistaken judgments,' and 'protects all but the plainly incompetent or those who knowingly violate the law.'") (quoting Ashcroft v. al-Kidd, 563 U.S. 731, 735 (2011)).  Given prior dispersal orders in the surrounding area, an officer could have reasonably believed the South Mall was the subject of a prior dispersal order, and that they had probable cause to arrest individuals present in that area.  See Skinner, 650 Fed. App'x at 217.

Thus, the Court finds Plaintiffs' Fourth Amendment claims against Defendant Officers are barred by qualified immunity and should be **DISMISSED**.

C. <u>First Amendment Rights of Free Speech & Association</u>

  Plaintiff's initial First Amendment cause of action alleges that the cancellation of the April 24th protest was an impermissible content-based prior restraint on Plaintiff's protected, expressive activity. (Dkt. # 42 at ¶ 195.) They assert such an action constitutes viewpoint discrimination in violation of the First Amendment. (Id. at ¶ 194.)

  "When public officials are given the power to deny use of a forum in advance of actual expression or association, the danger of [constitutionally impermissible] prior restraints exists." Collins v. Ainsworth, 382 F.3d 529, 539 (citing Se. Promotions, Ltd. v. Conrad, 420 U.S. 546, 553 (1975)). "The term prior restraint is used to describe administrative and judicial orders forbidding certain communications when issued in advance of the time that such communications are to occur." Alexander v. United States, 509 U.S. 544, 550 (1993) (citation, emphasis, and internal quotation marks omitted).

  The Court finds that Plaintiffs plead facts that, when viewed in the light most favorable to the Plaintiffs, allege that the April 24, 2024 protest was cancelled because of the group's viewpoint and perceived association with the pro-Palestine protest movement. (See Dkt. # 42 at 8, 180, 195.) This is further supported by Plaintiffs' allegations that the University has treated other student

organizations with a reputation for "provocative demonstrations" differently, including not cancelling a Young Conservatives of Texas ("YCT") demonstration that was anticipated to attract counter-protestors and controversy on campus.  (Id. at ¶¶ 160–162, 181.)  Thus, Plaintiffs' allegations are sufficient to survive a motion to dismiss on their First Amendment viewpoint discrimination claims related to UT's cancellation of the protest.

D. First Amendment Retaliation

Plaintiffs also bring a First Amendment retaliation claim, claiming their arrests and the later disciplinary actions brought against them were merely retaliation for their "constitutionally protected acts of peaceful assembly and political speech by participating in the April 24th protest."  (Id. at ¶ 237.)  To establish such a claim, Plaintiffs must adequately allege that (1) they "engaged in constitutionally protected activity"; (2) Defendants' actions caused Plaintiffs "to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity"; and (3) Defendants' "adverse actions were substantially motivated against" Plaintiffs' exercise of constitutionally protected speech."  Brooks v. City of West Point, Miss., 639 Fed. Appx. 986, 989 (5th Cir. 2016) (quoting Keenan v. Tedeja, 290 F.3d 252, 258 (5th Cir. 2002)).

All Plaintiffs allege they were involved in a constitutionally protected activity by attending a "peaceful assembly" and engaging in "political speech.  (Dkt. # 42 at ¶ 237.)  Indeed, it is well-established that peaceful

protests are protected by the First Amendment.  See, e.g., Thornhill v. State of Alabama, 310 U.S. 88 (1940); Edwards v. South Carolina, 372 U.S. 229 (1963). Additionally, Supreme Court precedent recognizes the importance of protecting political speech.  See, e.g., Citizens United v. FEC, 558 U.S. 310 (2010).  Thus, Plaintiffs successfully allege this first element.

Second, Plaintiffs alleged injuries were from retaliatory arrests themselves and UT's subsequent disciplinary actions against them.  (Dkt. # 42 at ¶ 240–41.)  Arrest is an action which would chill a person of ordinary firmness from engaging in protected activity.  Brooks, 639 Fed. Appx. at 989. Similarly, adverse disciplinary actions on student records, including the deferred suspension and academic probation consequences Plaintiffs faced, would also chill students from engaging in protected activities.  (See Dkt. # 42 at ¶ 243.)

Third, the Court finds that Plaintiffs have alleged sufficient facts that, viewed in the light most favorable to Plaintiffs, draw a reasonable inference that these adverse actions were motivated against their exercise of protected speech.  Plaintiffs have alleged that only pro-Palestine protestors were subject to arrests and discipline, while counter-protestors at the scene of the protest were not.  (Id. at ¶¶ 58, 61, 124, 204, 205, 208, 286.)  Plaintiffs also allege facts suggesting certain Officer Defendants were given a quota of pro-Palestinian protestors to arrest.  (Id. at 93, 97, 114, 216.)  Additionally, Plaintiffs allege similar protests on UT's campus on different topics have not resulted in arrests or prior cancellation.  (Id. at ¶¶ 159–166.)

To the extent Defendants argue that Plaintiffs cannot assert retaliatory arrest claims under Nieves v. Barlett, the Court finds these arguments unpersuasive.  Defendants cite Nieves for the proposition that a plaintiff must "plead and prove the absence of probable cause for the arrest" to assert a viable First Amendment retaliatory arrest claim.  (Dkt. # 48 at 43.)  They suggest that should the Court find the arresting officers had probable cause to arrest Plaintiffs, that finding is fatal to any accompanying First Amendment retaliation claims.  (Id.)

However, in Gonzalez v. Trevino, the Supreme Court clarified the standard in Nieves and recognized a narrow exception where a plaintiff produces "objective evidence that he was arrested when otherwise similarly situated individuals not engaged in the same sort of protected speech had not been."  602 U.S. 653, 655 (2024) (per curiam).  The Court finds that even if Plaintiffs did not adequately plead the absence of probable cause, they have alleged sufficient facts at this stage to permit their case to fall within the "narrow exception" identified in Nieves and Gonzalez.  As previously discussed, Plaintiffs have alleged that similarly situated counter-protestors were not subject to arrest or student discipline, and that past protests by similarly situated student organizations were not treated in the same manner.  (See, e.g., id. at ¶¶ 58, 61, 159–166.)  The Court finds these allegations sufficient at this stage to circumvent any bar to Plaintiffs' claims articulated in Nieves.

Thus, the Court finds Plaintiffs have adequately alleged their First Amendment retaliation claim with sufficient allegations to survive a motion to dismiss.

### E. Qualified Immunity

When evaluating a defendant's qualified immunity defense within the context of a Rule 12(b)(6) motion, a district court must first find "that the plaintiff's pleadings assert facts which, if true, would overcome the defense of qualified immunity." Backe v. LeBlanc, 691 F.3d 645, 648 (5th Cir. 2012) (internal citation omitted); Est. of Bonilla v. Orange Cnty., 982 F.3d 298, 306 (5th Cir. 2020) (quoting Hyatt v. Thomas, 843 F.3d 172, 177 (5th Cir. 2016)) ("Once a defendant asserts the qualified immunity defense, '[t]he plaintiff bears the burden of negating qualified immunity.' ").  "The doctrine of qualified immunity shields officials from civil liability so long as their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Mullenix v. Luna, 577 U.S. 7, 11 (2015) (quoting Pearson v. Callahan, 555 U.S. 223, 231 (2009)). Public officials are protected from suit by qualified immunity so long as their conduct does not violate a clearly established constitutional right.  Carnaby v. City of Houston, 636 F.3d 183, 187 (5th Cir. 2011).

"To determine whether a public official is entitled to qualified immunity, [the court must] decide (1) whether the facts that the plaintiff has

alleged make out a violation of a constitutional right; and (2) whether the right at issue was clearly established at the time of the defendant's alleged misconduct."  Ramirez v. Martinez, 716 F.3d 369, 375 (5th Cir. 2013) (internal quotations omitted).  "A right is clearly established when 'it would be clear to a reasonable [official] that his conduct was unlawful in the situation he confronted.'"  Id. (quoting Jones v. Lowndes Cnty., 678 F.3d 344, 351 (5th Cir. 2012)).

        As to the first prong, the Court has already established that all Plaintiffs sufficiently allege facts that make out the violation of their First Amendment rights, and that Plaintiffs Medrano and Cisco make out violations of their Fourth Amendment rights.  See supra Section III.B.  Thus, the first prong is satisfied by the Court's previous analyses.

        This leaves the second inquiry: whether the at-issue right was "clearly established."  "To be clearly established, a right must be sufficiently clear that every reasonable official would have understood that what he is doing violates that right." Taylor v. Barkes, 575 U.S. 822, 825 (2015) (quoting Reichle v. Howards, 566 U.S. 658, 664 (2012)). "When properly applied, [qualified immunity] protects all but the plainly incompetent or those who knowingly violate the law." Id. (quoting Ashcroft v. al–Kidd, 563 U.S. 731, 743 (2011)). While there is no requirement that caselaw directly on point exist, "existing precedent must have placed the statutory or constitutional question beyond debate." Id.

On Plaintiffs' First Amendment violations, it appears unsettled whether the rights Plaintiff claims are violated are "clearly established."  The Supreme Court recognized in <u>Tinker v. Des Moines Indep. Cmty. Sch. Dist.</u> that students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate," extending First Amendment protections to students in public schools.  393 U.S. 503, 506 (1969).  In that seminal case on First Amendment jurisprudence, the Court found there were no facts in the record "which might reasonably have led school authorities to forecast substantial disruption of or material interference with school activities."  <u>Id.</u> at 514.  In doing so, the Court also acknowledged a school's ability to constrain speech in limited circumstances where there is evidence that an otherwise protected activity will result in such a substantial disruption.  <u>See id.</u>  Under those circumstances, "undifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression."  <u>Id.</u> at 508.

However, <u>Tinker</u> was also a case about students in a K-12 public school, not a public university like UT.  Plaintiffs urge the Court that applying <u>Tinker</u> on a campus full of adults would "eviscerate First Amendment protections at colleges and universities" and that the age of the <u>Tinker</u> plaintiffs is of "paramount importance."  (Dkt. # 53 at 32.)  However, the Court here is not tasked with determining whether <u>Tinker</u> applies on college campuses; instead, the Court's role here is to determine whether the principle that <u>Tinker</u> is *inapplicable* to college campuses was "clearly established" such that a

reasonable official could not have relied on that case in cancelling the April 24th protest and arresting and disciplining students involved.  See Taylor, 575 U.S. at 825.

Under such an inquiry, the Court agrees with the district court's analysis in Students for Just. in Palestine, at Univ. of Houston v. Abbott that neither the Fifth Circuit nor the Supreme Court has definitively answered whether Tinker applies in higher education settings.  756 F. Supp. 3d 410, 425 (W.D. Tex. Oct. 28, 2024).  In that case, the court analyzed Fifth Circuit precedent and found, at minimum, uncertainty on this issue.  Id.  Such uncertainty prevents this Court from finding that Fifth Circuit precedent has "placed the statutory or constitutional question *beyond debate*."  Taylor, 575 U.S. at 825 (emphasis added).

Thus, Defendants could have reasonably forecasted that the April 24th protest would become a substantial disruption to school activities, given the national context of similar protests also titled "The Popular University for Gaza."  (See Dkt. # 48 at 5.)  Subsequent discipline also could have reasonably been viewed as justified in light of the University's cancellation of the protest.  Regardless of whether these decisions were correct, or whether such a reliance on Tinker was misplaced, the facts do not demonstrate the kind of "plainly incompetent" decisions that would survive qualified immunity and sustain an individual-capacity action against these officials.  See Taylor, 575 U.S. at 825.

Accordingly, Plaintiffs' individual-capacity claims against Defendants as to their First Amendment causes of action are barred by qualified immunity and are thus **DISMISSED**.

<u>CONCLUSION</u>

For the reasons above, Defendant Wray's Motion to Dismiss is **GRANTED** (Dkt. # 43.)  The remaining Defendants' Motion to Dismiss is **GRANTED IN PART AND DENIED IN PART**.  (Dkt. # 48.)  Defendants' Motion is **DENIED** with respect to Plaintiffs' First Amendment retaliation claims against Defendants Kevin Eltife and Jim Davis in their official capacities.  Defendants' Motion is **GRANTED** as to all other claims.

Accordingly, Defendants the University of Texas at Austin; the University of Texas System Board of Regents; Janiece Longoria; James Weaver; Christina Melton Crain; Jodie Lee Jiles; Kelcy Warren; Nolan Perez; Stuart Stedman; Robert Gauntt; Jay Hartzell; Greg Abbott; Hector Luevano; Roberto Rodriguez; L. Henry; Reynaldo Adame; John Doe UTPD Officers A-I; Christopher Wray; and John Doe DPS Officers A-E are **DISMISSED** as parties in this case.

**IT IS SO ORDERED.**
**SIGNED**: Austin, Texas, January 27, 2026

_____
DAVID A. EZRA
SENIOR UNITED STATES DISTRICT JUDGE

39